Case No. 23-1392

# United States Court of Appeals
# For the Federal Circuit

**INTEGRATED ADVERTISING LABS, LLC,**

*Appellant,*

v.

**REVCONTENT, LLC.**

*Appellee.*

Appeal from the United States District Court for the Middle District of Florida, Case No. 8:22-cv-00487-KKM

## OPENING BRIEF OF APPELLANT INTEGRATED ADVERTISING LABS, LLC

March 14, 2023

Edward R. Nelson III
NELSON BUMGARDNER CONROY PC
3131 West 7th Street, Suite 300
Fort Worth, TX  76107
Tel:  (817) 377-9111

Justin B. Kimble
NELSON BUMGARDNER CONROY PC
2727 N. Harwood Street, Suite 250
Dallas, TX 75201
Tel: (214) 446-4953

*Counsel for Appellant*
*Integrated Advertising Labs, LLC*

## CLAIMS 13 AND 22 OF U.S. PATENT NO. 9,286,622

13. A method of electronically delivering advertisements as sponsored news content to a plurality of web sites that each includes non-sponsored content, the method comprising:

electronically receiving the sponsored news content by a server computer from one or more advertisers over a communications network;

electronically distributing the sponsored news content by the server computer to a related one or more of the web sites over the communications network;

electronically receiving the sponsored news content by the one or more web sites from the server computer over the communications network;

electronically posting the sponsored news content among the non-sponsored content at each of the related one or more of the web sites;

electronically tracking one or more of impressions, clicks, click-through rate, or user actions with respect to the sponsored news content at the related one or more of the web sites;

electronically monitoring user data or user activity at the related one or more of the web sites; and

delivering a specific sponsored news content to a particular user utilizing a particular one of the monitored user data or user activity, wherein revenue generated from the delivery of the specific sponsored news content is shared with the related one or more of the web sites,

wherein the sponsored news content is not a banner advertisement,

wherein when the sponsored news content is displayed, it is displayed separately from any banner advertisement and contiguously together with at least some of the non-sponsored content appearing on the page to scroll together with the at least some of the non-sponsored content such that the sponsored news content is in a fixed, position relative to at least some of the contiguously displayed non-sponsored content,

wherein a time period during which the sponsored news content is posted at the related one or more of the web sites is limited,

wherein a frequency at which the sponsored news content is displayed for each user is limited, and

wherein a plurality of features of the sponsored news content are substantially the same as a corresponding plurality of features of the contiguous non-sponsored news content, and at least one feature of the sponsored news content differs from or is in addition to the corresponding feature of the non-sponsored news content in order to distinguish the sponsored news content from the non-sponsored news content.

22. The method of claim 13, further comprising electronically posting the sponsored news content among the non-sponsored content at each of multiple related web sites, and electronically monitoring user data or user activity at each of the multiple web sites.

## CLAIM 8 OF U.S. PATENT NO. 9,652,781

8. A method of electronically delivering advertisements as sponsored news content to a plurality of web sites that each includes non-sponsored content, the method comprising:

electronically monitoring user data or activity on one or more web sites;

electronically requesting sponsored news content by a server computer based on the monitored user data or activity;

electronically distributing the sponsored news content by the server computer to a related one or more of the web sites over the communications networks based on the monitored user data or activity;

electronically embedding the sponsored news content among the non-sponsored content at the related one or more of the web sites;

electronically tracking one or more of impressions, clicks, click-through rate, or user actions with respect to the sponsored news content at the related one or more of the web sites; and

electronically delivering a specific sponsored news content to a user based on the monitored user data or user activity,

displaying specific sponsored content among non-sponsored content on a plurality of related web sites;

wherein the sponsored news content is not a banner advertisement or a static header,

wherein when the sponsored news content is displayed, it is displayed separately from any banner advertisement and contiguously together with at least some of the non-sponsored content appearing on the page to scroll together with the at least some of the non-sponsored content such that the sponsored news content is in a fixed position relative to at least some of the contiguously displayed non-sponsored content,

wherein a time period during which the sponsored news content is posted at the related one or more of the web sites is limited,

wherein a frequency at which the sponsored news content is displayed for the user is limited, and

wherein a plurality of features of the sponsored news content are the same as a corresponding plurality of features of the contiguous non-sponsored news content, and at least one feature of the sponsored news content differs from or is in addition to the corresponding feature of the non-sponsored news content in order to distinguish the sponsored news content from the non-sponsored news content.

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

|  |  |
|---|---|
| **Case Number** | 2023-01392 |
| **Short Case Caption** | Integrated Advertising Labs, LLC v. Revcontent, LLC |
| **Filing Party/Entity** | Integrated Advertising Labs, LLC |

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes.  Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 03/03/2023

Signature:   */s/ Justin B. Kimble*

Name:   Justin B. Kimble

i

FORM 9. Certificate of Interest

Form 9 (p. 2)
March 2023

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☒ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☐ None/Not Applicable |
| Integrated Advertising Labs, LLC | | Nativo, Inc. |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐     Additional pages attached

**4. Legal Representatives.**  List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities.  Do not include those who have already entered an appearance in this court.  Fed. Cir. R. 47.4(a)(4).

☐     None/Not Applicable          ☐     Additional pages attached

| **Nelson Bumgardner Conroy PC:**<br>T. William Kennedy<br>Nathan L. Levenson<br><br>**The Law Office of Paul M. Sisco.**<br>Paul M. Sisco | **Gunster Yoakley & Stewart P.A.:**<br>John A. Schifino<br><br>**Winston & Strawn LLP:**<br>Christopher T. Gresalfi | |

**5. Related Cases.**  Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☑  Yes (file separate notice; see below)     ☐  No     ☐  N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b).  **Please do not duplicate information.**  This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal.  Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**.  Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees).  Fed. Cir. R. 47.4(a)(6).

☑     None/Not Applicable          ☐     Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST ................................................................i

TABLE OF CONTENTS ......................................................................iv

TABLE OF AUTHORITIES....................................................................vi

STATEMENT OF RELATED CASES ....................................................1

JURISDICTIONAL STATEMENT .........................................................1

STATEMENT OF THE ISSUES..............................................................2

STATEMENT OF THE CASE ................................................................2

SUMMARY OF THE ARGUMENT .....................................................13

ARGUMENT ..........................................................................................16

I.      Standard of review ...................................................................16

II.     The district court erred in finding that the claims are
        directed to the abstract idea of targeted advertising ..................17

    A.   Assessed as a whole, the claims are not directed to generic
         targeted advertising .....................................................................18

        1.   Claims 13 and 22 of the '622 patent are not representative ....19

        2.   The district court improperly analyzed claims 13 and 22........21

    B.   The claims disclose new methods of advertising on the
         Internet.........................................................................................23

        1.   Distributing advertisements across multiple websites ............23

    2.    Displaying advertisements natively ........................................ 25

III.    The district court erred in not recognizing that the
        claims teach an inventive concept ................................................ 31

  A.    IAL's pleadings preclude judgment under 12(c) .......................... 32

  B.    Disputed claim constructions preclude judgment on the
        pleadings ................................................................................. 36

CONCLUSION ................................................................................. 40

ADDENDUM ................................................................................. 42

CERTIFICATE OF COMPLIANCE ...................................................... 1-1

# TABLE OF AUTHORITIES

## Cases

*Aatrix Software, Inc. v. Green Shades Software, Inc.*,
  882 F.3d 1121 (Fed. Cir. 2018)..................................................35, 39

*Alice Corp. Pty. Ltd.v. CLS Bank*,
  573 U.S. 208 (2014) ..................................................................17, 31

*Automated Tracking Sols., LLC v. Coca-Cola Co.*,
  723 Fed. Appx. 989 (Fed. Cir. 2018).........................................16, 17

*Bancorp Servs., L.L.C. v. Sun Life Assur. Co. of Canada*,
  687 F.3d 1266 (Fed. Cir. 2012)........................................................37

*Bascom Global Internet Servs. v. AT&T Mobility LLC*,
  827 F.3d 1341 (Fed. Cir. 2016).......................................................35

*Berkheimer v. HP Inc.*,
  881 F.3d 1360 (Fed. Cir. 2018)...........................................16, 20, 35

*Cannon v. City of W. Palm Beach*,
  250 F.3d 1299 (11th Cir. 2001).......................................................16

*Cardionet, LLC v. Infobionic, Inc.*,
  816 Fed. Appx. 471 (Fed. Cir. 2020)...............................................30

*Content Extraction & Transmission LLC v. Wells Fargo Bank, N.A.*,
  776 F.3d 1343 (Fed. Cir. 2014).......................................................40

*Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat'l
  Ass'n*, 776 F.3d 1343 (Fed. Cir. 2014) ...........................................32

*Coop. Entm't, Inc. v. Kollective Tech., Inc.*,
  50 F.4th 127 (Fed. Cir. 2022) .....................................32, 33, 34, 36

*Core Wireless Licensing v. LG Electronics*,
  880 F.3d 1356 (Fed. Cir. 2018) ......................................... 17

*Cosmokey Sols. GMBH & Co. KG v. Duo Sec. LLC*,
  15 F.4th 1091 (Fed. Cir. 2021) .......................................... 35

*Customedia Techs., LLC v. Dish Network Corp.*,
  951 F.3d 1359 (Fed. Cir. 2020) ......................................... 30

*DDR Holdings, LLC v. Hotels.com, L.P.*,
  773 F.3d 1245 (Fed. Cir. 2014) .................................... 24, 36

*Diamond v. Diehr*,
  450 U.S. 175 (1981) ........................................................ 15

*Enfish, LLC v. Microsoft Corp.*,
  822 F.3d 1327 (Fed. Cir. 2016) ............................. 17, 18, 21

*Free Stream Media Corp. v. Alphonso Inc.*,
  996 F.3d 1355 (Fed. Cir. 2021) ......................................... 22

*Intellectual Ventures I LLC v. Symantec Corp.*,
  838 F.3d 1307 (Fed. Cir. 2016) ......................................... 39

*Internet Patents Corp. v. Active Network, Inc.*,
  790 F.3d 1343 (Fed. Cir. 2015) ......................................... 18

*Mayo v. Prometheus Labs.*,
  566 U.S. 66 (2012) .................................................... 17, 32

*MyMail, Ltd. v. ooVoo, LLC*,
  934 F.3d 1373 (Fed. Cir. 2019) ......................................... 39

*Perez v. Wells Fargo N.A.*,
  774 F.3d 1329 (11th Cir. 2014) ......................................... 16

vii

*Pfizer v. Apotex, Inc.*,
    480 F.3d 1348 (Fed. Cir. 2007) ........................................................ 14

*Shelcore, Inc. v. Durham Indus.*,
    745 F.2d 621 (Fed. Cir. 1984) ........................................................ 20

*Ultramercial, Inc. v. Hulu, LLC*,
    772 F.3d 709 (Fed. Cir. 2014) ........................................................ 30

*Weisner v. Google LLC*,
    51 4th 1073 (Fed.  Cir. 2022) ........................................................ 36

## Statutes

28 U.S.C. § 1338(a) ........................................................................ 1

28 U.S.C. § 1295 ............................................................................ 1

28 U.S.C. §§ 1331 .......................................................................... 1

35 U.S.C. §§ 101 ................................................................... passim

## Other Authorities

Fed. Cir. R. 47.5 ............................................................................ 1

Fed. R. Civ. P. 12(c) ............................................................ 2, 12, 15, 39

## STATEMENT OF RELATED CASES

Pursuant to Federal Circuit Rule 47.5, counsel for Appellant Integrated Advertising Labs, LLC ("IAL") states that no other appeal from the proceeding that is the subject of the present appeal was previously before this Court or any other appellate court. To the best of counsel's knowledge, the only cases that may directly affect or be directly affected by these appeals are: *Integrated Advertising Labs, LLC v. Revcontent, LLC*, Case No. 8:22-cv-00487-KKM-CPT (M.D. Florida) and *Revcontent, LLC v. Integrated Advertising Labs, LLC*, Case No. IPR2022-01511 (PTAB).

## JURISDICTIONAL STATEMENT

This action arose under the patent laws of the United States, 35 U.S.C. §§ 101 *et seq.* Thus, the District Court had subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1338(a). The Court of Appeals has jurisdiction under 28 U.S.C. § 1295. IAL seeks review of the District Court's December 8, 2022, final order granting Revcontent, LLC's ("Revcontent") motion for judgment on the pleadings under Rule 12(c), and entering final judgment.

1

## STATEMENT OF THE ISSUES

1.    Whether the district court legally erred in granting judgment on the pleadings that all 57 claims of U.S. Patent No. 9,286,622 (the '622 patent), U.S. Patent No. 9,652,781 (the '781 patent), U.S. Patent No. 10,147,121 (the '121 patent) (collectively, "the asserted patents" or "IAL's patents") are directed generically to the abstract idea of targeted advertising under step one of *Alice*.

2.    Whether the district court legally erred in granting judgment on the pleadings that all claims of the asserted patents lacked inventive concept under step two, even though IAL specifically pleaded that numerous claim elements were directed to disclosed problems in the art.

3.    Whether the allegations of IAL's Complaint raise factual disputes that precludes entry of judgment for IAL at the pleadings stage under Federal Rule of Civil Procedure 12(c).

## STATEMENT OF THE CASE

In 2006, inventor Justin Choi conceived of solutions to problems he faced in attempting to advertise effectively using the Internet. In particular, he discovered that it was impossible to assimilate existing advertisements to the look and feel of a website's formatted content in an

automated fashion, and manual attempts were not scalable across numerous websitest. Appx003-004, ¶9. Internet advertising that assimilated to a website's formatted content became known as native advertising. Furthermore, it was impossible to readily make such native advertisements appear across multiple websites simultaneously. *Id.* Through his company, Nativo, Inc., which assigned the asserted patents to IAL, Choi developed technology that embodied the claimed inventions at issue on this appeal. Appx003, ¶8.

An example of the claimed inventions embodied in Nativo's technology is shown in the annotated graphic below, taken from Fodor's website.



Appx518. The sponsored content, or advertisement, appears seamlessly, or natively, amongst other website content within the user interface in a browser. Claim 1 of the '121 patent, is reproduced and annotated below to demonstrate the multiple limitations that are drawn to native advertising.

   1. A method of **displaying sponsored posts among a plurality of non-sponsored posts** on one or more web pages, the method comprising:

      electronically receiving one or more sponsored posts over a communications network, wherein the sponsored post is directed to a particular user or user type;

electronically **displaying the sponsored post among the non-sponsored posts on the web page**;

electronically tracking user data or activity with respect to the sponsored post, the data or activity comprising one or more of impressions, clicks, click-through rate, or user actions;

wherein **the sponsored post is not a banner advertisement or a static header**,

wherein **when the sponsored post is displayed, it is displayed separately from any banner advertisement and contiguously together with at least some of the non-sponsored posts** **appearing on the web page to scroll together with the at least some of the non-sponsored post such that the sponsored post is in a fixed position relative to at least some of the contiguously displayed non-sponsored posts**,

wherein **the sponsored post includes at least one of video or image content**;

wherein a time period during which the sponsored post is posted is limited,

wherein a frequency at which the sponsored post is displayed for the user or user type is limited, and

wherein **a plurality of features of the sponsored post are the same as a corresponding plurality of features of the contiguous non-sponsored posts**, **and at least one feature of the sponsored post differs from or is in addition to the corresponding feature of the non-sponsored posts in order to distinguish the sponsored posts from the non-sponsored posts**.

Appx339-340, 14:54-15:22 (emphasis added).

5

The seamless presentation of advertisements of IAL's patents contrasts with the early days of intent advertising. For example, the image below from an early CNET website shows an internet advertisement as a white bar containing images of various corporate logos that interrupt the "More Stories" content of the website.



Appx515. This example does not show seamlessness between the advertisement and the regular website content. Instead, it is an example of the type of less effective banner advertisements that the asserted patents teach away from, and contains none of the claim limitations drawn to what would become referred to as native advertising.

IAL's patents are each entitled "Press Release Distribution System," claim priority to June 29, 2006, and comprise 57 claims. Appx004-006, Appx276. The inventions described and claimed in the asserted patents relate to new and novel approaches to placing sponsored content, *e.g.*, advertisements, among non-sponsored content across multiple websites in a manner that improves upon conventional forms of advertising on the Internet. *See*, *e.g.*, Appx322, 15:50-16:32.

The patents identify numerous extant problems with advertising on the Internet in 2006, including the ineffectiveness of single banner image ads, and the difficulties in working with numerous websites across the Internet.  Appx297, 1:19-25, 1:35-37, and 1:46-49. Specifically, because banner ads were ineffective, it was necessary to manually craft separate ads for each desired website, which would then need to be modified if the advertiser's product changed or new content was added to the websites. *Id.*, 2:12-21.

Thus, it was "desirable to provide tools that can be used by the advertisers or manufacturers to monitor dissemination of information regarding their brand names or products over the global computer networks." *Id.*, 2:43-46. The patents describe and claim embodiments in

7

which specific hardware and software modules are used to distribute the
advertisements to multiple websites according to relatedness between
the advertisements and the users of the websites, and to post the
advertisements natively within the content on those websites. Appx293,
Fig. 4, Appx298, 3:3-14, Appx302, 12:48-60; Appx303, 13:55-60. Further,
instead of static banner images, the inventions described in the patents
provided the ability to distribute ads comprising multiple components,
including "text, video, graphics, images, multimedia, programming,
and/or any other suitable information as those skilled in the art would
appreciate." Appx301, 9:59-62. To distribute and display ads comprised
of these varied components, the patents use specific software plug-ins
within the user's browser. *Id.*, 10:53-67.

The patents' improved native advertising is further described and
illustrated through Figure 6:



**FIG. 6**

Appx295. About this embodiment, the patents teach that the website includes one or more banner ads 502 and 506 and one or more posts 510. Appx303, 13:19-23. The website also "displays a press release 508, which is displayed with a background color (e.g., red) different from that of the member posts 510. This way, press releases from the advertisers 403 can be brought to the immediate attention of the forum member. In other embodiments, the press release post (or the alert thereof) may be displayed with other background color, distinguishing font and/or text format (e.g., bold text) as those skilled in the art would appreciate." *Id.*, 13:25-33. Further, as shown in Figure 6, the user can scroll through the

content and the press release 508 will stay in a fixed position contiguously with the member posts 510. Appx295.

These non-abstract improvements to the art are set forth in the claimed systems and methods and were key to the Patent Office's decision to issue the asserted patents. Indeed, the claims of the '622 patent were issued over initial rejections under § 101. The examiner originally contended that the claims "do not amount to significantly more than the abstract idea" of delivering advertisements and "do not amount to an improvement to the functioning of a computer itself." Appx345-346. As the applicant explained, the examiner initially failed to "take into account that [the claims], among other things, improve upon limitations of the internet itself. For example, the claims provide a system and method that places sponsored content among non-sponsored content on a website a manner that improves upon conventional forms of advertisements such as banner advertisements. Such improvements upon the Internet itself are not abstract ideas." Appx356. As one example, the applicant also pointed specifically to the limitation of "display[ing] the sponsored news content separately from any banner advertisement and contiguously together with at least some of the non-sponsored

content appearing on the page to scroll together . . . ." *Id.* The applicant further explained that the claims "include a number of substantial, meaningful and concrete limitations that tie the claims down and remove them from essentially affecting a monopoly on the allegedly abstract idea of merely delivering advertisements." *Id.* Shortly thereafter, the applicant conducted an interview with the examiner, who then agreed that the claims were directed to inventive concepts, including "an improvement to a user interface of a computer system." Appx365.

On March 1, 2022, IAL sued Revcontent for infringement of the claims of the '622 patent, the '781 patent, and the '121 patent. Appx001-020. IAL made specific allegations in its Complaint that the claims of the asserted patents are patent eligible. Appx005-011, ¶¶15-22. IAL also specifically pleaded facts about the inventor, Justin Choi, and Nativo's development of the patented technology. Appx003, ¶8, Appx003-004, ¶9.

IAL also pleaded that the patent examiner allowed and issued the claims of the '622 patent over §101 rejections based upon the applicant's arguments that claims included multiple limitations that "tie the claim down and remove them from essentially effectively a monopoly," including the limitations relating to "plac[ing] sponsored content among

11

non-sponsored content on a website" in a manner that improves upon conventional approaches such as banner advertisements. Appx009-010, ¶20.

IAL also specifically pleaded that "[o]ne such 'problem [in the art] is that one needs to work through many different sites to reach the market.'" Appx006, ¶17 (quoting '622 patent, 1:35-37). And "the existing banner images may not be ideal for all of the sites that the advertisements are to be placed on," and thus separate ads would need to be crafted for each site. Appx006-007, ¶17 (quoting '622 patent, 2:12-16). Thus, the patents include claim limitations solving those problems, such as "wherein when the sponsored news content is displayed, it is displayed separately from any banner advertisement and contiguously together with at least some of the non-sponsored content appearing on the page to scroll together with the at least some of the non-sponsored content such that the sponsored news content is in a fixed position relative to at least some of the contiguously displayed non-sponsored content," and "further comprising electronically posting the sponsored news content among the non-sponsored content at each of multiple

related web sites, and electronically monitoring user data or user activity at each of the multiple web sites." Appx010, ¶21.

On June 3, 2022, Revcontent filed a motion under Rule 12(c) seeking judgment on the pleadings that all claims of all three of IAL's patents are patent-ineligible under § 101. Appx201-230. IAL filed its response in opposition on June 24. Appx260-286. Over the following five months, the parties conducted discovery, disclosed claim construction positions, and filed a joint claim construction statement on November 11. Appx402-404. On a limited record and without oral argument, the district court granted Revcontent's motion and entered judgment on December 8. Appx454-470, Appx471-472. IAL timely appealed. Appx473-474.

## SUMMARY OF THE ARGUMENT

IAL appeals because the district court erred in issuing judgment on the pleadings under Rule 12(c) that IAL's patents do not claim patent eligible subject matter. The district court could only reach that decision by ignoring factual disputes and drawing inferences from the intrinsic and briefing record against IAL, the non-movant. This is reversible error under Eleventh Circuit law.

13

Moreover, throughout its opinion, the district court required IAL to prove that its claims are valid, instead of holding Revcontent to its burden to prove that they are invalid. The district court required IAL to disprove that Revcontent's representative claims were appropriate. And before the parties had fully disclosed their contentions and conducted claim construction, the district court required IAL to prove that claim construction raised factual issues. However, the "burden of proof *never shifts* to the patentee to prove validity." *Pfizer v. Apotex, Inc.*, 480 F.3d 1348, 1359 (Fed. Cir. 2007) (emphasis added).

Under step one of its *Alice* analysis, the district court further erred in concluding that all 57 claims of IAL's 3 asserted patents are directed to the abstract idea of targeted advertising. The district court cursorily dismissed the disclosure in the specifications and numerous related claim limitations on improvements to the functionality of the Internet itself. Specifically, IAL's patents are directed to novel approaches to advertising on the Internet, which would eventually be coined "native advertising." Indeed, the district court dismissed limitations that the Patent Office agreed overcame a rejection under §101, including displaying advertisements among other non-sponsored content on websites,

14

matching numerous features of the advertisements to the non-sponsored content, and displaying those native advertisements contiguously together with the non-sponsored content so that it scrolls together. The district court thus erred because it did not consider the claims as a whole, as it must. *Diamond v. Diehr*, 450 U.S. 175, 188 (1981).

Further, on the record before it, the district court's minimal analysis of step two of *Alice* is erroneous, in that the court resolved inferences against IAL and disregarded factual issues, including whether the combination of elements was well understood, routine, and conventional in 2006. IAL plausibly pleaded that, before its patents, there were numerous challenges in advertising on the Internet, and that existing static banner advertisements were ineffective and inefficient. IAL's patents disclosed numerous specific solutions to those problems that, at minimum, provide an inventive concept. In rendering judgment on the pleadings, on an undeveloped record and without claim construction, the district court erred.

# ARGUMENT

## I.    Standard of review.

This Court reviews a district court's grant of a motion for judgment on the pleadings under Rule 12(c) under regional circuit law, here the Eleventh Circuit. *Automated Tracking Sols., LLC v. Coca-Cola Co.*, 723 Fed. Appx. 989, 992 (Fed. Cir. 2018). The Eleventh Circuit reviews a grant of judgment on the pleadings *de novo. Cannon v. City of W. Palm Beach*, 250 F.3d 1299, 1301 (11th Cir. 2001).

Further, in the Eleventh Circuit, "[j]udgment on the pleadings is appropriate where there are no material facts in dispute and the moving party is entitled to judgment as a matter of law." *Perez v. Wells Fargo N.A.*, 774 F.3d 1329, 1335 (11th Cir. 2014) (internal quotation marks and citation omitted). "In determining whether a party is entitled to judgment on the pleadings, we accept as true all material facts alleged in the non-moving party's pleading, and we view those facts in the light most favorable to the nonmoving party." *Id.*

Patent eligibility under § 101 is a question of law, based on underlying factual questions. *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1368 (Fed. Cir. 2018). It cannot be resolved on the pleadings if a comparison of

the averments in the competing pleadings reveals a material dispute of fact. *Automated Tracking Sols., LLC v. Coca-Cola Co.*, 723 Fed. Appx. 989, 992 (Fed. Cir. 2018).

## II. The district court erred in finding that the claims are directed to the abstract idea of targeted advertising.

The district court overgeneralized the claims of the asserted patents and incorrectly concluded that all 57 claims are simply "directed to targeted advertising." Appx463. In so doing, the district court described the claims at a "high level of abstraction and untethered from the language of the claims." *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1337 (Fed. Cir. 2016). This approach fails to "articulate what the claims are directed to with enough specificity to ensure the step one inquiry is meaningful." *Core Wireless Licensing v. LG Electronics*, 880 F.3d 1356, 1361 (Fed. Cir. 2018). Indeed, because "all inventions at some level embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas," *Mayo v. Prometheus Labs.*, 566 U.S. 66, 71 (2012), courts must "tread carefully in construing this exclusionary principle lest it swallow all of patent law." *Alice Corp. Pty. Ltd.v. CLS Bank*, 573 U.S. 208, 217 (2014). At step one, courts cannot simply assess whether the patent claims *involve* a concept that is abstract; rather, "the

'directed to' inquiry applies a stage-one filter to claims, considered in light of the specification, based on whether 'their character as a whole is directed to excluded subject matter.'" *Enfish, LLC*, 822 F.3d at 1335 (quoting *Internet Patents Corp. v. Active Network, Inc.*, 790 F.3d 1343, 1346 (Fed. Cir. 2015)).

### A. Assessed as a whole, the claims are not directed to generic targeted advertising.

Here, the asserted patents do not claim all types of targeted advertising, or even all targeted advertising on the Internet. Instead, the patents claim specific ordered combinations directed to determining suitable advertisements and placing them across multiple websites for limited periods and displaying those advertisements in new and improved ways within other website content. *See, e.g.*, Appx304, 16:61-65. The district court, however, relying on its overly broad characterization of claims 13 and 22 of the '622 patent, gave short shrift to numerous claim limitations that narrow the claims beyond generic targeted advertising, such as posting or embedding advertisements on multiple related websites for limited time periods, sharing revenue from the delivery of the advertisements with the multiple websites, and displaying the advertisements separately from pre-existing and

ineffective banner advertisements and static headers and contiguously with other website content, wherein multiple features of the advertisements and other website content are substantially the same. *Id*.

### 1. Claims 13 and 22 of the '622 patent are not representative.

The district court erred in agreeing with Revcontent that claims 13 and 22 of the '622 patent are representative of all 57 claims of the 3 asserted patents. Appx457. Neither Revcontent nor the district court demonstrated that those two claims represented all the others. Instead the district court erroneously shifted the burden to IAL, the non-movant, to prove otherwise. Appx459.

In fact, there are many differences between even the independent method claims of the three patents that are relevant to whether the claims are patent eligible. For example,

- Claim 13 of the '622 patent calls for "electronically *posting* the sponsored news content among the non-sponsored content at each of the related one or more of the web sites," while claim 8 of the '781 patent calls for "electronically *embedding* the sponsored news content among the non-sponsored content at the related one or more of the web sites." Appx304, 16:1-3, Appx322, 15:62-64. These terms, and whether "posting" and "embedding" have the same meaning, are disputed. Appx408-409.

- Claim 13 of the '622 patent requires that "the sponsored news content is not a banner advertisement," and claim 8 of the '781

requires that "the sponsored news content is not a banner advertisement *or a static header*" and claim 1 of the '121 similarly states that "the sponsored *post* is not a banner advertisement *or a static header*." Appx304, 16:15-16, Appx322, 16:10-11, Appx340, 16:13-14.

- Claim 13 of the '622 patent requires that "a plurality of features of the sponsored news content are *substantially the same* as a corresponding plurality of features of the contiguous non-sponsored news content", while claim 8 of the '781 patent requires "a plurality of features of the sponsored news content are *the same* as a corresponding plurality of features of the contiguous non-sponsored news content" and claim 1 of the '121 patent "a plurality of features of the sponsored *post* are *the same* as a corresponding plurality of features of the contiguous non-sponsored *posts*." Appx304, 16:30-33, Appx322, 16:25-27, Appx340, 16:24-26. The meanings of these terms are disputed. Appx410.

Notwithstanding, without any analysis of the claims, the district court concluded that two claims of the '622 patent are representative of all claims, because IAL did not prove otherwise. App459. This was erroneous because, absent an agreement, the party challenging the validity of the claim must prove that each claim is invalid. *Shelcore, Inc. v. Durham Indus.*, 745 F.2d 621, 625 (Fed. Cir. 1984). Here, like in *Berkheimer*, IAL did not agree that claims 13 and 22 of the '622 patent were representative of all claims. Appx275-276; *Berkheimer*, 881 F.3d at 1365. On this basis alone, the district court's order should be reversed.

## 2.     The district court improperly analyzed claims 13 and 22.

In addition, the district court failed to assess even the so-called "representative" claims as a whole, and instead purported to break them down into "four main components" and then determined that each component is abstract:

> The patent claims a targeted advertising platform, ('622 at 15:56–16:11), that allows for revenue sharing among many websites, ('622 at 16:11–13), and enables efficient advertising across many websites simultaneously. ('622 at 16:61–65) Furthermore, claim 13 limits IAL's patent to advertising placed on a website contiguously with non-sponsored content. ('622 at 16:14–24, 16:29–36) Each of these four components is an abstract idea.

Appx463. This does not comport with the step one requirement to determine whether the claim as a whole is directed to excluded subject matter. Instead, at most, this demonstrates an incorrect attempt to determine whether the claims *involve* a concept that might be abstract. *Enfish, LLC*, 822 F.3d at 1335. But even the district court's analysis of claim 13 of the '622 patent, as broken down into components, is erroneous.

In addressing what it identified as the first so-called "component," the district court claimed that the entirety of IAL's patent is directed to

targeted advertising. Appx463. But, again, this finding erroneously disregards numerous claim limitations. Illustrating this disregard, the district court only relies on a small portion of claim 13 of the '622 patent, to the exclusion of the very limitations that overcame a §101 rejection during prosecution and that IAL specifically identified in its pleadings. Appx464.

Furthermore, the district court's reliance on the holding in *Free Stream* about targeted advertising is misplaced. In that case, the Court found that the claims were directed to "1) gathering information about television users' viewing habits; (2) matching the information with other content (i.e., targeted advertisements) based on relevancy to the television viewer; and (3) sending that content to a second device." *Free Stream Media Corp. v. Alphonso Inc.*, 996 F.3d 1355, 1362 (Fed. Cir. 2021). The Court accordingly found the claims directed to the abstract idea of targeted advertising. *Id.* Moreover, those claims did not describe how they achieved the alleged improvement in computer functionality. *Id.* at 1363-1364. Here, while the claims involve targeted advertising, they comprise multiple limitations directed to other improvements in the way that sponsored content is displayed natively on multiple websites

across the Internet. *See, e.g.*, Appx304, 16:61-65. Thus, the asserted claims are not comparable to those found abstract in *Free Stream*.

## B. The claims disclose new methods of advertising on the Internet.

### 1. Distributing advertisements across multiple websites.

The district court also incorrectly determined that the additional requirement in dependent claim 22 of posting the advertisements at multiple related websites is abstract. Appx464-465. In particular, the district court found that this disclosure is not "a novel and inventive mechanism that improves computer functionality." *Id.*

In fact, the claims of the asserted patents do not generically claim using the Internet to perform an abstract business practice, but instead provide an improvement to known and disclosed problems with advertising on the Internet. The asserted patents describe the problems associated with posting advertisements on multiple websites in 2006, including less effective banner images and site-specific advertisements that could not be efficiently delivered to desired websites across the Internet. Appx297, 2:12-21. And the patents provide a detailed description of how these difficulties can be overcome, including the embodiment illustrated in Figure 4, in which a press release distribution

23

system, among other things, posts advertisements to the multiple sites utilizing press release interface plug-ins within the website software. Appx302, 12:48-60, Appx303, 13:55-60. The plug-ins allowed the distribution and display of advertisements beyond static images, like the banner ads, and instead complex ad campaigns of various multimedia components. *Id.*, 9:57-64. This embodiment is included within the scope of dependent claim 22 of the '622 patent and other asserted claims.

The Court's decision in *DDR* is instructive. There, the Court distinguished *Ultramercial* because the claims in *DDR* did "not broadly and generically claim 'use of the Internet' to perform an abstract business practice," but instead specified how interactions within the Internet were manipulated to override what would ordinarily happen when clicking a hyperlink. *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1257-1259 (Fed. Cir. 2014) ("[a]lthough the claims address a business challenge (retaining website visitors), it is a challenge particular to the internet"). The Court further found that the claims were "necessarily rooted in computer technology in order to overcome a problem specifically arising in the realm of computer networks." *Id.* In other words, the claims were "not merely the routine or conventional use of the Internet." *Id.*

24

Here, the district court incorrectly distinguished *DDR* from this case in determining that the claims in *DDR* were a new method of internet commerce, while IAL's claims are "just a new method of familiar targeted advertising." Appx467. Aside from the fact that IAL's claims are not directed simply to targeted advertising, the district court's logic does not hold. If it is not abstract to improve internet commerce, then also it is not abstract to improve internet advertising (itself is a form of internet commerce), which IAL's claims indisputably accomplish. Before the inventions of the asserted patents, advertisements were conventional banner advertisements or other advertisements that were manually customized for each website. IAL's patents, on the other hand, claim methods and systems for automatically posting native advertisements across multiple websites, which was new and novel in 2006. *See, e.g.*, Appx304, 16:61-65, Appx322, 15:50-16:32.

## 2.    Displaying advertisements natively.

The additional limitations within the asserted claims about how the advertisements are displayed natively amongst other non-sponsored content also demonstrate that the claims are not simply directed to the abstract idea of targeted advertising. To solve disclosed problems with

existing banner images and static headers, the patents describe displaying specific, non-banner advertisements amongst other website content, which scroll together with other content on the website, as shown in Figure 6. Appx295. The patents further explain that these advertisements would have numerous features in common with the surrounding non-sponsored website content, including background, font, text format, and the like. Appx303, 13:19-38. Moreover, a website user can scroll through the content and the advertisement will stay in a fixed position contiguously with the surrounding content. Appx295. In these ways, the advertisements appeared "native" to the websites in which they appeared.

The claims (*e.g.*, claim 8 of the '781 patent) comprise limitations drawn to these improvements, including those emphasized below:

> 8. A method of electronically **delivering advertisements as sponsored news content to a plurality of web sites that each includes non-sponsored content**, the method comprising:
>
> electronically monitoring user data or activity on one or more web sites;
>
> electronically requesting sponsored news content by a server computer based on the monitored user data or activity;

electronically distributing the sponsored news content by the server computer to a related one or more of the web sites over the communications networks based on the monitored user data or activity;

electronically **embedding the sponsored news content among the non-sponsored content** at the related one or more of the web sites;

electronically tracking one or more of impressions, clicks, click-through rate, or user actions with respect to the sponsored news content at the related one or more of the web sites; and

electronically delivering a specific sponsored news content to a user based on the monitored user data or user activity,

displaying specific sponsored content among non-sponsored content on a plurality of related web sites;

wherein **the sponsored news content is not a banner advertisement or a static header**,

wherein **when the sponsored news content is displayed, it is displayed separately from any banner advertisement and contiguously together with at least some of the non-sponsored content appearing on the page to scroll together with the at least some of the non-sponsored content such that the sponsored news content is in a fixed position relative to at least some of the contiguously displayed non-sponsored content**,

wherein a time period during which the sponsored news content is posted at the related one or more of the web sites is limited,

wherein a frequency at which the sponsored news content is displayed for the user is limited, and

wherein **a plurality of features of the sponsored news content are the same as a corresponding plurality of features of the contiguous non-sponsored news content**, and **at least one feature of the sponsored news content differs from or is in addition to the corresponding feature of the non-sponsored news content in order to distinguish the sponsored news content from the non-sponsored news content**.

Appx322, 15:50-16:32 (emphasis added).

The district court erred in not recognizing that these numerous elements limit the claims beyond generic targeted advertising, and also in finding the limitations themselves are abstract. Appx466-467. In finding that "the notion of arranging information on a computer screen is a claim directed to an abstraction," the district court ignored the discussion in the specification about the existing problems in the art and the solution, and the numerous claim limitations around that solution. These claims are not simply directed to "arranging information on a computer screen," but complex technical advancements.

Indeed, during prosecution of the '622 patent, the patent examiner objected to the claims under §101, and the applicant overcame the objection. The examiner originally contended that the claims "do not amount to significantly more than the abstract idea" of delivering

advertisements and "do not amount to an improvement to the functioning of a computer itself." Appx345-346. In response, the applicant explained that "the claims provide a system and method that places sponsored content among non-sponsored content on a website in a manner that improves upon conventional forms of advertisements such as banner advertisements. Such improvements upon the Internet itself are not abstract ideas." Appx356. As one example, the applicant also pointed specifically to the limitation of "display[ing] the sponsored news content separately from any banner advertisement and contiguously together with at least some of the non-sponsored content appearing on the page to scroll together . . . ." *Id.* The examiner then agreed that the claims were directed to inventive concepts, including "an improvement to a user interface of a computer system." Appx365.

The cases that the district court relied upon for the premise that simply arranging information on a display is abstract are inapposite or distinguishable. First, the claims deemed abstract in *Customedia* are not about displaying information, but instead "recite reserving memory to ensure storage space is available for at least some advertising data." *Customedia Techs., LLC v. Dish Network Corp.*, 951 F.3d 1359, 1365

(Fed. Cir. 2020). And in *Cardionet*, the Court found that "merely displaying data by *conventional methods* as part of a series of abstract steps is itself an abstract concept." *Cardionet, LLC v. Infobionic, Inc.*, 816 Fed. Appx. 471, 475 (Fed. Cir. 2020) (emphasis added). In contrast, the advertisements here are displayed by unconventional methods, which is core to the claimed inventions. The Court's decision in *Ultramercial* also does not support the district court's conclusion. First, the district court relies upon *Ultramercial* for step one, but cites its discussion around inventive concepts under step two. That aside, the claims, in that case, were determined to be directed to "only the abstract idea of showing an advertisement before delivering free content." *Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 715 (Fed. Cir. 2014). The focus of the case was not on how the advertisement was displayed, but rather whether it was abstract to provide free content in exchange for showing the advertisement. Thus, none of these cases stand for the proposition that all possible ways of displaying information are abstract, nor that all possible forms of advertising on the Internet are abstract.

Because it wrongly concluded that two claims are representative, did not analyze even those claims properly, and ignored multiple claim

limitations that narrow the claims of the asserted patents beyond simple "targeted advertising," the district court erred in finding the claims to be directed to an abstract idea. Instead, it should have concluded that the claims are directed to specific improvements to interactions with the Internet, and denied the motion for judgment on the pleadings.

## III. The district court erred in not recognizing that the claims teach an inventive concept.

In its perfunctory step two analysis, which does not span even two pages, the district court drew and resolved disputed factual issues against IAL, the non-movant, and did not hold Revcontent to its burden to overcome the presumption that the claims of IAL's patents are valid. Even if it were correct to conclude that the claims of IAL's patents are directed to an abstract idea—which IAL disputes—the pleadings, including those related to the prosecution history, and the lack of a claim construction, create factual disputes that preclude judgment under Rule 12(c).

At step two, courts must examine "the elements of the claim to determine whether it contains an 'inventive concept' sufficient to 'transform' the claimed abstract idea into a patent eligible application." *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 573 U.S. 208, 217 (2014) (quoting

31

*Mayo Collaborative Servs. V. Prometheus Labs., Inc.*, 566 U.S. 66, 72 (2012)). To do that, courts "determine whether the claim elements, individually and as an ordered combination, contain an inventive concept, which is more than merely implementing an abstract idea using 'well-understood, routine, [and] conventional activities previously known to the industry.'" *Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n*, 776 F.3d 1343, 1347-48 (Fed. Cir. 2014) (quoting *Alice*, 573 U.S. at 225). "Thus, patent eligibility may be resolved at the Rule 12 stage only if there are no plausible factual disputes after drawing all reasonable inferences from the intrinsic and Rule 12 record in favor of the non-movant." *Coop. Entm't, Inc. v. Kollective Tech., Inc.*, 50 F.4th 127, 130 (Fed. Cir. 2022).

## A.    IAL's pleadings preclude judgment under 12(c).

Here, IAL plausibly pleaded that the ordered combination of features and functions in the claims were not well-understood, routine, or conventional, that a number of claim limitations solved extant problems in the art as discussed in the specification, and that those limitations were relied upon to overcome a § 101 rejection in prosecution of the '622 patent. Appx005-011, ¶¶15-22. Further, IAL did not agree that

claims 13 and 22 of the '622 patent were representative of all 57 claims of the three IAL patents. Appx275-276. Finally, the district court did not conduct a claim construction, even though the parties had filed a joint claim construction statement identifying a number of disputed claim terms before the Rule 12(c) order issued. Appx402-411. Such failings were the basis for this Court's recent reversal of a Rule 12 order in *Kollective Tech.,* 50 F.4th at 135-136.

In its Complaint, IAL explicitly pleaded that "the technologies covered by the claims consist of ordered combinations of features and functions that, at the time of the invention, were not, alone or in combination, well-understood, routine, or conventional." Appx005-006, ¶16. IAL also pleaded that the specifications disclosed shortcomings in the art, such as the challenges in advertising effectively on multiple websites across the Internet, the insufficiencies of existing banner advertisements, and the challenge in distributing and displaying custom advertisements for multiple websites. Appx006-009, ¶¶17-19. Indeed, IAL's pleadings included facts relating to inventor Justin Choi's contemporaneous work with his company, Nativo, which solely owns IAL. Appx003, ¶¶8-10. Specifically, IAL explained that before the inventions

33

claimed in the asserted patents, it was difficult to automatically assimilate advertisements to the look and feel of a website's content, much less to do so across multiple websites simultaneously. *Id.* Previous attempts to do this manually resulted in inelegant or disruptive ad placement, particularly as webpage content was changed or supplemented. *Id.*

IAL also pleaded that, during prosecution of the application that issued as the '622 patent, the examiner initially rejected the claim under § 101, but that the examiner was persuaded to allow the claims. Appx009, ¶20 ("For example, the claims provide a system and method that places sponsored content among non-sponsored content on a website a manner that improves upon conventional forms of advertisements such as banner advertisements. Such improvements upon the Internet itself are not abstract ideas.").

In reversing the lower court in *Kollective*, the Court noted that the appellant's "amended complaint plausibly alleges that the [] patent claims recite inventive concepts at Alice step two, precluding dismissal." *Kollective,* 50 F.4th at 131. The same is true here. Further, the district court provided no reasoning or basis by which it could determine that the

pleaded claim limitations were well understood, routine, or conventional. *Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121, 1129-1130 (Fed. Cir. 2018) (vacating because pleaded factual allegations prevented dismissal under Rule 12(b)(6)); *Berkheimer*, 881 F.3d at 1368. Construed in favor of IAL, the claims do not preempt all ways of using user information to deliver targeted content over a network; rather, to the extent they can be characterized as directed to that idea (a characterization IAL disputes), "they recite a specific discrete implementation of the abstract idea." *Bascom Global Internet Servs. v. AT&T Mobility LLC*, 827 F.3d 1341, 1350 (Fed. Cir. 2016); *see also Cosmokey Sols. GMBH & Co. KG v. Duo Sec. LLC*, 15 F.4th 1091, 1099 (Fed. Cir. 2021). Even the "representative" claims recite methods that include specific server computers configured to execute a specific set of ordered steps to enable electronic delivery and display of advertisements to a plurality of websites. The claims improve upon the prior art by delivering specific advertisements to specific users for limited time periods and displaying those advertisements separately from existing banner advertisements but contiguously with other website content.

Moreover, the district court ignored that IAL's pleaded allegations regarding displaying advertising among website content in a manner that improved upon conventional (in 2006) advertising, such as banner advertisements, mirrored the applicant's arguments in the prosecution history. *Kollective,* 50 F.4th at 135 (noting that the pleaded "allegations mirror the applicant's statements in the prosecution history and the patent's specification."). The claims here, like those in *Weisner,* are patent eligible because "they provided a specific solution to an Internet-centric problem." *Weisner v. Google LLC*, 51 4th 1073, 1087 (Fed. Cir. 2022) (discussing *DDR Holdings*, 773 F.3d at 1258). Here too, "the record supports that the claims plausibly provide a solution to an Internet-centric problem," and the district court's judgment should be reversed. *Id.* at 1087-1088.

## B.   Disputed claim constructions preclude judgment on the pleadings.

The district court also issued judgment without conducting a claim construction, shifting the burden to IAL to identify a claim construction dispute. Appx462 ("Because IAL fails to identify a disputed term requiring construction before judgment on the pleadings, Revcontent's motion is not premature.") (citation omitted). But before the court issued

its order, the parties had submitted disputed claim constructions, including on terms that IAL argued were inventive. Appx402-411. Claim construction is "often necessary" before proceeding to assess eligibility, especially at this early dismissal phase. *See Bancorp Servs., L.L.C. v. Sun Life Assur. Co. of Canada*, 687 F.3d 1266, 1273 (Fed. Cir. 2012).

Briefing on Revcontent's Rule 12(c) motion was limited to a motion and a response, which was completed on June 24, 2022. Appx260-286. At that point, Revcontent had not disclosed invalidity contentions and claim construction proceedings were months away. But on November 9, 2022, the parties filed a joint claim construction statement, identifying a number of disputed terms, as well as expert opinion about the terms and the state of the art. Appx402.

One dispute is whether "electronically *posting* the sponsored news content among the non-sponsored news content at each of the multiple related web sites" in claim 13 of the '622 patent had the same meaning as "electronically *embedding* the sponsored news content among the non-sponsored news content at each of the multiple related web sites" in claim 8 of the '781 patent, and what that meaning is. Appx408-409. Revcontent argued that both terms mean "posting the sponsored content among the

37

non-sponsored news content on the web server hosting each of the [related one or more] websites." *Id.* IAL disputes this, contending that the terms have their plain meaning, such that in claim 13 the sponsored content would be embedded into the web page (for example by using an HTML tag), and in claim 8 the content would be posted on a website displayed to a user viewing within a browser. *Id.* In other words, these terms do not simply mean saving data on a server, but instead are about one of the key improvements the inventor disclosed and argued to the examiner over a § 101 rejection.

The parties also dispute whether the term "wherein a plurality of features of the sponsored news content are substantially the same as a corresponding plurality of features of the contiguous non-sponsored news content" is indefinite. Appx410. Here the dispute is if a person of ordinary skill could have determined with reasonable certainty whether the features of the sponsored news content, on the one hand, were substantially the same as corresponding features of non-sponsored content on the other. Again, this is core to what makes an advertisement "native" to the website. Appx003, ¶8 ("placing branded advertisements within the content experience of websites in such a way that the

38

advertisements would not compete with core website content for the consumer's attention"), Appx003, ¶9 ("[I]t was a particular challenge to assimilate advertisements to the look and feel of a website's content in an automated fashion.").

Thus, before the district court entered judgment, the parties had submitted competing claim construction positions that could have impacted the determination of patent eligibility, and the district court erred in issuing judgment before resolving those disputes. *See MyMail, Ltd. v. ooVoo, LLC*, 934 F.3d 1373, 1380 (Fed. Cir. 2019) (citing *Aatrix Software, Inc.*, 882 F3d at 1125).

Relatedly, the court found that claims 13 and 22 were representative even though IAL contested it. Appx457-459. Revcontent did not prove that claims 13 and 22 are representative, and the district court erred in invalidating all claims without holding Revcontent to its burden to demonstrate that all claims are substantially similar and linked to the same abstract idea, particularly where IAL did not agree to those claims being representative. *See Intellectual Ventures I LLC v. Symantec Corp.*, 838 F.3d 1307, 1316 n.9 (Fed. Cir. 2016) (quoting

39

*Content Extraction & Transmission LLC v. Wells Fargo Bank, N.A.*, 776 F.3d 1343, 1348 (Fed. Cir. 2014)).

## CONCLUSION

IAL asks the Court to reverse the district court's Rule 12(c) decision that the claims of the '622 patent, the '781 patent, and the '121 patent are not patent eligible and thus invalid. The claims are not simply directed to targeted advertising and, at least, include numerous limitations that provide an inventive concept. And the district court resolved numerous factual disputes against IAL, precluding judgment on the pleadings.

Dated: March 14, 2023          Respectfully Submitted,

*/s/ Justin B. Kimble*
Edward R. Nelson III
ed@nelbum.com
NELSON BUMGARDNER CONROY PC
3131 West 7th Street, Suite 300
Fort Worth, Texas 76107
[Tel.] (817) 377-9111
[Fax] (817) 377-3485

Justin B. Kimble
justin@nelbum.com
NELSON BUMGARDNER CONROY PC
2727 N. Harwood Street, Suite 250
Dallas, Texas 75201
[Tel.] (214) 446-4953

*Attorneys for Appellant*
*Integrated Advertising Labs, LLC*

# ADDENDUM

TABLE OF CONTENTS

| Document Title | Page Range |
|---|---|
| Dkt. 70 – Order | APPX454-APPX470 |
| Dkt. 71 – Judgment in a Civil Case | APPX471-APPX472 |
| U.S. Patent No. 9,286,622 | APPX288-APPX304 |
| U.S. Patent No. 9,652,781 | APPX306-APPX322 |
| U.S. Patent No. 10,147,121 | APPX324-APPX340 |

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

INTEGRATED ADVERTISING LABS,
LLC,

     Plaintiff,

v.                         Case No: 8:22-cv-487-KKM-CPT

REVCONTENT, LLC,

     Defendant.

_____

## ORDER

Integrated Advertising Labs, LLC, sues Revcontent, LLC, for infringing U.S. Patent No. 9,286,622 ('622), U.S. Patent No. 9,652,781 ('781), and U.S. Patent No. 10,147,121 ('121). (Doc. 1) Challenging the validity of the asserted patents under 35 U.S.C. § 101, Revcontent moves (Doc. 35) for judgment on the pleadings.

## I.    BACKGROUND

Integrated Advertising Labs, LLC, is wholly owned by Nativo, Inc. (Doc. 1 ¶ 1), which organized IAL to issue patent licenses and receive revenue from the licensed patents—the '622 patent, the '781 patent, and the '121 patent. (Doc. 1 ¶ 7) However, Nativo is not a party to this action. (Doc. 1)

Each patent specifies a "press release distribution system" designed for advertising on websites colloquially known as "forum sites" (or, sometimes, "fan

sites"). ('622 at 1:19–2:46) [1] The specified system simultaneously distributes an advertisement to many forum sites; tracks user engagement; splits advertising revenue among forum sites, ('622 at 3:29–43, 16:9–13); and allegedly improves conventional advertisements by "placing sponsored content among non-sponsored content." (Doc. 1 ¶ 15)

Revcontent is one of IAL's competitors. Revcontent created a platform that, like IAL's platform, distributes and places advertising on forum sites. IAL alleges that Revcontent infringes claim 13 of the '622 patent, claim 8 of the '781 patent, and claim 1 of the '121 patent. (Doc. 1 ¶¶ 28, 38, 48)

As IAL acknowledges (Doc. 1 ¶ 20; Doc. 40 at 5–6), the patent examiner initially rejected the '622 patent because, "[t]he claims merely amount to the application . . . [of an] abstract idea (i.e. delivering advertisements) on a computer," (Doc. 40-4 ¶ 15) and because "the claims do not effect an improvement to another technology or technical field; the claims do not amount to an improvement to the functioning of a computer itself; and the claims do not move beyond a general link of the use of an abstract idea to a particular technological environment." (Doc. 40-4 ¶ 14) But the examiner concluded differently after IAL insisted that the claims describe an improved website display, "in which sponsored content is placed among non-sponsored content." (Doc. 40-6 at 7.) In other words, the examiner found that the '622

---

[1] As the plaintiff acknowledges in the complaint, "[t]he Asserted Patents are all related and share a common specification; thus, the citations to the '622 patent specification apply equally to all Asserted Patents." (Doc. 1 at 6 n.1)

patent claims a novel way to place advertisements in a list with posts native to the website. Revcontent moves for judgment on the pleadings and argues that each patent is invalid under 35 U.S.C. § 101. (Doc. 35)

## II.    LEGAL STANDARD

Under Rule 12(c), Fed. R. Civ. P., Revcontent may "move for judgment on the pleadings" after "the pleadings are closed." To succeed, Revcontent must prove that "there are no material facts in dispute" and that "the moving party is entitled to judgment as a matter of law." *Scott v. Taylor*, 405 F.3d 1251, 1253 (11th Cir. 2005). In determining whether a party is entitled to judgment on the pleadings, the non-movant's factual allegations—but not the non-movant's legal conclusions—are assumed true. *Perez v. Wells Fargo N.A.*, 774 F.3d 1329, 1335 (11th Cir. 2014). Because "[p]atent eligibility under § 101 is a question of law that may involve underlying questions of fact," a determination of patent validity is possible occasionally on the pleadings. *MyMail, Ltd. v. ooVoo, LLC*, 934 F.3d 1373, 1379 (Fed. Cir. 2019).

"The § 101 inquiry must focus on the language of the Asserted Claims themselves." *Synopsys, Inc. v. Mentor Graphics Corp.*, 839 F.3d 1138, 1149 (Fed. Cir. 2016). The asserted claims must describe a patentable invention. *Free Stream Media Corp. v. Alphonso Inc.*, 996 F.3d 1355, 1363–64 (Fed. Cir. 2021). A detailed specification cannot rescue a claim that fails to describe a patentable invention. 996 F.3d at 1363.

3

## III.  ANALYSIS

### A. Claim 13 and claim 22 of the '622 patent are representative.

Revcontent correctly argues (Doc. 35 at 2 n.1) that claim 13 and claim 22 of the

'622 patent are representative of the '781 patent, the '121 patent, and the '622 patent's

other claims. A claim is "representative" of other claims if it is "substantially similar

and linked to the same abstract idea." *Content Extraction & Transmission LLC v. Wells*

*Fargo Bank, Nat. Ass'n*, 776 F.3d 1343, 1348 (Fed. Cir. 2014). Furthermore, "[c]ourts

may treat a claim as representative . . . if the patentee does not present any meaningful

argument for the distinctive significance of any claim limitations not found in the

representative claim." *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1365 (Fed. Cir. 2018).

Claim 13 and Claim 22 of the '622 patent are substantially similar and linked to

the same abstract idea as the other claims and patents. The '622 patent claims:

13. A method of electronically delivering advertisements as sponsored news content to a plurality of web sites that each includes non-sponsored content, the method comprising;

electronically receiving the sponsored news content by a server computer from one or more advertisers over a communications network;

electronically distributing the sponsored news content by the server computer to a related one or more of the web sites over the communications network;

electronically receiving the sponsored news content by the one or more web sites from the server computer over the communications network;

electronically posting the sponsored news content among the non-sponsored content at each of the related one or more of the web sites;

electronically tracking one or more of impressions, clicks, click-through rate, or user actions with respect to the sponsored news content at the related one or more of the web sites;

4

electronically monitoring user data or user activity at the related one or more of the web sites; and

delivering a specific sponsored news content to a particular user utilizing a particular one of the monitored user data or user activity, wherein revenue generated from the delivery of the specific sponsored news content is shared with the related one or more of the web sites,

wherein the sponsored news content is not a banner advertisement,

wherein when the sponsored news content is displayed, it is displayed separately from any banner advertisement and contiguously together with at least some of the non-sponsored content appearing on the page to scroll together with the at least some of the non-sponsored content such that the sponsored news content is in a fixed, position relative to at least some of the contiguously displayed non-sponsored content,

wherein a time period during which the sponsored news content is posted at the related one or more of the web sites is limited,

wherein a frequency at which the sponsored news content is displayed for each user is limited, and

wherein a plurality of features of the sponsored news content are substantially the same as a corresponding plurality of features of the contiguous non-sponsored news content, and at least one feature of the sponsored news content differs from or is in addition to the corresponding feature of the non-sponsored news content in order to distinguish the sponsored news content from the non-sponsored news content.

22. The method of claim 13, further comprising electronically posting the sponsored news content among the non-sponsored content at each of multiple related web sites, and electronically monitoring user data or user activity at each of the multiple web sites.

('622 at 15:56–36, 16:61–65) Simply stated, claim 13 and claim 22 of the '622 patent describe a targeted advertising tool that allows advertisers to easily place advertisements on many websites. Also, IAL's platform requires revenue sharing and arranging advertisements contiguously with non-sponsored content. Although the other claims do not use the same words, each asserted patent encompasses the

5

technology detailed in claim 13 and claim 22 of the '622 patent. ('622 at 14:26–16:65, '781 at 14:54–16:63, '121 at 14:53–16:56) And the '622 patent, the '781 patent, and the '121 patent contain the same specification of IAL's technology. As IAL acknowledges, "[t]he Asserted Patents are all related and share a common specification; thus, the citations to the '622 patent specification apply equally to all Asserted Patents." (Doc. 1 at 6 n.1)

Although IAL objects (Doc. 40 at 11–12) to characterizing claim 13 and claim 22 as representative, IAL fails to identify even one distinction between claim 13 and claim 22 of the '622 patent and the other asserted patents and claims. *Berkheimer*, 881 F.3d at 1365 ("Courts may treat a claim as representative . . . if the patentee does not present any meaningful argument for the distinctive significance of any claim limitations not found in the representative claim . . ."); *Sensormatic Elecs., LLC v. Wyze Labs, Inc.*, No. 2020-2320, 2021 WL 2944838, at *4 (Fed. Cir. July 14, 2021) (holding that a claim was representative because the plaintiff "fails to identify any relevant claim limitations, alone or in combination, that the [district] court failed to consider."). Furthermore, although IAL never directly asserts that claim 13 of the '622 patent is representative, IAL utilizes claim 13 as a representative example to illustrate the claims of the other asserted patents. (Doc. 1 ¶¶ 17–22.) Because IAL fails to explain the distinctive significance of the other patents and claims, claim 13 and claim 22 of the '622 patent are representative of the other claims.

6

## B. Patent validity is sometimes resolved by the pleadings.

Because patent validity is a question of law, "in many cases it is possible and proper to determine patent eligibility under 35 U.S.C. § 101 on a [Rule 12] motion." *Genetic Techs. Ltd. v. Merial L.L.C.*, 818 F.3d 1369, 1373–74 (Fed. Cir. 2016). However, the determination of validity requires more if a factual dispute or a claim construction dispute appears. *Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121, 1125 (Fed. Cir. 2018).

IAL argues that Revcontent's Rule 12 motion is improper because "[t]he presumption of validity creates a fact issue." (Doc. 40 at 9–10) Of course, under 35 U.S.C. § 282, a patent enjoys the benefit of a presumption of validity. However, the presumption derives only from "the fact that the Patent and Trademark Office has already examined whether the patent satisfies 'the prerequisites for issuance of a patent,' including § 101." *Soft, Inc. v. Fitbit, Inc.*, 927 F.3d 1306, 1319 (Fed. Cir. 2019). If the presumption of validity creates a factual dispute, a patent is unassailable by a motion for judgment on the pleadings. 35 U.S.C. § 282; *Microsoft Corp. v. I4I Ltd. P'ship*, 564 U.S. 91, 100 (2011). However, patents are regularly invalidated by judgments on the pleadings. [2]

---

[2] *See, e.g.*, *Free Stream Media Corp. v. Alphonso Inc.*, 996 F.3d 1355 (Fed. Cir. 2021); *Univ. of Fla. Rsch. Found., Inc. v. Gen. Elec. Co.*, 916 F.3d 1363 (Fed. Cir. 2019); *FairWarning IP, LLC v. Iatric Sys., Inc.*, 839 F.3d 1089 (Fed. Cir. 2016); *Affinity Labs of Texas, LLC v. Amazon.com Inc.*, 838 F.3d 1266 (Fed. Cir. 2016); *Mortg. Application Techs., LLC v. MeridianLink, Inc.*, 839 F. App'x 520 (Fed. Cir. 2021); *Cisco Sys., Inc. v. Uniloc 2017 LLC*, 813 F. App'x 495 (Fed. Cir. 2020); *Bridge & Post, Inc. v. Verizon Commc'ns, Inc.*, 778 F. App'x 882 (Fed. Cir. 2019); *Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat. Ass'n*, 776 F.3d 1343 (Fed. Cir. 2014).

7

Additionally, IAL asserts that "the Court cannot conclude, as a matter of law, that the claimed ordered combination was 'well-understood, routine, and conventional to a skilled artisan at the time of the patent.'" But a broad invocation of the "claim ordered combination" of three patents fails to identify anything not "well-understood, routine, and conventional" at the time of the patents. As explained below, IAL's patents claim only abstract ideas and lack an inventive concept.

Next, IAL argues that Revcontent's motion "is premature because the Court has not construed the asserted claims." (Doc. 40 at 10.) But "claim construction is not an inviolable prerequisite to a validity determination under § 101." *Bancorp Servs., L.L.C. v. Sun Life Assur. Co. of Canada (U.S.)*, 687 F.3d 1266, 1273–74 (Fed. Cir. 2012). "In many cases, . . . evaluation of a patent claim's subject matter eligibility under § 101 can proceed even before a formal claim construction." *Genetic Techs.*, 818 F.3d at 1373– 74. Although claim construction is a prerequisite if there is a claim construction dispute relevant to the validity of the patent, *Aatrix Software*, 882 F.3d at 1125, neither party identifies a term requiring claim construction before judgment on the pleadings. (Doc. 35; Doc. 40); *see also Genetic Techs. Ltd. v. Merial L.L.C.*, 818 F.3d 1369, 1373–74 (Fed. Cir. 2016) (determining patent validity based on the pleadings because "there is no claim construction dispute relevant to the eligibility issue"); *Cyberfone Sys., LLC v. CNN Interactive Grp., Inc.*, 558 F. App'x 988, 992 n.1 (Fed. Cir. 2014) ("Cyberfone argues that claim construction must precede the § 101 analysis, but does not explain which terms require construction or how the analysis would change. It merely points

8

to claim language that we consider here. There is no requirement that the district court engage in claim construction before deciding § 101 eligibility."). Because IAL fails to identify a disputed term requiring construction before judgment on the pleadings, (Doc. 40 at 10–11), Revcontent's motion is not premature.

### C. 35 U.S.C. § 101 and *Alice* invalidate the '622 patent, the '781 patent, and the '121 patent.

Under 35 U.S.C. § 101, "Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title." Section 101 also includes an exception: "Laws of nature, natural phenomena, and abstract ideas are not patentable." *Alice Corp. Pty. v. CLS Bank Int'l*, 573 U.S. 208, 216 (2014) (quotation omitted).

*Alice*, 573 U.S. at 217–18 (citing *Mayo Collaborative Servs. v. Prometheus Lab'ys, Inc.*, 566 U.S. 66 (2012)), prescribes two steps to identify a patent-ineligible claim. First, determine whether the claim is directed to a patent-ineligible concept, such as an abstract idea. *Alice*, 573 U.S. at 217. Second, if the claim is directed to a patent-ineligible concept, examine whether the patent claims an "inventive concept" that ensures "that the patent in practice amounts to significantly more than a patent upon the ineligible concept itself." *Alice*, 573 U.S. at 217–18 (quotation omitted).

Analyzing the validity of a patent under *Alice* requires accounting for the primary object of patent law; that is, promoting innovation. *Alice*, 573 U.S. at 216.

9

Monopolizing an abstract idea "might tend to impede innovation more than it would tend to promote it." *Mayo*, 566 U.S. at 71. Patent law should not "inhibit further discovery by improperly tying up the future use of these building blocks of human ingenuity." *Alice*, 573 U.S. at 216 (quotation omitted).

### 1. Step One

IAL's asserted patents fail the first step because they claim an abstract idea. Claim 13 and claim 22 of the '622 patent—the representative claims—discuss four main components of IAL's technology. The patent claims a targeted advertising platform, ('622 at 15:56–16:11), that allows for revenue sharing among many websites, ('622 at 16:11–13), and enables efficient advertising across many websites simultaneously. ('622 at 16:61–65) Furthermore, claim 13 limits IAL's patent to advertising placed on a website contiguously with non-sponsored content. ('622 at 16:14–24, 16:29–36) Each of these four components is an abstract idea.

Targeted advertising is an abstract idea because targeted advertising is a fundamental, routine, and enduring practice long used in marketing. *Intell. Ventures I LLC v. Cap. One Bank (USA)*, 792 F.3d 1363, 1369 (Fed. Cir. 2015). For example, *Free Stream*, 996 F.3d at 1361–62, holds that a patent claimed ineligible concepts because the claims were directed to "(1) gathering information about television users' viewing habits; (2) matching the information with other content (i.e., targeted advertisements) based on relevancy to the television viewer; and (3) sending that content to a second device." Like the patent in *Free Stream*, IAL's patent is directed to targeted advertising.

10

IAL's patent claims a method of posting and tracking advertisements to efficiently tailor marketing content to future customers. ('622 at 15:56–16:11) This is a patent-ineligible subject.

IAL emphasizes that the technology enables efficient advertising across a plurality of websites. (Doc. 40 at 14–15) However, to prove that the patents claim more than an abstract idea, IAL must prove that the technology "enables a computer . . . to do things [that the computer] could not do before." *Finjan, Inc. v. Blue Coat Sys., Inc.*, 879 F.3d 1299, 1305 (Fed. Cir. 2018); *Customedia Techs., LLC v. Dish Network Corp.*, 951 F.3d 1359, 1363 (Fed. Cir. 2020); *Affinity Labs of Texas, LLC v. Amazon.com Inc.*, 838 F.3d 1266, 1270 (Fed. Cir. 2016). To meet this threshold, IAL must identify language in the claims of the asserted patents that describes how IAL's technology improves computer functionality. *Free Stream*, 996 F.3d at 1363–64. If the claims invoke generic computer tools to implement an abstract idea, the patent is invalid. *Free Stream*, 996 F.3d at 1363–64; *Affinity Labs*, 838 F.3d at 1269–70; *FairWarning IP, LLC v. Iatric Sys., Inc.*, 839 F.3d 1089, 1096–97 (Fed. Cir. 2016).

Although the technology enables advertisers to market on a plurality of websites, the patent claims describe a system that adds only "conventional computer components to well-known business practices." *Affinity Labs*, 838 F.3d at 1270. Claim 13 asserts that IAL's technology uses a "server computer" to receive and distribute "sponsored news content" and to track "user data and activity." ('622 at 15:56–16:11) Claim 22 states that IAL's platform allows companies to place and monitor

11

advertisements on "multiple related websites." ('622 at 16:61–65) Instead of disclosing a novel and inventive mechanism that improves computer functionality, the claims "do no more than describe a desired function or outcome." *Affinity Labs*, 838 F.3d at 1269. "[T]he essentially result-focused, functional character" of the claim language is "a frequent feature of claims held ineligible under § 101." *Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1356 (Fed. Cir. 2016). For instance, in *Free Stream*, 996 F.3d at 1363, the patent holder argued that the invention allowed "devices on the same network to communicate where such devices were previously unable to do so." But the asserted claims disclosed only that the invention operated by "piercing or otherwise overcoming a mobile device's security sandbox." 996 F.3d at 1363. The claims did not "describe how that result is achieved." 996 F.3d at 1364. Thus, *Free Stream*, 996 F.3d at 1364, held that the patent claimed an abstract idea because the claims did not "recite an improvement in computer functionality." 996 F.3d at 1364; *FairWarning*, 839 F.3d at 1096–97; *Affinity Labs*, 838 F.3d at 1269–70. Like the claims at issue in *Free Stream*, the claims in IAL's patent describe no improvement in computer functionality. The claims describe results, and the claims invoke generic computer tools to achieve those results.

Also, claim 13 describes revenue sharing, "wherein revenue generated from the delivery of the specific sponsored news content is shared with the related one or more of the web sites." ('622 at 16:11–13) But this claim describes an abstract idea because revenue sharing is "a fundamental economic practice long prevalent in our system of

12

commerce." *Bilski v. Kappos*, 561 U.S. 593, 611 (2010); *Content Extraction*, 776 F.3d at 1347 ("[C]laims directed to the mere formation and manipulation of economic relations may involve an abstract idea."). Although the claims describe the concept of revenue sharing through computer technology, "[s]tating an abstract idea while adding the words 'apply it with a computer'" is "not enough for patent eligibility." *Alice*, 573 U.S. at 223.

Lastly, IAL argues (Doc. 40 at 14–20) that the claims do not recite an abstract idea because the patents do not relate to traditional "banner advertisements." ('622 at 16:16–23) Instead, the patents claim sponsored content that appears contiguously with "non-sponsored content." ('622 at 16:16–23) IAL cites this limitation as the primary reason that the patent examiner reversed her initial objection to IAL's claims. (Doc. 40 at 17 (citing Doc. 40-5 at 8; Doc. 40-6 at 7)) But this limitation is directed to an abstract idea. A claim that purports to patent the notion of arranging information on a computer screen is a claim directed to an abstraction. *Customedia Techs., LLC*, 951 F.3d at 1364–65; *CardioNet, LLC v. InfoBionic, Inc.*, 816 F. App'x 471, 475–76 (Fed. Cir. 2020) ("CardioNet's unified display may be very useful to physicians, but usefulness alone does not necessarily negate abstractness."). For instance, *Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 715–16 (Fed. Cir. 2014), holds that requiring users to view an advertisement before viewing copyrighted material is an abstract idea. The asserted patents claim advertisements that "scroll together" with "non-sponsored content such that the sponsored news content is in a fixed position relative to at least some of the

13

contiguously displayed non-sponsored content." ('622 at 16:19–23) This requirement claims a certain format for displaying advertisements on a website. Because the arrangement of displayed advertisements is an abstract idea, the asserted patents fail step one of *Alice*.

IAL insists (Doc. 40 at 14–15) that the asserted claims are akin to the valid patent claims in *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245 (Fed. Cir. 2014), and *Bascom Glob. Internet Servs., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341 (Fed. Cir. 2016). But the invention in *DDR Holdings*, 773 F.3d at 1257–59, allows a user to purchase a product from a third-party advertiser without leaving the host website. 773 F.3d at 1257–58. The invention in *DDR Holdings* is a new method of internet commerce, not just a new method of familiar targeted advertising. 773 F.3d at 1257–59. Furthermore, *DDR Holdings*, 773 F.3d at 1258, cautions:

> [N]ot all claims purporting to address Internet-centric challenges are eligible for patent. For example, in our recently decided *Ultramercial* opinion, the patentee argued that its claims were 'directed to a specific method of advertising and content distribution that was previously unknown . . .' But this alone could not render its claims patent-eligible. In particular, we found the claims to merely recite the abstract idea of 'offering media content in exchange for viewing an advertisement' . . .

IAL's claims are like the claims in *Ultramercial*, 772 F.3d at 714–16, because IAL's claims describe only targeted advertising. Comparatively, the patent in *DDR Holdings*, 773 F.3d at 1257–59, claims an invention that facilitates new forms of internet commerce.

Nor does *Bascom*, 827 F.3d 1341, support IAL's argument. In *Bascom*, the patent claimed an internet filter designed to prevent a user's viewing objectionable online

14

material. 827 F.3d at 1348. Although IAL cites *Bascom* to argue that the asserted claims "are not directed to an abstract idea" under step one of *Alice*, (Doc. 40 at 12, 15), *Bascom* actually holds that filtering internet content "is an abstract idea." 827 F.3d at 1348. Notably, *Bascom*, 827 F.3d at 1350, holds also that the internet filter satisfies step two of *Alice* because the patent describes "how its particular arrangement of elements is a technical improvement over prior art ways of filtering such content." But unlike the patent in *Bascom*, IAL's patents merely describe an abstract idea—targeted advertising, *Free Stream*, 996 F.3d at 1361–62; *Intell. Ventures I*, 792 F.3d at 1369— along "with the requirement to perform [the abstract idea] on the Internet, [and] to perform [the abstract idea] on a set of generic computer components." *Bascom*, 827 F.3d at 1350. Claim 13 states no more than that IAL's technology employs "a server computer" to engage in targeted advertising. ('622 at 15:57–67) "Such claims [do] not contain an inventive concept." *Bascom*, 827 F.3d at 1350. The internet filter in *Bascom* manifests a sufficiently inventive concept; IAL's patents fail to describe improvements adequate to confer patentability.

### 2. Step Two

Although the asserted patents fail step one of *Alice*, the patents remain valid if they claim an "inventive concept" that ensures "that the patent in practice amounts to significantly more than a patent upon the ineligible concept itself." *Alice*, 573 U.S. at 217–18 (quotation omitted). Step two of *Alice* examines "precisely . . . what the claim elements add to determine if they identify an inventive concept in the application of

15

the ineligible matter to which the claim is directed." *Customedia*, 951 F.3d at 1365. For example, *Customedia*, 951 F.3d at 1365–66, holds that a patent claiming a method of targeted advertising fails step two of *Alice* because "[a]side from the abstract idea of delivering targeted advertising, the claims recite only generic computer components, including a programmable receiver unit, a storage device, a remote server and a processor . . . Such generic and functional hardware is insufficient to render eligible claims directed to an abstract idea."

Like the patent in *Customedia*, the asserted patents fail step two of *Alice*, that is, the patents fail to "amount to significantly more" than an abstract idea. Instead, the claims merely restate abstract ideas. Claim 13 says that IAL's system uses "a server computer" to receive and distribute "sponsored news content." ('622 at 15:57–67) IAL's technology tracks "impressions, clicks, click-through rates, or user actions with respect to the sponsored news content." ('622 at 16:4–7) But these claims deliver no explanation of how IAL's system improves computer functionality. Instead, the claims restate traditional components of targeted advertising, which is nothing more than an instruction to "apply" an abstract idea. *Customedia*, 951 F.3d at 1365–66. The asserted patents claim both the platform's revenue sharing capability, ('622 at 16:11–13), and the platform's ability to operate on "multiple related web sites." ('622 at 16:61–65) However, the claims never describe how IAL's platform accomplishes these abstract ideas. ('622 at 16:11–13, 16:61–65); *Elec. Power Grp.*, 830 F.3d at 1356 ("[T]he essentially result-focused, functional character of claim language has been a frequent

16

feature of claims held ineligible under § 101."). Further, the claims limit IAL's patents to advertisements "displayed separately from any banner advertisement and contiguously together with at least some of the non-sponsored content." ('622 at 16:17–18) But this does not amount to "significantly more" than an abstract idea. *Alice*, 573 U.S. at 218. Instead, the claim describes the abstract idea of where to display an online advertisement. *Ultramercial*, 772 F.3d at 715–16. Because "the claims at issue amount to 'nothing significantly more' than an instruction to apply [an] abstract idea," *Alice*, 573 at 225–226, the asserted patents fail step two of *Alice*.

## IV.  CONCLUSION

The '622 patent, the '781 patent, and the '121 patent are invalid under 35 U.S.C. § 101 and *Alice*. Accordingly, Revcontent's motion (Doc. 35) for judgment on the pleadings is **GRANTED**. Revcontent's request (Doc. 42) for oral argument is **DENIED**. The clerk is directed to enter **JUDGMENT** in favor of Revcontent; to terminate any pending motion and deadline; and to **CLOSE** this case.

**ORDERED** in Tampa, Florida, on December 8, 2022.

STEVEN D. MERRYDAY
UNITED STATES DISTRICT JUDGE

17

**APPX470**

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

INTEGRATED ADVERTISING
LABS, LLC,

         Plaintiff,

v.                                  Case No: 8:22-cv-487-KKM-CPT

REVCONTENT, LLC,

         Defendant.

---

## JUDGMENT IN A CIVIL CASE

**Decision by Court.** This action came before the Court and a decision has been rendered.

    **IT IS ORDERED AND ADJUDGED** that Judgment is entered in favor of

Revcontent.

                           ELIZABETH M. WARREN,
                           CLERK

                           s/ST, Deputy Clerk

## CIVIL APPEALS JURISDICTION CHECKLIST

1. **Appealable Orders**: Courts of Appeals have jurisdiction conferred and strictly limited by statute:

   (a) **Appeals from final orders pursuant to 28 U.S.C. Section 1291**: Only final orders and judgments of district courts, or final orders of bankruptcy courts which have been appealed to and fully resolved by a district court under 28 U.S.C. Section 158, generally are appealable. A final decision is one that "ends the litigation on the merits and leaves nothing for the court to do but execute the judgment." Pitney Bowes, Inc. V. Mestre, 701 F.2d 1365, 1368 (11th Cir. 1983). A magistrate judge's report and recommendation is not final and appealable until judgment thereon is entered by a district court judge. 28 U.S.C. Section 636(c).

   (b) **In cases involving multiple parties or multiple claims**, a judgment as to fewer than all parties or all claims is not a final, appealable decision unless the district court has certified the judgment for immediate review under Fed.R.Civ.P. 54(b), Williams v. Bishop, 732 F.2d 885, 885-86 (11th Cir. 1984). A judgment which resolves all issues except matters, such as attorneys' fees and costs, that are collateral to the merits, is immediately appealable. Budinich v. Becton Dickinson & Co., 486 U.S. 196, 201, 108 S. Ct. 1717, 1721-22, 100 L.Ed.2d 178 (1988); LaChance v. Duffy's Draft House, Inc., 146 F.3d 832, 837 (11th Cir. 1998).

   (c) **Appeals pursuant to 28 U.S.C. Section 1292(a)**: Appeals are permitted from orders "granting, continuing, modifying, refusing or dissolving injunctions or refusing to dissolve or modify injunctions..." and from "[i]nterlocutory decrees...determining the rights and liabilities of parties to admiralty cases in which appeals from final decrees are allowed." Interlocutory appeals from orders denying temporary restraining orders are not permitted.

   (d) **Appeals pursuant to 28 U.S.C. Section 1292(b) and Fed.R.App.P.5**: The certification specified in 28 U.S.C. Section 1292(b) must be obtained before a petition for permission to appeal is filed in the Court of Appeals. The district court's denial of a motion for certification is not itself appealable.

   (e) **Appeals pursuant to judicially created exceptions to the finality rule**: Limited exceptions are discussed in cases including, but not limited to: Cohen V. Beneficial Indus. Loan Corp., 337 U.S. 541,546,69 S.Ct. 1221, 1225-26, 93 L.Ed. 1528 (1949); Atlantic Fed. Sav. & Loan Ass'n v. Blythe Eastman Paine Webber, Inc., 890 F. 2d 371, 376 (11th Cir. 1989); Gillespie v. United States Steel Corp., 379 U.S. 148, 157, 85 S. Ct. 308, 312, 13 L.Ed.2d 199 (1964).

2. **Time for Filing:** The timely filing of a notice of appeal is mandatory and jurisdictional. Rinaldo v. Corbett, 256 F.3d 1276, 1278 (11th Cir. 2001). In civil cases, Fed.R.App.P.4(a) and (c) set the following time limits:

   (a) **Fed.R.App.P. 4(a)(1)**: A notice of appeal in compliance with the requirements set forth in Fed.R.App.P. 3 must be filed in the district court within 30 days after the entry of the order or judgment appealed from. However, if the United States or an officer or agency thereof is a party, the notice of appeal must be filed in the district court within 60 days after such entry. **THE NOTICE MUST BE RECEIVED AND FILED IN THE DISTRICT COURT NO LATER THAN THE LAST DAY OF THE APPEAL PERIOD - no additional days are provided for mailing.** Special filing provisions for inmates are discussed below.

   (b) **Fed.R.App.P. 4(a)(3)**: "If one party timely files a notice of appeal, any other party may file a notice of appeal within 14 days after the date when the first notice was filed, or within the time otherwise prescribed by this Rule 4(a), whichever period ends later."

   (c) **Fed.R.App.P.4(a)(4)**: If any party makes a timely motion in the district court under the Federal Rules of Civil Procedure of a type specified in this rule, the time for appeal for all parties runs from the date of entry of the order disposing of the last such timely filed motion.

   (d) **Fed.R.App.P.4(a)(5) and 4(a)(6)**: Under certain limited circumstances, the district court may extend the time to file a notice of appeal. Under Rule 4(a)(5), the time may be extended if a motion for an extension is filed within 30 days after expiration of the time otherwise provided to file a notice of appeal, upon a showing of excusable neglect or good cause. Under Rule 4(a)(6), the time may be extended if the district court finds upon motion that a party did not timely receive notice of the entry of the judgment or order, and that no party would be prejudiced by an extension.

   (e) **Fed.R.App.P.4(c)**: If an inmate confined to an institution files a notice of appeal in either a civil case or a criminal case, the notice of appeal is timely if it is deposited in the institution's internal mail system on or before the last day for filing. Timely filing may be shown by a declaration in compliance with 28 U.S.C. Section 1746 or a notarized statement, either of which must set forth the date of deposit and state that first-class postage has been prepaid.

3. **Format of the notice of appeal**: Form 1, Appendix of Forms to the Federal Rules of Appellate Procedure, is a suitable format. See also Fed.R.App.P. 3(c). A pro se notice of appeal must be signed by the appellant.

4. **Effect of a notice of appeal**: A district court loses jurisdiction (authority) to act after the filing of a timely notice of appeal, except for actions in aid of appellate jurisdiction or to rule on a timely motion of the type specified in Fed.R.App.P. 4(a)(4).

US009286622B2

## (12) United States Patent
### Choi

(10) Patent No.: **US 9,286,622 B2**
(45) Date of Patent: **Mar. 15, 2016**

(54) **PRESS RELEASE DISTRIBUTION SYSTEM**

(71) Applicant: **NATIVO, INC.**, Long Beach, CA (US)

(72) Inventor: **Justin Choi**, Newport Coast, CA (US)

(73) Assignee: **NATIVO, INC.**, El Segundo, CA (US)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **13/871,794**

(22) Filed: **Apr. 26, 2013**

(65) **Prior Publication Data**

US 2013/0246165 A1 Sep. 19, 2013

### Related U.S. Application Data

(63) Continuation of application No. 11/772,014, filed on Jun. 29, 2007.

(60) Provisional application No. 60/817,771, filed on Jun. 29, 2006.

(51) **Int. Cl.**
| G06Q 30/00 | (2012.01) |
| G06Q 30/02 | (2012.01) |

(52) **U.S. Cl.**
CPC ............ **G06Q 30/0246** (2013.01); **G06Q 30/00** (2013.01); **G06Q 30/0256** (2013.01); **G06Q 30/0269** (2013.01); **G06Q 30/0277** (2013.01); G06Q 30/0241 (2013.01); G06Q 30/0251 (2013.01)

(58) **Field of Classification Search**
None
See application file for complete search history.

(56) **References Cited**

### U.S. PATENT DOCUMENTS

| 6,571,234 | B1 * | 5/2003 | Knight et al. | |
| 7,801,905 | B1 * | 9/2010 | Singh et al. | 707/758 |

| 2002/0065802 | A1 | | 5/2002 | Uchiyama | |
| 2003/0028441 | A1 | | 2/2003 | Barsness et al. | |
| 2003/0028451 | A1 | | 2/2003 | Ananian | |
| 2004/0044571 | A1 | * | 3/2004 | Bronnimann et al. | 705/14 |
| 2004/0068750 | A1 | | 4/2004 | Maa | |
| 2004/0093266 | A1 | * | 5/2004 | Dohring | 705/14 |
| 2004/0186777 | A1 | * | 9/2004 | Margiloff et al. | 705/14 |
| 2005/0021521 | A1 | * | 1/2005 | Wycoff | 707/10 |

(Continued)

### FOREIGN PATENT DOCUMENTS

WO WO 2006017622 A2 * 2/2006

### OTHER PUBLICATIONS

CNN.com homepage, Jan. 1, 2005, Wayback Machine internet archive.*

(Continued)

*Primary Examiner* — Amanda Abrahamson
*Assistant Examiner* — Meredith A Long
(74) *Attorney, Agent, or Firm* — Lewis Roca Rothgerber Christie LLP

(57) **ABSTRACT**

A press release distribution system provides press release and other news to forum sites as posts. The forum software that runs at forum sites includes press release interface software or is adapted to receive press release interface plug-in modules for interfacing with the press release distribution system. The press release interface software or plug-in module may also monitor and/or analyze user data of forum members and/or forum activities of the users. The monitored user data and forum activities may be provided to the press release distribution system for analysis and generation of user profiles. Using the result of the analysis (e.g., user profiles), the press release distribution system can target particular users or forums to direct the press releases, news, or advertisements for most effective advertising campaign.

**22 Claims, 7 Drawing Sheets**



US 9,286,622 B2

Page 2

(56)                **References Cited**

U.S. PATENT DOCUMENTS

| 2005/0192948 | A1  | 9/2005  | Miller et al.      |        |
|--------------|-----|---------|--------------------|--------|
| 2005/0222900 | A1  | 10/2005 | Fuloria et al.     |        |
| 2006/0074751 | A1  | 4/2006  | Kline et al.       |        |
| 2006/0190333 | A1* | 8/2006  | Choi               | 705/14 |
| 2007/0043617 | A1* | 2/2007  | Stein et al.       | 705/14 |
| 2011/0191309 | A1  | 8/2011  | Anderson et al.    |        |

OTHER PUBLICATIONS

International Search Report of PCT/US07/15084 dated Feb. 11, 2008.
U.S. Office action dated Nov. 10, 2009 corresponding to U.S. Appl. No. 11/359,003, 10 pages.
U.S. Office action dated Jul. 6, 2010 corresponding to U.S. Appl. No. 11/359,003, 14 pages.
U.S. Office action dated Sep. 15, 2011 corresponding to U.S. Appl. No. 11/359,003, 13 pages.
U.S. Office action dated Apr. 27, 2012 corresponding to U.S. Appl. No. 11/359,003, 14 pages.
U.S. Office action dated Sep. 10, 2012 corresponding to U.S. Appl. No. 11/359,003, 3 pages.
U.S. Office action dated Jun. 14, 2010 corresponding to U.S. Appl. No. 11/772,014, 9 pages.
U.S. Office action dated Jan. 5, 2011 corresponding to U.S. Appl. No. 11/772,014, 10 pages.
U.S. Office action dated Mar. 8, 2011 corresponding to U.S. Appl. No. 11/772,014, 3 pages.
U.S. Office action dated Sep. 26, 2013 corresponding to U.S. Appl. No. 11/772,014, 16 pages.
U.S. Office action dated Jun. 12, 2014, for cross reference U.S. Appl. No. 11/772,014, (17 pages).
U.S. Office action dated Sep. 30, 2014, for cross reference U.S. Appl. No. 11/772,014, (27 pages).
MessageBoardBlaster.com homepage and FAQ, Mar. 1, 2005, Wayback Machine internet archive (6 pages).
U.S. Final Office Action dated Jul. 28, 2015 for cross reference U.S. Appl. No. 11/359,003 (19 pages).
U.S. Office Action dated Sep. 23, 2015 for cross reference U.S. Appl. No. 11/772,014 (18 pages).

* cited by examiner

Case: 23-1392     Document: 12     Page: 77     Filed: 03/14/2023



FIG. 1

APPX290

Case: 23-1392    Document: 12    Page: 78    Filed: 03/14/2023



FIG. 2



FIG. 3

ACCESS THE DIRECTORY SYSTEM 300

SELECT AD SITES 302

CREATE / SUBMIT ADS 304

ARRANGE ONLINE PAYMENT 305

DISTRIBUTE ADS 306

ADS ARE TRACKED 308

ADJUST AD CAMPAIGN 310

Case: 23-1392    Document: 12    Page: 80    Filed: 03/14/2023



FIG. 4

Case: 23-1392      Document: 12      Page: 81      Filed: 03/14/2023



FIG. 5

PRESS RELEASE DISTRIBUTION SYSTEM

400



FIG. 6

Case: 23-1392    Document: 12    Page: 82    Filed: 03/14/2023



FIG. 7

RECEIVE PRESS RELEASE OR NEWS 600

PROVIDE THE PRESS RELEASE OR NEWS TO FORUM SITE 602

MONITOR USER DATA 604

MONITOR FORUM ACTIVITY OF ONE OR MORE USERS 605

ANALYZE THE USER DATA AND FORUM ACTIVITIES 606

USE THE ANALYSIS RESULT TO TARGET THE USER/ FORUM SITE 608

PROVIDE PRESS RELEASES, NEWS, ADS TO THE FORUM SITE/USER 610

APPX296

US 9,286,622 B2

**1**

## PRESS RELEASE DISTRIBUTION SYSTEM

### CROSS-REFERENCE TO RELATED APPLICATION

This application is a continuation of application Ser. No. 11/772,014 filed Jun. 29, 2007, which claimed the benefit of U.S. Provisional Application No. 60/817,771 filed Jun. 29, 2006, the entire content of which is incorporated by reference herein.

### FIELD OF THE INVENTION

The present invention relates to online brand marketing and monitoring.

### BACKGROUND

Global computer networks, such as the Internet, are increasingly being used for marketing and advertisements, encroaching into advertising markets traditionally reserved for printed media (e.g., newspapers and magazine) and/or television. Online advertisements often appear on web sites or web pages of the World Wide Web (WWW) in a form of banner ads, or the like. There are also other web sites that are fan sites (or forum sites) utilized for discussing particular interests or hobbies. These fan sites normally consist of message forums and other venues for disseminating information over the global computer networks, are being used to portray certain products or brands in a positive or negative light, and can be important sources of consumer feedback for advertisers, manufacturers and consumers alike.

Since these fan sites tend to have smaller audiences, one should advertise across many of them to reach a sizable market. While this market is highly desirable, the problem is that one needs to work through many different sites to reach the market. Also, since each fan site typically requires a fee for placing an advertisement, it is impractical or impossible to place advertisements on each and every one of them. Therefore, the advertisers, manufacturers or those seeking to reach the market through the fan sites must select the right fan sites on which to place their advertisements. Further, these sites tend to be less professional than typical larger sites (Yahoo, CNN, etc.) that sell ad spaces so it is desirable to have them fit into a set standard for distributing and processing ads.

Due to a generally large number of fan sites available for placing advertisements, it is often very difficult and time consuming to select those relatively few fan sites to run advertisements. For one thing, it is often difficult to identify those fan sites that are frequented by a number of potential customers. Further, it is even more difficult to measure the effectiveness of the advertisements placed on any particular fan site.

Such difficulties in identifying the target fan sites are even more pronounced when the brands being advertised or marketed are for a niche market such as the automotive aftermarket industry, for example. The automotive aftermarket is already fragmented into a number of different market segments such as parts for trucks, sport compact cars, domestic performance cars, luxury SUVs, etc. Therefore, it is not an easy task for an aftermarket manufacturer, which is often a small or medium-sized business with limited resources and marketing budget, to select one or more aftermarket car enthusiast fan sites that will serve as an effective venue for its marketing campaign.

Further, although these fan sites typically provide an advertising tracking program, they generally only indicate how many people saw the ad and how many people clicked on it

**2**

without any further information on ad effectiveness. In addition, the fan site operator typically provides advertising tracking information once in a while by sending an e-mail, for example, and the advertiser has no way of validating their data. Therefore, it is very difficult to quantitatively assess which site is truly better than another site.

Further, since each site has its own paperwork and processes for accepting ads and ad money, ranging from very formal to very informal, an advertiser must spend extra time to track which placement invoices should be coming for which sites and for how long.

To further complicate the matter, the existing banner images may not be ideal for all of the sites that the advertisements are to be placed on. In this case, separate ads should be crafted for certain specific sites, which makes tracking even more complicated and the advertiser must keep track of which ads go to which sites. In addition, when the advertiser's products change and/or a new feature is added, the advertiser must re-do all of his advertising banners to reflect the changes and resubmit them to the appropriate sites. This may involve sending e-mails to all of the various site owners.

Other problems associated with online advertisements and marketing that prevent many businesses from effectively utilizing the web for advertising brands or products include: 1) difficulty in monitoring positive and negative comments on user forums, fan sites and/or the like that can make noticeable impacts on sales, as it is difficult and time consuming to monitor the thousands of user forums and other sites on the web; 2) lack of advertisers' knowledge or expertise in gauging the quality of the vendors' sites and limited availability of tools for measuring the performance of the online placements that are purchased, even when advertisers want to diversify their ad spending and advertising on enthusiast web sites; and 3) difficulty in monitoring unauthorized retailers who sell fake products because small or medium-sized businesses generally cannot afford to spend the time to monitor the entire web for unauthorized dealers.

Therefore, it is desirable to provide tools that will facilitate the advertisers, manufacturers or brand managers to locate the most suitable fan sites that are frequented by the target audience, and to monitor the effectiveness of any advertisements that are placed on these fan sites. Further, it is desirable to provide tools that can be used by the advertisers or manufacturers to monitor dissemination of information regarding their brand names or products over the global computer networks.

### SUMMARY OF THE INVENTION

In one exemplary embodiment according to the present invention, a press release distribution system is used to provide press releases, other news, advertisements, messages and/or non-"press" events to the forum sites.

In one exemplary embodiment according to the present invention, the press release distribution system inserts or posts a press release as a message at one or more forum sites.

In one exemplary embodiment according to the present invention, the press release distribution system interfaces with the forum software that runs at each of the forum sites. The forum software may have a built-in software for interfacing with the press release distribution system or may be adapted to receive a press release interface plug-in module for interfacing with the press release distribution system.

In one exemplary embodiment according to the present invention, the component of the press release distribution system that runs at respective forum sites, e.g., the press release interface plug-in, generates a user profile (e.g., a mar-

US 9,286,622 B2

3

keting profile) using user data and/or user activities at the forum such as user reads and uploads.

In an exemplary embodiment according to the present invention, a press release distribution system includes a distributor module adapted to receive a press release, and to distribute the press release to one or more forum sites over a network according to relatedness between the press release and the one or more forum sites; at least one input handler module adapted to receive the press release from one or more advertisers, and to provide the press release to the distributor module; and at least one press release poster module adapted to run at respective said one or more forum sites, to receive the press release over the network, and to post the press release as a message at the respective said one or more forum sites.

In another exemplary embodiment according to the present invention, a method of distributing a press release to one or more forum sites, is provided. The method includes: receiving the press release from one or more advertisers; distributing the press release to the one or more forum sites over a network according to relatedness between the press release and the one or more forum sites; and posting the press release as a message at the one or more forum sites.

In exemplary embodiments of the present invention, a brand management system used to provide marketing and monitoring services for brands or products over the global computer networks, includes a press release distribution system.

In another exemplary embodiment according to the present invention, a brand management system coupled to a plurality of web sites over a communications network, is provided. The brand management system includes: a press release distribution system adapted to receive a press release related to an advertiser and provide the press release to one or more forum sites among the plurality of web sites to post as a message, in accordance with relatedness between the press release and the one or more forum sites; a brand monitoring tool adapted to automatically monitor one or more of the web sites for at least one keyword related to a particular brand or product of the advertiser; and an advertisement directory system comprising a directory of web sites that are likely to provide an effective venue for one or more advertisements for the particular brand or product.

These and other aspects of the invention will be more readily comprehended in view of the discussion herein and accompanying drawings.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a configuration diagram of a brand management system coupled over the global computer networks to advertisers, ad sites, monitored sites, consumers and dealers;

FIG. 2 is a block diagram showing components of the brand management system of FIG. 1;

FIG. 3 is a flow diagram illustrating the process of using the brand management system for ad placement and tracking in an exemplary embodiment of the present invention;

FIG. 4 is a configuration diagram of a press release distribution system coupled over the global computer networks to advertisers and forum sites in an embodiment in accordance with the present invention;

FIG. 5 is a conceptualized block diagram of the press release distribution system of FIG. 4 in one embodiment according to the present invention;

FIG. 6 is a schematic view of a screen shot of a forum site home page in an embodiment in accordance with the present invention; and

4

FIG. 7 is a flow diagram of the operation of the press release distribution system in one embodiment in accordance with the present invention.

DETAILED DESCRIPTION

Exemplary embodiments according to the present invention provide a method and apparatus for facilitating targeted advertising of various different brands and monitoring thereof, over global computer networks, including distribution of press releases. This application contains subject matter related to U.S. patent application Ser. No. 11/359,003 filed Feb. 21, 2006, which claims priority to and the benefit of U.S. Provisional Application No. 60/654,163 filed on Feb. 18, 2005, the entire contents of both of which are incorporated herein by reference.

A brand management system or a brand monitoring and marketing system in exemplary embodiments of the present invention is a web-based application suite that provides businesses with the tools necessary to monitor and market their brands online. The system will provide the businesses with one or more of the tools including, but not limited to, a brand monitoring tool, an ad management tool, and a file management tool. The system can aggregate existing tools and/or provide new tools and services that are not currently available. The brand management system in one embodiment also includes a press release distribution system, and a number of press release interface software or plug-in modules running at forum sites to interface with the press release distribution system. The press release distribution system and the press release interface software may together be also referred to as a press release distribution system.

In an exemplary embodiment according to the present invention, the brand management system includes an ad directory system or an ad directory in a form of a web site to link the brand advertisers or manufacturers to various different web sites that are likely to provide an effective venue for marketing and advertisements for particular market segments. The advertisers or manufacturers can view (which can include logging in) the web page on which the directory of web sites is placed, and select one or more web sites based on their particular needs, in accordance with the information provided in the directory.

The ad directory system can also be used to facilitate distribution of the advertisements, tracking and monitoring of the effectiveness of the advertisements, and transfer of advertisement fees between the advertisers and the web site owners. The brand management system can use a brand monitor including a bot to monitor various different sites (e.g., popular forums, fan sites, etc.) through a keyword search, for example,

The brand management system of the present invention provides one or more of, without being limited to, the following features: 1) identification of the sites that would be suitable or ideal for the brands and/or products of interest, instead of finding one site at a time; 2) quantitative assessment as to which site is truly better than another site; 3) quantitative measurement of ad effectiveness, by such information as how many customers actually purchased products as a result of a particular advertisement on a particular web site; 4) independent confirmation of advertisement tracking data provided by the web site operators; 5) ability to create banner and/or other images that are suitable or ideal for all of the sites on which the advertisements are placed, because separate ads may be required for certain specific sites, which makes tracking even more complicated since the advertiser must keep track of which ads go to which sites; and 6) saving the advertisers

US 9,286,622 B2

5

from having to re-do all of the advertising banners to reflect the changes and resubmit them to the appropriate sites, when the products change or a new feature is added.

As illustrated in FIG. 1, a brand management system 100 is coupled to advertisers 103, and is coupled to monitored sites 110, including ad sites 1 to N 104, 106, 108, over the global computer networks 102. The monitored sites 110 also include popular sites 109 that are not necessarily ad sites. By way of example, the popular sites may include large sites that are monitored but do not have ad sales provided through the brand management system 100. Consumers 112 (or computers thereof) are coupled to the ad sites 1 to N 104, 106, 108. The consumers generally would not directly access the brand management system 100.

The brand management system 100 is used for monitoring and marketing by one or more advertisers, for example, and may also be referred to as a brand monitoring and marketing system herein. The advertisers 103 represent one or more different advertisers, manufacturers, dealers or brand marketers who are using the services provided by the brand management system 100. Similarly, the monitored sites 110 represent one or more sites that are monitored by the brand management system 100 on behalf of the advertisers 103.

As can be seen in FIG. 2, the brand management system 100 includes brand monitoring tools 200, an ad directory system 202, an online payment system 204, and a file manager 210. The ad directory system 202 includes an ad tracker 206, an ad generator 207 and an ad distributor 208. In one embodiment, the brand management system optionally includes a press release distribution system 400. The box 400 representing the press release distribution system 400 is shown in dotted lines because the press release distribution system 400 is optional. In addition, the press release distribution system 400 may be implemented in one or more other modules, such as the ad tracker 206, the ad distributor 208 and/or the file manager 210. Further, some of the components of the press release distribution system 400, such as, for example, press release plug-ins shown in FIG. 4 (or press release posters shown in FIG. 5) may be implemented at the forum sites, separately from the rest of the brand management system 100.

The brand monitoring tools 200 are used for monitoring the user forums, fan sites, etc. to afford advertisers or manufacturers an insight into how their products and/or brands are received or perceived in the market, especially by the relevant online community. The ad directory system 202 is for bringing together sellers and buyers of online advertisements, and includes ad tracking, ad generation and ad distributor features as follows. The ad generator 207 can be used by the advertisers or manufacturers to create or to modify online ads (e.g., including banners), while the ad distributor 208 and the ad tracker 206 can be used to distribute ads and to track effectiveness of ads, respectively. Alternatively, the advertisers or manufacturers can submit their own pre-created ads for distribution rather than using the ad generator 207.

By way of example, the ad directory system 202 facilitates the advertisements by the manufacturers/distributors by enabling them to create/submit/modify their own advertisements and placing them on the advertisement directory of the ad directory system 202. The advertisers may also post specific products and quantities/inventories available for sale for each product, such that transactions can be facilitated through the use of the brand management system 100. Hence, the brand management system 100 brings the sellers and purchasers together in an online community setting.

The transactions can be consummated through the use of the online payment system 204. The users of the ad directory

6

system 100 can, in addition to purchasing products from the advertisers/manufacturers/distributors online, bid for products online, such that the ad directory system 202 can be used for advertising, selling, purchasing and/or bidding of various different products having different prices and in different quantities. All these transactions can be monitored using the ad tracker 206 such that the effectiveness of the ads and/or ad campaigns can be measured.

The file manager 210 can be used for online distribution of information related to products or brands (e.g., images, brochures, performance data, etc.) to the dealers and/or the consumers. Any advertising fee transactions between the advertisers and ad site owners can take place using the online payment system 204, for example.

In other embodiments, the ad distributor 208 may also distribute press releases as ad units, and the ad tracker 206 may also track effectiveness of the press releases. In yet other embodiments, the file manager 210 may also be used to distribute the press releases. In still other embodiments, a separate press releases distribution system is used as a part of the brand management system 100 or as a separate system/module to receives press releases and other news, and distribute them to the advertisement sites (e.g., forum sites). One instance of such press release distribution system is illustrated in FIG. 4, and described in reference to FIGS. 4-6 below.

Search engine ranking, linked sites, eBay® postings, and other negative or positive product comments on forums and other web sites can have a dramatic impact on how a brand is perceived. This negative or positive "press" can also directly affect sales. Hence, in an exemplary embodiment, the brand management system 100 performs brand monitoring using the brand monitoring tools 200.

The brand monitoring tools 200 include a bot 201. The brand monitoring tools 200 may also include one or more other tools known to those skilled in the art. During brand monitoring, the bot is used to automatically monitor certain web sites and web postings for specific keywords. These keywords may appear as topics and/or content of discussions in different online forums. They may also appear as products for sale on Internet auction sites. Hence, the bot can be used to monitor/track various different web sites and/or web postings to search for particular keywords, brands, products, advertiser identifications, etc. to monitor how the monitored brands, products, etc. are characterized/perceived by the online community. By way of example, the bot can be targeted to one or more predetermined web sites. The user may also have flexibility to tailor monitoring of various different web sites and postings to fit his needs using the bot. The web sites searched can include one or more of, but are not limited to, eBay® and other auction site postings, Froogle™ posts, Epinions® posts, forum posts, search engines, number of links to the manufacturer's web site, Alexa® ranking, Google® Adwords®, Overture®, Groups, and the like.

EBAY® is a registered trademark of eBay Inc., a Delaware corporation; FROOGLE™ is a trademark of Google Technology Inc., a California corporation; EPINIONS® is a registered trademark of Epinions, Inc., a Delaware corporation; ALEXA® is a registered trademark of Alexa Internet Corporation, a California corporation; GOOGLE® and Adwords® are registered trademarks of Google Inc., a Delaware corporation; and OVERTURE® is a registered trademark of Overture Services, Inc. a Delaware corporation.

The advertiser, such as a brand owner and/or a product manufacturer, can select which keywords, trademarks, and phrases are relevant to their businesses. The advertiser can be given links to any posts that contain these keywords. This

US 9,286,622 B2

7

feature can be used, for example, to give the marketing manager an instant overview of the web activity that their brand is generating. For example, the marketing managers can have, all on one screen, a summary of Internet activities relevant to their brand.

The bot of the brand monitoring tools 200 should be more sophisticated than a normal bot, and should be used for checking Internet activities. In one embodiment, the bot is able to navigate web sites that require users to log in to the web site. In this embodiment, the bot is also able to look for specific data on each web page. Further, the bot is a programmable bot that can be customized for each site being monitored.

In one embodiment, the bot reports indexing failures to indicate changes to the web sites that may cause the bot to fail. "Behaviors" are programmed into the bot as many of these web sites have rules designed to exclude bots from using specific features on their sites. For example, some forums do not allow more than one search every 20 seconds to avoid bots overloading their servers. Those skilled in the art would know how to create/program a bot having one or more of the above features according to exemplary embodiments.

The ad directory system 202, which may also be referred to as an ad directory, of the brand management system 100 provides manufacturers or advertisers with a large directory of web sites related to a particular brand, such as top automotive enthusiast web sites. The manufacturers or advertisers can select web sites that they wish to advertise their brands or products on, using a system similar to an online shopping cart.

By aggregating and organizing these sites, the brand management system will enable advertisers to quickly create and manage ad campaigns across multiple web sites. For web sites selling advertising spaces, the ad directory system 202 will enable them to post their site information, ad programs, audience type, and ad rates. These enthusiast sites will have the option of having their traffic audited for an additional monthly fee. Such auditing process can be automated through an automated digital tracking system (e.g., pixeling), for example. These sites can be specially marked, for example, to indicate that their traffic has been audited.

Advertisers or manufacturers should be able to view these enthusiast sites by site type (e.g., make/model) and easily select multiple ad placements to create an online media buy. Web sites selling their placements through the brand management system 100 should be able to review requested placements and ads submitted by manufacturers. Once an ad placement is accepted by a particular web site, the brand management system 100 will automatically place the ad on that particular web site. The ad distributor 208 manages ad distribution, and the ad tracker 206 manages detailed ad tracking.

The ad tracker 206, which may also be referred to as an ad tracking system, would enable advertisers to easily track a variety of data per ad or per placement. Advertisers would be able to track information including contact form submissions, orders, number of shopping carts started, product pages viewed, and the like.

The ad generator 207, which may also be referred to as an ad generation system or an ad creation system, is a tool that can be used to generate ads that are suitable for all ad sites. The ad generator 207 can also be used to generate two or more ads, each of which is suitable for placement on one or more specific sites. In addition, the ad generator 207 can be used to convert existing ads on printed media to banner or other ads suitable for placement on web pages.

The ad distributor 208, which may also be referred to as an ad distribution system, provides the advertiser with the ability to remove and/or replace ads. Advertisers could also run

8

multiple ads in rotation in one single placement. Optionally, advertisers may have the brand management system automatically disable the less effective one or more ads of a plurality of ads. Advertisers would be able to set which factor they wish to use in evaluating effectiveness including clickthrus, orders, contact form submissions, and/or the like.

In addition to traditional banner placements, the brand management system 100, or the ad distributor 208 thereof, will enable advertisers to distribute online press releases, or choose keyword-related placements tied to text or image ads on the ad sites, which may be enthusiast sites.

An online media buy may include dozens of web sites, so organizing and tracking these payments online will be important for advertisers. The brand management system 100 can process the transactions for the placement fees through its online payment system 204 using a model similar to that of an application service provider (ASP) model. By way of example, monthly fees may be charged by the ad sites through the online payment system 204 for placing advertisements. Advertiser/site feedback may also be incorporated into the brand management system 100. The online payment system 204 can also be used by the advertisers and/or the ad sites to pay for services provided by the brand management system 100.

A model similar to the ASP model can also be used between the advertisers and/or ad sites and the brand management system 100. By way of example, a model similar to the ASP can be used to implement the transactions between the advertisers and/or the ad sites and the brand management system 100. This way, the brand management system 100 can charge a monthly access fee to the advertisers and/or ad sites for buying and selling of ad spaces.

There are at least two fees that are associated with the brand management system of the present invention. A first fee is an access fee to access the system for brand monitoring and to access ad directory. The access fee can be a monthly ASP style fee, and it is conceivable that some customers may only pay this monthly access fee but not buy any ads. The online payment system 204 is used to pay for the placement of the ads. The operator of the brand management system, for example, may keep a percentage of revenue generated through all of the transactions involving purchasing ad spaces and placing ads.

According to FIG. 3, the advertiser or manufacturer first accesses the ad directory system (300). The ad directory system contains information on available ad sites corresponding to the products or brands of interest. The advertiser or manufacturer selects ad sites based on the site type (e.g., catering to the specific industry) and/or the like (302).

The advertiser or manufacturer may already have available ads, or they may wish to modify existing ads and/or create new ads using the tools available in the brand management system, such as the ad generator 207 (304). After selection of the ad sites and the creation/submission of the ads, a payment is arranged (305), for example, through the online payment system 204. Then, the ads are distributed to the selected ad sites (306). The effectiveness of the ads can be tracked (308) using the ad tracker 206, for example. The ad campaign can then be adjusted (310) using factors such as effectiveness of the various different ad sites.

Further, advertisers or manufactures can gain detailed tracking information by using the brand management system 100. By way of example, a total summary for the campaign may show total clicks, total impressions, click-through rates (CTR) and total user actions, all of which can be tracked, such that ads can be tied to some user activity such as a dealer search, product page view, contact form submission, or an

US 9,286,622 B2

**9**

online order. This way, one or more user activities associated with the advertisements can be tracked/monitored.

In addition, manufacturers or advertisers can distribute ads evenly or remove ineffective ads after so many days or after so many impressions. Further, the advertisers or manufactures can remove or edit existing ads or generate new ads. This way, advertisers or manufactures can quickly change ads on multiple sites, run multiple ads in one placement, run different ads based on time of day, and/or remove ineffective ads without having to resubmit the ads manually to multiple site owners.

Currently, product images, documents, and data are typically distributed by burning the data onto CD-ROMs as their dealers request them. By moving this functionality online, the manufacturer will gain several benefits including, but not limited to, reduced labor costs associated with distributing materials to dealers and media and reduced CD media and postage costs.

The file manager 210 is a part of a suite of tools (i.e., the brand management system 100) that address the common needs of advertisers or manufacturers, such as the automotive aftermarket industry.

The file manager 210 should enable advertisers or manufacturers to do one or more of, but not limited to, the following: 1) upload various documents and images; 2) upload large images and automatically have "thumbnail" previews created; 3) organize documents and images into categories and/or subcategories; 4) establish access rights depending on user type; 5) track downloads by user and by file; and 6) provide news/updates to dealers.

Further, the file manager 210 should enable manufacturers' dealers to do one or more of, but not limited to, the following: 1) view thumbnails of images (created automatically by the system); 2) search for files by a keyword; 3) browse files by category/subcategory; 4) select multiple files or download entire categories of files; and 5) quickly see new files uploaded since the last login.

While the present application has been described mainly in reference to the automotive aftermarket, the directory system in exemplary embodiments of the present invention can be applied to any suitable market with strong enthusiast following online. The sites and market segments having such strong enthusiast following online, may include wedding sites, golf, professional wrestling, and the like.

As discussed above, in embodiments in accordance with the present invention, the following strategy is used, for example, for brand monitoring, marketing and management: 1) A large number of small automotive forums (publishers) are aggregated into one automotive network; 2) The clients are enabled to easily create online ad campaigns by selecting various publishers; 3) The advertisers are enabled to upload, distribute, and track ad banners across these publishers; 4) The brand monitoring and marketing system will automatically monitor posts on these sites to see if anything negative or positive is said about the advertiser; and 5) Other online services will be provided to advertisers through the brand monitoring and marketing system (e.g., e-commerce, etc.).

In another embodiment in accordance with the present invention, a press release distribution system is used to inject or post press releases into the forum. The press releases can include text, video, graphics, images, multimedia, programming, and/or any other suitable information as those skilled in the art would appreciate. Here, each of the press releases may be viewed or referred to as an ad unit that can be embedded into the forums.

As shown in FIG. 4, a press release (PR) distribution system 400 in an embodiment in accordance with the present invention, is coupled to advertisers 403 and forum sites 1 to N

**10**

(410, 420, 430), wherein N is an integer greater than or equal to 3. In the described embodiment, there is no limit to the number of forum sites that the press release distribution system 400 is coupled with. The press release distribution system 400 receives press releases, news feed and/or Really Simple Syndication (RSS) feed over a network 402, which may be a global computer network or the Internet, or any other suitable network known to those skilled in the art. The press release distribution system 400 may be a part of a brand management system 100, or may be a standard alone system. Such stand alone press release distribution system may be coupled or not coupled with the brand management system 100. One embodiment of the press release system 400 may be referred to as POSTRELEASE™, which is a trademark of CIE Studios, LLC, Long Beach, Calif.

In the example depicted in FIG. 4, the press release distribution system 400 receives press releases from the advertisers 403. In other embodiments, the press release distribution system 400 may receive the press releases in any other suitable manner over the network 402 or otherwise. Further, the news and RSS feeds may be provided using any suitable method over the network 402 or otherwise, as those skilled in the art would appreciate. Any advertisements including text and/or graphics can also be distributed and posted directly into forums using the press release distribution system 400, of course. The press releases are posted on (or inserted into) the forum (or forum site) as a message or an announcement. The "message" may also be referred to as a "post" throughout this specification. Further, the "message" is not limited to text, but may also include one or more of images, video, web site code, Flash, or any other suitable information or data.

As can be seen in FIG. 4, one or more users 440 (i.e., computers or other network devices thereof) are also coupled to the forum sites 1-N (410, 420, 430) via the network 402. The users 440 are consumers who may be members or users of the forum sites 1-N. The press releases posted on the forum sites 1-N will be read by the users 440 of the corresponding forum sites. The users 440 upload posts at the forum sites, and also read the posts of interest from the forum sites. These user activities can be used or analyzed to generate personal/marketing profiles for the users. While only one box 400 is used to designate the users in FIG. 4, the users of course can be located at multiple different locations (e.g., across the globe).

The press release distribution system 400 may be included in the brand management system 100 of FIGS. 1 and 2, for example, or implemented as a system separate from the brand management system 100 on the same or different server from that of the brand management system 100. In other embodiments, the features and functions of the press release distribution system 400 are implemented in other modules of the brand management system 100, such as the ad tracker 206, or the ad distributor 208 and/or the file manager 210.

The forum site 1 (410) runs forum software 412; the forum site 2 (420) runs forum software 422; and the forum site N (430) runs forum software 432. The forum software 412, 422 and 432 respectively have installed therein, respective press release (PR) plug-ins (or plug-in modules) 414, 424 and 434. The press release plug-ins may also be referred to as press release interface plug-ins herein. The forum software may be VBulletin or any other forum software available to those skilled in the art. Those skilled in the art would appreciate that the plug-in modules are designed and developed to work with one or more desired forum software. The press release plug-in module receives the press releases and/or other news from the press release distribution system 400, and posts the received press releases and/or other news on the corresponding forum site. Alternatively, the press release distribution system 400

US 9,286,622 B2

11 12

and the press release plug-ins may together also be referred to as a press release distribution system.

Each of the forum sites 1 to N (**410, 420, 430**) also includes a respective one of databases **415, 425** and **435**. The database includes user data, e.g., name, birth date/age, gender, occupation, address, e-mail address, phone number, and/or any other personal data required (or optionally requested) by the forum site for registration as a member. The database also includes the forum postings, traffic and forum activities, and may also include history and/or archive of the forum postings, traffic and forum activities. The forum activities may include the activities of the users/members while logged onto the forum site, such as the posts downloaded/read and posts written/uploaded by the users.

In one embodiment, the press release plug-in module is used to monitor the posts, user information, user behavior, and/or other forum activity at the corresponding forum site. By way of example, most forum sites require that the users be registered as members in order to post on forums, while non-registered users can still view the site and posts thereon. Also, most forums are broken down by topic areas. Further, the registration process on many forums including nearly all automotive forums require age information and optional location, occupation, and other personal data. The press release plug-in in one embodiment uses such personal data and by tracking the content of each message the user posts and reads, to develop a marketing profile for that user. Further, almost every forum has a search feature or function, and the search activity of the user (e.g., search terms or keywords used by the user during the search) can also be used to create user profile. As such, the plug-in module in one embodiment monitors the forum activity of the user and uses that information to create a marketing profile (or user profile) and then deliver ads against that profile for a targeted advertising. By way of example, in one embodiment, the marketing profile (or user profile) can be created by analyzing the posts/messages that the user reads, the posts/messages that the user creates, and/or the profile information the user entered when the user created his/her account on the forum.

By way of example, if someone is viewing a post thread about wheels and he responds to the thread, the press release plug-in module can be used to determine that that particular user may have an interest in wheels, and deliver wheel ads to that user. Alternatively, the press release plug-in module may provide the user activity information to the press release distribution system **400** for such analysis/determination. As such, in the described embodiment, the press release distribution system **400** is integrated into existing forum sites using the press release plug-in modules, rather than sites specifically developed for operating with the press release distribution system. Hence, the press release distribution system **400** draws existing data from forums (i.e., mines already existing data) that are generated by user activities on forums. To get these forum sites to join the network of press release distribution system **400**, a revenue sharing may be instituted, in which the press release distribution system **400** delivers ads and shares revenue, as many of these forum sites, despite having great traffic, typically need help to generate revenue from the traffic.

In other embodiments, the forum software may already include a press release interface module for receiving and posting press releases from the press release distribution system **400** and for monitoring user data and forum activity thereof, such that a separate plug-in module is not necessary. Hence, while the press release interface plug-in module is installed separately by the forum site owner, the site owner needs only install the forum software when it already includes the features and functions of the press release interface plug-in module.

The press release distribution system **400** in one embodiment limits the time period during which particular press releases are posted at one or more forums. Further, in one embodiment, the press release distribution system **400** (either alone or together with the forum software and/or the press release interface plug-in module) limits the frequency at which the press releases are displayed for each user. The press release distribution system **400** in one embodiment also tracks the result (i.e., effectiveness) of the press release distribution campaigns.

As shown in FIG. **4**, therefore, press releases, news and/or advertisements from/related to the advertisers **403** of particular brand or product can be directed to particular one or more forum sites in accordance with the relationship or relatedness between the press releases, news, advertisements, advertisers, brand, product and the forum sites. By way of example, press releases, advertisement, etc. from aftermarket automotive parts manufacturers will be directed to forum sites of auto enthusiasts and press releases, advertisements, etc. from golf club manufacturers will be directed to golf enthusiast forum sites. Further, in one embodiment, the press releases, advertisements, news, etc. are directed to one or more particular users/members of the forum sites in accordance with the user profiles and/or user activities at the forum site. By way of example, a user actively reading or uploading on threads on multi-function cellular phones will be targeted to be provided with press releases and/or advertisements from cellular phone manufacturers.

FIG. **5** is a conceptual block diagram of the press release distribution system **400** of FIG. **4**. As shown in FIG. **5**, the press release distribution system includes a press release handler module (or press release handler) **450**, a news feed handler module (or news feed handler) **452** and an rss feed handler module (or rss feed handler) **454** for receiving and handling press releases, news feed, and rss feed, respectively. The press release handler module **450**, the news feed handler module **452** and the rss feed handler module, either together or separately, may also be referred to as an input handler or input handler module. The term "module" is used throughout this specification to refer to any hardware, software, firmware, application, tool, widget, plug-in, any other suitable processing apparatus or method known to those skilled in the art to implement the described functions, or any combinations thereof.

The press release distribution system **400** also includes a distributor/controller module **460** (to be referred to hereinafter as "distributor" or "distributor module") **460**. The distributor module **460** receives the press releases, news feed and rss feed, and provide them to one or more press release poster/monitor modules (to be referred to hereinafter as "press release posters" or "press release poster modules") **470, 472, 474** to be posted at the respective forum sites. In one embodiment, each of the press release poster modules **470, 472** and **474** posts or inserts the press releases as a message on the forum (or forum site). In one embodiment, the press release poster modules **470, 472, 474** are implemented as plug-ins, such as the PR interface plug-ins **414, 424** and **434** of FIG. **4**.

In addition to posting the press releases, news feed, and rss feed, the press release poster modules **470, 472, 474** monitor user data and/or forum activities of one or more users at respective forum sites. The press release poster module **470, 472** or **474** may analyze the user data and/or forum activity data. Alternatively or in addition to the analysis of the user data and/or forum activity data in the press release poster

US 9,286,622 B2

13

modules **470**, **472**, **474**, in one embodiment, the distributor module **460** analyzes the user data and/or the forum activities. The distributor module **460** may also receive the result of the analysis of one or more of the press release poster modules **470**, **472** or **474**, and further analyze such analysis result. Then the distributor module **460** uses the analysis result to target the user/forum site to direct the press releases, news, advertisements, messages and/or non-"press" events. Therefore, in one embodiment, the distributor module **460** analyzes or further analyzes the user/forum activity data, and/or controls providing press releases, news, rss feed, messages, non-"press" events, and/or advertisements to the forum sites and/or the users. The press release poster modules **470**, **472** and **474** are not limited to posting press releases and/or monitoring the user data/forum activities, but may be used to post other information such as, for example, advertisements, other news, messages and/or non-"press" events, or any other information suitable for posting on one or more forum sites.

As can be seen in the schematic view of a screen shot of a forum site home page **500** in FIG. **6**, the home page of a forum site typically includes a forum name **504** and one or more banner ads **502**, **506**. The home page typically displays one or more posts **510** posted by the members of the forum. Such posts may include threads initiated by a particular posting or postings. The home page **500** also displays a press release **508**, which is displayed with a background color (e.g., red) different from that of the member posts **510**. This way, press releases from the advertisers **403** can be brought to the immediate attention of the forum member. In other embodiments, the press release post (or the alert thereof) may be displayed with other background color, distinguishing font and/or text format (e.g., bold text) as those skilled in the art would appreciate. Such press releases can be viewed and referred to as ad units in the described embodiment, and may be effective advertisements directed at particular forum sites, and/or particular members or users. While the press release **508** is shown as an announcement in FIG. **6**, the press release **508** may be posted or inserted as a message in other embodiments.

FIG. **7** illustrates a flow diagram showing an operation of the press release distribution system in one embodiment in accordance with the present invention. The flow diagram of FIG. **7** will be described in reference to FIGS. **4**, **5** and **7**. The press release distribution system **400** first receives a press release or news (**600**). The press release may have originated from one of the advertisers **403** who desires to use the press release as an advertisement to be distributed to the forum sites of interest. By way of example, the advertiser may be a manufacturer of after market auto parts who desires to distribute a press release regarding a scheduled release of a new product to the auto enthusiast fan or forum sites. The press release distribution system **400** may also receive news or RSS feed relevant to one or more of its associated forum sites 1-N (**410**, **420**, **430**), and distribute the news or other information to the forum sites and/or users/members of the forum sites.

The press release distribution system **400** then distributes the press release or news to the relevant forum sites (**602**). The press release interface plug-in (**414**, **424** or **434**) in the forum software (**412**, **422** or **432**) of these forum sites posts such press release or news at the forum to be viewed by the members and visitors of the forum site.

The press release plug-in module also monitors user data (e.g., stored in the database **415**, **425** or **435**) or the respective forum site (**604**). Such user data is gathered from the users/members by the forum sites at the time of registration or at any other suitable time. The database at the forum site also includes information regarding user activities. By way of example, the database may include such forum activities as

14

reading the posts (or threads thereof) or writing posts onto the forum sites. The press release plug-in also monitors these forum activities of one or more users/members (**605**). The monitored information may be gathered and analyzed by the press release plug-in and/or may be provided to the press release distribution system to be analyzed to generate user profiles (**606**). Based on such user profiles, the press release distribution system can target particular forum sites and/or members thereof to direct the press releases, news and/or advertisements (**608**). Hence, based on the user profiles, particular press releases, advertisements and/or news can be directed (or provided) to the particular forums and/or users (**610**).

While certain exemplary embodiments have been described above in detail and shown in the accompanying drawings, it is to be understood that such embodiments are merely illustrative and not restrictive of the broad invention. It will thus be recognized that various modifications may be made to the illustrated and other embodiments of the invention described above, without departing from the broad inventive scope thereof. In view of the above it will be understood that the invention is not limited to the particular embodiments or arrangements disclosed, but is rather intended to cover any changes, adaptations or modifications which are within the scope and spirit of the invention.

What is claimed is:

1. A press release distribution system configured to deliver advertisements as sponsored news content to multiple web sites that each includes one or more pages containing non-sponsored content, the press release distribution system comprising:

one or more server computers configured to receive sponsored news content from one or more advertisers over a communications network and to distribute the sponsored news content to a related one or more of the web sites over the communications network;

multiple web server computers coupled to the server computer over the communications network,

each web server computer configured to run at one or more of the related one or more of the web sites, wherein the web servers are further configured to receive the sponsored news content from the server computer over the communications network, to post the sponsored news content among the non-sponsored content at the related one or more of the web sites, and to monitor user data or user activity at the related one or more of the web sites,

wherein the press release distribution system is further configured to utilize a particular one of the monitored user data or user activity to deliver a specific advertisement in a form of the sponsored news content to a particular user,

wherein the one or more web servers are further configured to track one or more of impressions, clicks, click-through rate, or user actions with respect to the sponsored news content,

wherein the sponsored news content is not a banner advertisement or a static header,

wherein the at least one web server is further configured to display the sponsored news content separately from any banner advertisement or static header on the page, embed the sponsored news content contiguously together with at least some of the non-sponsored content on the page, enable the sponsored content to scroll together with the at least some of the non-sponsored content on the page, and to place the sponsored news content in a fixed position relative to the contiguous non-sponsored news content on the page,

US 9,286,622 B2

15

wherein a plurality of features of the sponsored news content are substantially the same as a corresponding plurality of features of the contiguous non-sponsored news content, and at least one feature of the sponsored news content differs from or is in addition to the corresponding feature of the non-sponsored news content in order to distinguish the sponsored news content from the non-sponsored news content, and

wherein the press release distribution system is further adapted to limit a time period during which the sponsored news content is posted at the related one or more of the web sites, and to limit a frequency at which the sponsored news content is displayed for each user.

2. The press release distribution system of claim 1, wherein the sponsored news content comprises a press release, news, announcement, message, news feed, or non-"press" event.

3. The press release distribution system of claim 1, wherein the non-sponsored content comprises one or more of messages, postings, posts, or threads.

4. The press release distribution system of claim 1, wherein the communications network is the Internet.

5. The press release distribution system of claim 1, wherein the plurality of web sites comprise forum sites, fan sites, popular sites, enthusiast sites, message forums, user forums, or popular forums.

6. The press release distribution system of claim 1, wherein the at least one poster module comprises a corresponding at least one press release plug-in module.

7. The press release distribution system of claim 1, wherein the press release distribution system is further configured to generate user profiles from the monitored user data or user activity at the related one or more of the web sites.

8. The press release distribution system of claim 1, wherein the user activity at the related one or more of the web sites comprises one or more of posts, reads of posts, or searches at the related one or more of the web sites.

9. The press release distribution system of claim 1, wherein the sponsored news content comprises one or more of text, video, or images.

10. The press release distribution system of claim 1, wherein the at least one poster module is configured to display the sponsored news content with a background color or another distinguishing feature to denote it as being different from the non-sponsored content.

11. The press release distribution system of claim 1, wherein revenue generated from the delivery of the specific advertisement is shared between an operator of the press release distribution system and operators of the related one or more of the web sites.

12. The press release distribution system of claim 1, wherein the poster module is configured to post the sponsored news content among the non-sponsored content at each of multiple web sites, and to monitor user data or user activity at each of the multiple web sites.

13. A method of electronically delivering advertisements as sponsored news content to a plurality of web sites that each includes non-sponsored content, the method comprising:

electronically receiving the sponsored news content by a server computer from one or more advertisers over a communications network;

electronically distributing the sponsored news content by the server computer to a related one or more of the web sites over the communications network;

electronically receiving the sponsored news content by the one or more web sites from the server computer over the communications network;

16

electronically posting the sponsored news content among the non-sponsored content at each of the related one or more of the web sites;

electronically tracking one or more of impressions, clicks, click-through rate, or user actions with respect to the sponsored news content at the related one or more of the web sites;

electronically monitoring user data or user activity at the related one or more of the web sites; and

delivering a specific sponsored news content to a particular user utilizing a particular one of the monitored user data or user activity, wherein revenue generated from the delivery of the specific sponsored news content is shared with the related one or more of the web sites,

wherein the sponsored news content is not a banner advertisement,

wherein when the sponsored news content is displayed, it is displayed separately from any banner advertisement and contiguously together with at least some of the non-sponsored content appearing on the page to scroll together with the at least some of the non-sponsored content such that the sponsored news content is in a fixed, position relative to at least some of the contiguously displayed non-sponsored content,

wherein a time period during which the sponsored news content is posted at the related one or more of the web sites is limited,

wherein a frequency at which the sponsored news content is displayed for each user is limited, and

wherein a plurality of features of the sponsored news content are substantially the same as a corresponding plurality of features of the contiguous non-sponsored news content, and at least one feature of the sponsored news content differs from or is in addition to the corresponding feature of the non-sponsored news content in order to distinguish the sponsored news content from the non-sponsored news content.

14. The method of claim 13, wherein the sponsored news content comprises a press release, news, announcement, message, news feed, or non-"press" event.

15. The method of claim 13, wherein the non-sponsored content comprises one or more of messages, postings, posts, or threads.

16. The method of claim 13, wherein the communications network is the Internet.

17. The method of claim 13, wherein the plurality of web sites comprise forum sites, fan sites, popular sites, enthusiast sites, message forums, user forums, or popular forums.

18. The method of claim 13, further comprising electronically generating user profiles from the monitored user data or user activity at the related one or more of the web sites.

19. The method of claim 13, wherein the user activity at the related one or more of the web sites comprises one or more of posts, reads of posts, or searches at the related one or more of the web sites.

20. The method of claim 13, wherein the sponsored news content comprises one or more of text, video, or images.

21. The method of claim 13, wherein the sponsored news content is displayed with a background color or another distinguishing feature to denote it as being different from the non-sponsored content.

22. The method of claim 13, further comprising electronically posting the sponsored news content among the non-sponsored content at each of multiple related web sites, and electronically monitoring user data or user activity at each of the multiple web sites.

* * * * *

US009652781B2

## (12) United States Patent
### Choi

(10) Patent No.: **US 9,652,781 B2**
(45) Date of Patent: *May 16, 2017

(54) **PRESS RELEASE DISTRIBUTION SYSTEM**

(71) Applicant: **NATIVO, INC.**, El Segundo, CA (US)

(72) Inventor: **Justin Choi**, Newport Coast, CA (US)

(73) Assignee: **NATIVO, INC.**, El Segundo, CA (US)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **15/069,908**

(22) Filed: **Mar. 14, 2016**

(65) **Prior Publication Data**

US 2016/0196581 A1 Jul. 7, 2016

### Related U.S. Application Data

(63) Continuation of application No. 13/871,794, filed on Apr. 26, 2013, now Pat. No. 9,286,622, which is a
(Continued)

(51) **Int. Cl.**
| | |
|---|---|
| *G06Q 30/00* | (2012.01) |
| *G06Q 30/02* | (2012.01) |

(52) **U.S. Cl.**
CPC ......... *G06Q 30/0255* (2013.01); *G06Q 30/00* (2013.01); *G06Q 30/0246* (2013.01);
(Continued)

(58) **Field of Classification Search**
None
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 6,571,234 B1 | 5/2003 | Knight et al. | |
| 7,287,267 B2* | 10/2007 | Knudson ............... | G06Q 30/02 348/E5.105 |

(Continued)

FOREIGN PATENT DOCUMENTS

WO    WO 2006/017622 A2    2/2006

OTHER PUBLICATIONS

CNN.com homepage, Jan. 1, 2005, Wayback Machine internet archive.

(Continued)

*Primary Examiner* — Meredith A Long
(74) *Attorney, Agent, or Firm* — Lewis Roca Rothgerber Christie LLP

(57) **ABSTRACT**

A press release distribution system provides press release and other news to forum sites as posts. The forum software that runs at forum sites includes press release interface software or is adapted to receive press release interface plug-in modules for interfacing with the press release distribution system. The press release interface software or plug-in module may also monitor and/or analyze user data of forum members and/or forum activities of the users. The monitored user data and forum activities may be provided to the press release distribution system for analysis and generation of user profiles. Using the result of the analysis (e.g., user profiles), the press release distribution system can target particular users or forums to direct the press releases, news, or advertisements for most effective advertising campaign.

**17 Claims, 7 Drawing Sheets**



US 9,652,781 B2

Page 2

## Related U.S. Application Data

continuation of application No. 11/772,014, filed on Jun. 29, 2007.

(60) Provisional application No. 60/817,771, filed on Jun. 29, 2006.

(52) **U.S. Cl.**
CPC ..... *G06Q 30/0256* (2013.01); *G06Q 30/0269* (2013.01); *G06Q 30/0277* (2013.01); *G06Q 30/0241* (2013.01); *G06Q 30/0251* (2013.01)

(56) **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 7,801,905 | B1 | 9/2010 | Singh et al. |
| 2002/0065802 | A1 | 5/2002 | Uchiyama |
| 2003/0028441 | A1 | 2/2003 | Barsness et al. |
| 2003/0028451 | A1 | 2/2003 | Ananian |
| 2004/0044571 | A1 | 3/2004 | Bronnimann et al. |
| 2004/0068750 | A1 | 4/2004 | Maa |
| 2004/0093266 | A1 | 5/2004 | Dohring |
| 2004/0186777 | A1 | 9/2004 | Margiloff et al. |
| 2005/0021521 | A1 | 1/2005 | Wycoff |
| 2005/0192948 | A1 | 9/2005 | Miller et al. |
| 2005/0222900 | A1 | 10/2005 | Fuloria et al. |
| 2006/0074751 | A1 | 4/2006 | Kline et al. |
| 2006/0190333 | A1 | 8/2006 | Choi |
| 2007/0043617 | A1 | 2/2007 | Stein et al. |
| 2007/0294635 | A1* | 12/2007 | Craddock ............ G06F 3/0485 715/784 |
| 2011/0191309 | A1 | 8/2011 | Anderson et al. |

## OTHER PUBLICATIONS

International Search Report of PCT/US07/15084 dated Feb. 11, 2008.
U.S. Office action dated Nov. 10, 2009 corresponding to U.S. Appl. No. 11/359,003, 10 pages.
U.S. Office action dated Jul. 6, 2010 corresponding to U.S. Appl. No. 11/359,003, 14 pages.
U.S. Office action dated Sep. 15, 2011 corresponding to U.S. Appl. No. 11/359,003, 13 pages.
U.S. Office action dated Apr. 27, 2012 corresponding to U.S. Appl. No. 11/359,003, 14 pages.
U.S. Office action dated Sep. 10, 2012 corresponding to U.S. Appl. No. 11/359,003, 3 pages.
U.S. Office action dated Jun. 14, 2010 corresponding to U.S. Appl. No. 11/772,014, 9 pages.
U.S. Office action dated Jan. 5, 2011 corresponding to U.S. Appl. No. 11/772,014, 10 pages.
U.S. Office action dated Mar. 8, 2011 corresponding to U.S. Appl. No. 11/772,014, 3 pages.
U.S. Office action dated Sep. 26, 2013 corresponding to U.S. Appl. No. 11/772,014, 16 pages.
U.S. Office action dated Jan. 12, 2014, for cross reference U.S. Appl. No. 11/772,014, (17 pages).
U.S. Office action dated Sep. 30, 2014, for cross reference U.S. Appl. No. 11/359,003, (27 pages).
MessageBoardBlaster.com homepage and FAQ, Mar. 1, 2005, Wayback Machine internet archive (6 pages).
U.S. Final Office Action dated Jul. 28, 2015 for cross reference U.S. Appl. No. 11/359,003 (19 pages).
U.S. Office Action dated Sep. 23, 2015 for cross reference U.S. Appl. No. 11/772,014 (18 pages).

* cited by examiner

Case: 23-1392   Document: 12   Page: 94   Filed: 03/14/2023



FIG. 1



FIG. 2

Case: 23-1392    Document: 12    Page: 95    Filed: 03/14/2023

FIG. 3



ACCESS THE DIRECTORY SYSTEM 300

SELECT AD SITES 302

CREATE / SUBMIT ADS 304

ARRANGE ONLINE PAYMENT 305

DISTRIBUTE ADS 306

ADS ARE TRACKED 308

ADJUST AD CAMPAIGN 310



FIG. 4

Case: 23-1392      Document: 12      Page: 97      Filed: 03/14/2023

Case: 23-1392     Document: 12     Page: 98     Filed: 03/14/2023



FIG. 5

PRESS RELEASE DISTRIBUTION SYSTEM

400

Case: 23-1392    Document: 12    Page: 99    Filed: 03/14/2023



FIG. 6



FIG. 7

RECEIVE PRESS RELEASE OR NEWS 600

PROVIDE THE PRESS RELEASE OR NEWS TO FORUM SITE 602

MONITOR USER DATA 604

MONITOR FORUM ACTIVITY OF ONE OR MORE USERS 605

ANALYZE THE USER DATA AND FORUM ACTIVITIES 606

USE THE ANALYSIS RESULT TO TARGET THE USER/ FORUM SITE 608

PROVIDE PRESS RELEASES, NEWS, ADS TO THE FORUM SITE/USER 610

Case: 23-1392   Document: 12   Page: 100   Filed: 03/14/2023

US 9,652,781 B2

1

## PRESS RELEASE DISTRIBUTION SYSTEM

### CROSS-REFERENCE TO RELATED APPLICATIONS

This application is a continuation of U.S. patent application Ser. No. 13/871,794 filed Apr. 26, 2013, which is a continuation of U.S. patent application Ser. No. 11/772,014 filed Jun. 29, 2007, which claims the benefit of U.S. Provisional Application No. 60/817,771 filed Jun. 29, 2006, the entire contents of each which is incorporated by reference herein.

### FIELD OF THE INVENTION

The present invention relates to online brand marketing and monitoring.

### BACKGROUND

Global computer networks, such as the Internet, are increasingly being used for marketing and advertisements, encroaching into advertising markets traditionally reserved for printed media (e.g., newspapers and magazine) and/or television. Online advertisements often appear on web sites or web pages of the World Wide Web (WWW) in a form of banner ads, or the like. There are also other web sites that are fan sites (or forum sites) utilized for discussing particular interests or hobbies. These fan sites normally consist of message forums and other venues for disseminating information over the global computer networks, are being used to portray certain products or brands in a positive or negative light, and can be important sources of consumer feedback for advertisers, manufacturers and consumers alike.

Since these fan sites tend to have smaller audiences, one should advertise across many of them to reach a sizable market. While this market is highly desirable, the problem is that one needs to work through many different sites to reach the market. Also, since each fan site typically requires a fee for placing an advertisement, it is impractical or impossible to place advertisements on each and every one of them. Therefore, the advertisers, manufacturers or those seeking to reach the market through the fan sites must select the right fan sites on which to place their advertisements. Further, these sites tend to be less professional than typical larger sites (Yahoo, CNN, etc.) that sell ad spaces so it is desirable to have them fit into a set standard for distributing and processing ads.

Due to a generally large number of fan sites available for placing advertisements, it is often very difficult and time consuming to select those relatively few fan sites to run advertisements. For one thing, it is often difficult to identify those fan sites that are frequented by a number of potential customers. Further, it is even more difficult to measure the effectiveness of the advertisements placed on any particular fan site.

Such difficulties in identifying the target fan sites are even more pronounced when the brands being advertised or marketed are for a niche market such as the automotive aftermarket industry, for example. The automotive aftermarket is already fragmented into a number of different market segments such as parts for trucks, sport compact cars, domestic performance cars, luxury SUVs, etc. Therefore, it is not an easy task for an aftermarket manufacturer, which is often a small or medium-sized business with limited resources and marketing budget, to select one or more

2

aftermarket car enthusiast fan sites that will serve as an effective venue for its marketing campaign.

Further, although these fan sites typically provide an advertising tracking program, they generally only indicate how many people saw the ad and how many people clicked on it without any further information on ad effectiveness. In addition, the fan site operator typically provides advertising tracking information once in a while by sending an e-mail, for example, and the advertiser has no way of validating their data. Therefore, it is very difficult to quantitatively assess which site is truly better than another site.

Further, since each site has its own paperwork and processes for accepting ads and ad money, ranging from very formal to very informal, an advertiser must spend extra time to track which placement invoices should be coming for which sites and for how long.

To further complicate the matter, the existing banner images may not be ideal for all of the sites that the advertisements are to be placed on. In this case, separate ads should be crafted for certain specific sites, which makes tracking even more complicated and the advertiser must keep track of which ads go to which sites. In addition, when the advertiser's products change and/or a new feature is added, the advertiser must re-do all of his advertising banners to reflect the changes and resubmit them to the appropriate sites. This may involve sending e-mails to all of the various site owners.

Other problems associated with online advertisements and marketing that prevent many businesses from effectively utilizing the web for advertising brands or products include: 1) difficulty in monitoring positive and negative comments on user forums, fan sites and/or the like that can make noticeable impacts on sales, as it is difficult and time consuming to monitor the thousands of user forums and other sites on the web; 2) lack of advertisers' knowledge or expertise in gauging the quality of the vendors' sites and limited availability of tools for measuring the performance of the online placements that are purchased, even when advertisers want to diversify their ad spending and advertising on enthusiast web sites; and 3) difficulty in monitoring unauthorized retailers who sell fake products because small or medium-sized businesses generally cannot afford to spend the time to monitor the entire web for unauthorized dealers.

Therefore, it is desirable to provide tools that will facilitate the advertisers, manufacturers or brand managers to locate the most suitable fan sites that are frequented by the target audience, and to monitor the effectiveness of any advertisements that are placed on these fan sites. Further, it is desirable to provide tools that can be used by the advertisers or manufacturers to monitor dissemination of information regarding their brand names or products over the global computer networks.

### SUMMARY OF THE INVENTION

In one exemplary embodiment according to the present invention, a press release distribution system is used to provide press releases, other news, advertisements, messages and/or non-"press" events to the forum sites.

In one exemplary embodiment according to the present invention, the press release distribution system inserts or posts a press release as a message at one or more forum sites.

In one exemplary embodiment according to the present invention, the press release distribution system interfaces with the forum software that runs at each of the forum sites. The forum software may have a built-in software for interfacing with the press release distribution system or may be

US 9,652,781 B2

3

adapted to receive a press release interface plug-in module for interfacing with the press release distribution system.

In one exemplary embodiment according to the present invention, the component of the press release distribution system that runs at respective forum sites, e.g., the press release interface plug-in, generates a user profile (e.g., a marketing profile) using user data and/or user activities at the forum such as user reads and uploads.

In an exemplary embodiment according to the present invention, a press release distribution system includes a distributor module adapted to receive a press release, and to distribute the press release to one or more forum sites over a network according to relatedness between the press release and the one or more forum sites; at least one input handler module adapted to receive the press release from one or more advertisers, and to provide the press release to the distributor module; and at least one press release poster module adapted to run at respective said one or more forum sites, to receive the press release over the network, and to post the press release as a message at the respective said one or more forum sites.

In another exemplary embodiment according to the present invention, a method of distributing a press release to one or more forum sites, is provided. The method includes: receiving the press release from one or more advertisers; distributing the press release to the one or more forum sites over a network according to relatedness between the press release and the one or more forum sites; and posting the press release as a message at the one or more forum sites.

In exemplary embodiments of the present invention, a brand management system used to provide marketing and monitoring services for brands or products over the global computer networks, includes a press release distribution system.

In another exemplary embodiment according to the present invention, a brand management system coupled to a plurality of web sites over a communications network, is provided. The brand management system includes: a press release distribution system adapted to receive a press release related to an advertiser and provide the press release to one or more forum sites among the plurality of web sites to post as a message, in accordance with relatedness between the press release and the one or more forum sites; a brand monitoring tool adapted to automatically monitor one or more of the web sites for at least one keyword related to a particular brand or product of the advertiser; and an advertisement directory system comprising a directory of web sites that are likely to provide an effective venue for one or more advertisements for the particular brand or product.

These and other aspects of the invention will be more readily comprehended in view of the discussion herein and accompanying drawings.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a configuration diagram of a brand management system coupled over the global computer networks to advertisers, ad sites, monitored sites, consumers and dealers;

FIG. 2 is a block diagram showing components of the brand management system of FIG. 1;

FIG. 3 is a flow diagram illustrating the process of using the brand management system for ad placement and tracking in an exemplary embodiment of the present invention;

FIG. 4 is a configuration diagram of a press release distribution system coupled over the global computer networks to advertisers and forum sites in an embodiment in accordance with the present invention;

4

FIG. 5 is a conceptualized block diagram of the press release distribution system of FIG. 4 in one embodiment according to the present invention;

FIG. 6 is a schematic view of a screen shot of a forum site home page in an embodiment in accordance with the present invention; and

FIG. 7 is a flow diagram of the operation of the press release distribution system in one embodiment in accordance with the present invention.

DETAILED DESCRIPTION

Exemplary embodiments according to the present invention provide a method and apparatus for facilitating targeted advertising of various different brands and monitoring thereof, over global computer networks, including distribution of press releases. This application contains subject matter related to U.S. patent application Ser. No. 11/359,003 filed Feb. 21, 2006, which claims priority to and the benefit of U.S. Provisional Application No. 60/654,163 filed on Feb. 18, 2005, the entire contents of both of which are incorporated herein by reference.

A brand management system or a brand monitoring and marketing system in exemplary embodiments of the present invention is a web-based application suite that provides businesses with the tools necessary to monitor and market their brands online. The system will provide the businesses with one or more of the tools including, but not limited to, a brand monitoring tool, an ad management tool, and a file management tool. The system can aggregate existing tools and/or provide new tools and services that are not currently available. The brand management system in one embodiment also includes a press release distribution system, and a number of press release interface software or plug-in modules running at forum sites to interface with the press release distribution system. The press release distribution system and the press release interface software may together be also referred to as a press release distribution system.

In an exemplary embodiment according to the present invention, the brand management system includes an ad directory system or an ad directory in a form of a web site to link the brand advertisers or manufacturers to various different web sites that are likely to provide an effective venue for marketing and advertisements for particular market segments. The advertisers or manufacturers can view (which can include logging in) the web page on which the directory of web sites is placed, and select one or more web sites based on their particular needs, in accordance with the information provided in the directory.

The ad directory system can also be used to facilitate distribution of the advertisements, tracking and monitoring of the effectiveness of the advertisements, and transfer of advertisement fees between the advertisers and the web site owners. The brand management system can use a brand monitor including a bot to monitor various different sites (e.g., popular forums, fan sites, etc.) through a keyword search, for example.

The brand management system of the present invention provides one or more of, without being limited to, the following features: 1) identification of the sites that would be suitable or ideal for the brands and/or products of interest, instead of finding one site at a time; 2) quantitative assessment as to which site is truly better than another site; 3) quantitative measurement of ad effectiveness, by such information as how many customers actually purchased products as a result of a particular advertisement on a particular web site; 4) independent confirmation of advertisement tracking

APPX316

US 9,652,781 B2

5

data provided by the web site operators; 5) ability to create banner and/or other images that are suitable or ideal for all of the sites on which the advertisements are placed, because separate ads may be required for certain specific sites, which makes tracking even more complicated since the advertiser must keep track of which ads go to which sites; and 6) saving the advertisers from having to re-do all of the advertising banners to reflect the changes and resubmit them to the appropriate sites, when the products change or a new feature is added.

As illustrated in FIG. 1, a brand management system 100 is coupled to advertisers 103, and is coupled to monitored sites 110, including ad sites 1 to N 104, 106, 108, over the global computer networks 102. The monitored sites 110 also include popular sites 109 that are not necessarily ad sites. By way of example, the popular sites may include large sites that are monitored but do not have ad sales provided through the brand management system 100. Consumers 112 (or computers thereof) are coupled to the ad sites 1 to N 104, 106, 108. The consumers generally would not directly access the brand management system 100.

The brand management system 100 is used for monitoring and marketing by one or more advertisers, for example, and may also be referred to as a brand monitoring and marketing system herein. The advertisers 103 represent one or more different advertisers, manufacturers, dealers or brand marketers who are using the services provided by the brand management system 100. Similarly, the monitored sites 110 represent one or more sites that are monitored by the brand management system 100 on behalf of the advertisers 103.

As can be seen in FIG. 2, the brand management system 100 includes brand monitoring tools 200, an ad directory system 202, an online payment system 204, and a file manager 210. The ad directory system 202 includes an ad tracker 206, an ad generator 207 and an ad distributor 208. In one embodiment, the brand management system optionally includes a press release distribution system 400. The box 400 representing the press release distribution system 400 is shown in dotted lines because the press release distribution system 400 is optional. In addition, the press release distribution system 400 may be implemented in one or more other modules, such as the ad tracker 206, the ad distributor 208 and/or the file manager 210. Further, some of the components of the press release distribution system 400, such as, for example, press release plug-ins shown in FIG. 4 (or press release posters shown in FIG. 5) may be implemented at the forum sites, separately from the rest of the brand management system 100.

The brand monitoring tools 200 are used for monitoring the user forums, fan sites, etc. to afford advertisers or manufacturers an insight into how their products and/or brands are received or perceived in the market, especially by the relevant online community. The ad directory system 202 is for bringing together sellers and buyers of on-line advertisements, and includes ad tracking, ad generation and ad distributor features as follows. The ad generator 207 can be used by the advertisers or manufacturers to create or to modify online ads (e.g., including banners), while the ad distributor 208 and the ad tracker 206 can be used to distribute ads and to track effectiveness of ads, respectively. Alternatively, the advertisers or manufacturers can submit their own pre-created ads for distribution rather than using the ad generator 207.

By way of example, the ad directory system 202 facilitates the advertisements by the manufacturers/distributors by enabling them to create/submit/modify their own advertisements and placing them on the advertisement directory

6

of the ad directory system 202. The advertisers may also post specific products and quantities/inventories available for sale for each product, such that transactions can be facilitated through the use of the brand management system 100. Hence, the brand management system 100 brings the sellers and purchasers together in an online community setting.

The transactions can be consummated through the use of the online payment system 204. The users of the ad directory system 100 can, in addition to purchasing products from the advertisers/manufacturers/distributors online, bid for products online, such that the ad directory system 202 can be used for advertising, selling, purchasing and/or bidding of various different products having different prices and in different quantities. All these transactions can be monitored using the ad tracker 206 such that the effectiveness of the ads and/or ad campaigns can be measured.

The file manager 210 can be used for online distribution of information related to products or brands (e.g., images, brochures, performance data, etc.) to the dealers and/or the consumers. Any advertising fee transactions between the advertisers and ad site owners can take place using the online payment system 204, for example.

In other embodiments, the ad distributor 208 may also distribute press releases as ad units, and the ad tracker 206 may also track effectiveness of the press releases. In yet other embodiments, the file manager 210 may also be used to distribute the press releases. In still other embodiments, a separate press releases distribution system is used as a part of the brand management system 100 or as a separate system/module to receives press releases and other news, and distribute them to the advertisement sites (e.g., forum sites). One instance of such press release distribution system is illustrated in FIG. 4, and described in reference to FIGS. 4-6 below.

Search engine ranking, linked sites, eBay® postings, and other negative or positive product comments on forums and other web sites can have a dramatic impact on how a brand is perceived. This negative or positive "press" can also directly affect sales. Hence, in an exemplary embodiment, the brand management system 100 performs brand monitoring using the brand monitoring tools 200.

The brand monitoring tools 200 include a bot 201. The brand monitoring tools 200 may also include one or more other tools known to those skilled in the art. During brand monitoring, the bot is used to automatically monitor certain web sites and web postings for specific keywords. These keywords may appear as topics and/or content of discussions in different online forums. They may also appear as products for sale on Internet auction sites. Hence, the bot can be used to monitor/track various different web sites and/or web postings to search for particular keywords, brands, products, advertiser identifications, etc. to monitor how the monitored brands, products, etc. are characterized/perceived by the online community. By way of example, the bot can be targeted to one or more predetermined web sites. The user may also have flexibility to tailor monitoring of various different web sites and postings to fit his needs using the bot. The web sites searched can include one or more of, but are not limited to, eBay® and other auction site postings, Froogle™ posts, Epinions® posts, forum posts, search engines, number of links to the manufacturer's web site, Alexa® ranking, Google® Adwords®, Overture®, Groups, and the like.

EBAY® is a registered trademark of eBay Inc., a Delaware corporation; FROOGLE™ is a trademark of Google Technology Inc., a California corporation; EPINIONS® is a registered trademark of Epinions, Inc., a Delaware corpo-

US 9,652,781 B2

7

ration; ALEXA® is a registered trademark of Alexa Internet Corporation, a California corporation; GOOGLE® and Adwords® are registered trademarks of Google Inc., a Delaware corporation; and OVERTURE® is a registered trademark of Overture Services, Inc. a Delaware corporation.

The advertiser, such as a brand owner and/or a product manufacturer, can select which keywords, trademarks, and phrases are relevant to their businesses. The advertiser can be given links to any posts that contain these keywords. This feature can be used, for example, to give the marketing manager an instant overview of the web activity that their brand is generating. For example, the marketing managers can have, all on one screen, a summary of Internet activities relevant to their brand.

The bot of the brand monitoring tools 200 should be more sophisticated than a normal bot, and should be used for checking Internet activities. In one embodiment, the bot is able to navigate web sites that require users to log in to the web site. In this embodiment, the bot is also able to look for specific data on each web page. Further, the bot is a programmable bot that can be customized for each site being monitored.

In one embodiment, the bot reports indexing failures to indicate changes to the web sites that may cause the bot to fail. "Behaviors" are programmed into the bot as many of these web sites have rules designed to exclude bots from using specific features on their sites. For example, some forums do not allow more than one search every 20 seconds to avoid bots overloading their servers. Those skilled in the art would know how to create/program a bot having one or more of the above features according to exemplary embodiments.

The ad directory system 202, which may also be referred to as an ad directory, of the brand management system 100 provides manufacturers or advertisers with a large directory of web sites related to a particular brand, such as top automotive enthusiast web sites. The manufacturers or advertisers can select web sites that they wish to advertise their brands or products on, using a system similar to an online shopping cart.

By aggregating and organizing these sites, the brand management system will enable advertisers to quickly create and manage ad campaigns across multiple web sites. For web sites selling advertising spaces, the ad directory system 202 will enable them to post their site information, ad programs, audience type, and ad rates. These enthusiast sites will have the option of having their traffic audited for an additional monthly fee. Such auditing process can be automated through an automated digital tracking system (e.g., pixeling), for example. These sites can be specially marked, for example, to indicate that their traffic has been audited.

Advertisers or manufacturers should be able to view these enthusiast sites by site type (e.g., make/model) and easily select multiple ad placements to create an online media buy. Web sites selling their placements through the brand management system 100 should be able to review requested placements and ads submitted by manufacturers. Once an ad placement is accepted by a particular web site, the brand management system 100 will automatically place the ad on that particular web site. The ad distributor 208 manages ad distribution, and the ad tracker 206 manages detailed ad tracking.

The ad tracker 206, which may also be referred to as an ad tracking system, would enable advertisers to easily track a variety of data per ad or per placement. Advertisers would

8

be able to track information including contact form submissions, orders, number of shopping carts started, product pages viewed, and the like.

The ad generator 207, which may also be referred to as an ad generation system or an ad creation system, is a tool that can be used to generate ads that are suitable for all ad sites. The ad generator 207 can also be used to generate two or more ads, each of which is suitable for placement on one or more specific sites. In addition, the ad generator 207 can be used to convert existing ads on printed media to banner or other ads suitable for placement on web pages.

The ad distributor 208, which may also be referred to as an ad distribution system, provides the advertiser with the ability to remove and/or replace ads. Advertisers could also run multiple ads in rotation in one single placement. Optionally, advertisers may have the brand management system automatically disable the less effective one or more ads of a plurality of ads. Advertisers would be able to set which factor they wish to use in evaluating effectiveness including click-thrus, orders, contact form submissions, and/or the like.

In addition to traditional banner placements, the brand management system 100, or the ad distributor 208 thereof, will enable advertisers to distribute online press releases, or choose keyword-related placements tied to text or image ads on the ad sites, which may be enthusiast sites.

An online media buy may include dozens of web sites, so organizing and tracking these payments online will be important for advertisers. The brand management system 100 can process the transactions for the placement fees through its online payment system 204 using a model similar to that of an application service provider (ASP) model. By way of example, monthly fees may be charged by the ad sites through the online payment system 204 for placing advertisements. Advertiser/site feedback may also be incorporated into the brand management system 100. The online payment system 204 can also be used by the advertisers and/or the ad sites to pay for services provided by the brand management system 100.

A model similar to the ASP model can also be used between the advertisers and/or ad sites and the brand management system 100. By way of example, a model similar to the ASP can be used to implement the transactions between the advertisers and/or the ad sites and the brand management system 100. This way, the brand management system 100 can charge a monthly access fee to the advertisers and/or ad sites for buying and selling of ad spaces.

There are at least two fees that are associated with the brand management system of the present invention. A first fee is an access fee to access the system for brand monitoring and to access ad directory. The access fee can be a monthly ASP style fee, and it is conceivable that some customers may only pay this monthly access fee but not buy any ads. The online payment system 204 is used to pay for the placement of the ads. The operator of the brand management system, for example, may keep a percentage of revenue generated through all of the transactions involving purchasing ad spaces and placing ads.

According to FIG. 3, the advertiser or manufacturer first accesses the ad directory system (300). The ad directory system contains information on available ad sites corresponding to the products or brands of interest. The advertiser or manufacturer selects ad sites based on the site type (e.g., catering to the specific industry) and/or the like (302).

The advertiser or manufacturer may already have available ads, or they may wish to modify existing ads and/or create new ads using the tools available in the brand man-

US 9,652,781 B2

9

agement system, such as the ad generator **207** (**304**). After selection of the ad sites and the creation/submission of the ads, a payment is arranged (**305**), for example, through the online payment system **204**. Then, the ads are distributed to the selected ad sites (**306**). The effectiveness of the ads can be tracked (**308**) using the ad tracker **206**, for example. The ad campaign can then be adjusted (**310**) using factors such as effectiveness of the various different ad sites.

Further, advertisers or manufactures can gain detailed tracking information by using the brand management system **100**. By way of example, a total summary for the campaign may show total clicks, total impressions, click-through rates (CTR) and total user actions, all of which can be tracked, such that ads can be tied to some user activity such as a dealer search, product page view, contact form submission, or an online order. This way, one or more user activities associated with the advertisements can be tracked/monitored.

In addition, manufacturers or advertisers can distribute ads evenly or remove ineffective ads after so many days or after so many impressions. Further, the advertisers or manufactures can remove or edit existing ads or generate new ads. This way, advertisers or manufactures can quickly change ads on multiple sites, run multiple ads in one placement, run different ads based on time of day, and/or remove ineffective ads without having to resubmit the ads manually to multiple site owners.

Currently, product images, documents, and data are typically distributed by burning the data onto CD-ROMs as their dealers request them. By moving this functionality online, the manufacturer will gain several benefits including, but not limited to, reduced labor costs associated with distributing materials to dealers and media and reduced CD media and postage costs.

The file manager **210** is a part of a suite of tools (i.e., the brand management system **100**) that address the common needs of advertisers or manufacturers, such as the automotive aftermarket industry.

The file manager **210** should enable advertisers or manufacturers to do one or more of, but not limited to, the following: 1) upload various documents and images; 2) upload large images and automatically have "thumbnail" previews created; 3) organize documents and images into categories and/or subcategories; 4) establish access rights depending on user type; 5) track downloads by user and by file; and 6) provide news/updates to dealers.

Further, the file manager **210** should enable manufacturers' dealers to do one or more of, but not limited to, the following: 1) view thumbnails of images (created automatically by the system); 2) search for files by a keyword; 3) browse files by category/subcategory; 4) select multiple files or download entire categories of files; and 5) quickly see new files uploaded since the last login.

While the present application has been described mainly in reference to the automotive aftermarket, the directory system in exemplary embodiments of the present invention can be applied to any suitable market with strong enthusiast following online. The sites and market segments having such strong enthusiast following online, may include wedding sites, golf, professional wrestling, and the like.

As discussed above, in embodiments in accordance with the present invention, the following strategy is used, for example, for brand monitoring, marketing and management: 1) A large number of small automotive forums (publishers) are aggregated into one automotive network; 2) The clients are enabled to easily create online ad campaigns by selecting various publishers; 3) The advertisers are enabled to upload,

10

distribute, and track ad banners across these publishers; 4) The brand monitoring and marketing system will automatically monitor posts on these sites to see if anything negative or positive is said about the advertiser; and 5) Other online services will be provided to advertisers through the brand monitoring and marketing system (e.g., e-commerce, etc.).

In another embodiment in accordance with the present invention, a press release distribution system is used to inject or post press releases into the forum. The press releases can include text, video, graphics, images, multimedia, programming, and/or any other suitable information as those skilled in the art would appreciate. Here, each of the press releases may be viewed or referred to as an ad unit that can be embedded into the forums.

As shown in FIG. **4**, a press release (PR) distribution system **400** in an embodiment in accordance with the present invention, is coupled to advertisers **403** and forum sites 1 to N (**410, 420, 430**), wherein N is an integer greater than or equal to 3. In the described embodiment, there is no limit to the number of forum sites that the press release distribution system **400** is coupled with. The press release distribution system **400** receives press releases, news feed and/or Really Simple Syndication (RSS) feed over a network **402**, which may be a global computer network or the Internet, or any other suitable network known to those skilled in the art. The press release distribution system **400** may be a part of a brand management system **100**, or may be a standard alone system. Such stand alone press release distribution system may be coupled or not coupled with the brand management system **100**. One embodiment of the press release system **400** may be referred to as POSTRELEASE™, which is a trademark of CIE Studios, LLC, Long Beach, Calif.

In the example depicted in FIG. **4**, the press release distribution system **400** receives press releases from the advertisers **403**. In other embodiments, the press release distribution system **400** may receive the press releases in any other suitable manner over the network **402** or otherwise. Further, the news and RSS feeds may be provided using any suitable method over the network **402** or otherwise, as those skilled in the art would appreciate. Any advertisements including text and/or graphics can also be distributed and posted directly into forums using the press release distribution system **400**, of course. The press releases are posted on (or inserted into) the forum (or forum site) as a message or an announcement. The "message" may also be referred to as a "post" throughout this specification. Further, the "message" is not limited to text, but may also include one or more of images, video, web site code, Flash, or any other suitable information or data.

As can be seen in FIG. **4**, one or more users **440** (i.e., computers or other network devices thereof) are also coupled to the forum sites 1-N (**410, 420, 430**) via the network **402**. The users **440** are consumers who may be members or users of the forum sites 1-N. The press releases posted on the forum sites 1-N will be read by the users **440** of the corresponding forum sites. The users **440** upload posts at the forum sites, and also read the posts of interest from the forum sites. These user activities can be used or analyzed to generate personal/marketing profiles for the users. While only one box **400** is used to designate the users in FIG. **4**, the users of course can be located at multiple different locations (e.g., across the globe).

The press release distribution system **400** may be included in the brand management system **100** of FIGS. **1** and **2**, for example, or implemented as a system separate from the brand management system **100** on the same or different server from that of the brand management system **100**. In

US 9,652,781 B2

11

other embodiments, the features and functions of the press release distribution system 400 are implemented in other modules of the brand management system 100, such as the ad tracker 206, the ad distributor 208 and/or the file manager 210.

The forum site 1 (410) runs forum software 412; the forum site 2 (420) runs forum software 422; and the forum site N (430) runs forum software 432. The forum software 412, 422 and 432 respectively have installed therein, respective press release (PR) plug-ins (or plug-in modules) 414, 424 and 434. The press release plug-ins may also be referred to as press release interface plug-ins herein. The forum software may be VBulletin or any other forum software available to those skilled in the art. Those skilled in the art would appreciate that the plug-in modules are designed and developed to work with one or more desired forum software. The press release plug-in module receives the press releases and/or other news from the press release distribution system 400, and posts the received press releases and/or other news on the corresponding forum site. Alternatively, the press release distribution system 400 and the press release plug-ins may together also be referred to as a press release distribution system.

Each of the forum sites 1 to N (410, 420, 430) also includes a respective one of databases 415, 425 and 435. The database includes user data, e.g., name, birth date/age, gender, occupation, address, e-mail address, phone number, and/or any other personal data required (or optionally requested) by the forum site for registration as a member. The database also includes the forum postings, traffic and forum activities, and may also include history and/or archive of the forum postings, traffic and forum activities. The forum activities may include the activities of the users/members while logged onto the forum site, such as the posts downloaded/read and posts written/uploaded by the users.

In one embodiment, the press release plug-in module is used to monitor the posts, user information, user behavior, and/or other forum activity at the corresponding forum site. By way of example, most forum sites require that the users be registered as members in order to post on forums, while some non-registered users can still view the site and posts thereon. Also, most forums are broken down by topic areas. Further, the registration process on many forums including nearly all automotive forums require age information and optional location, occupation, and other personal data. The press release plug-in in one embodiment uses such personal data and by tracking the content of each message the user posts and reads, to develop a marketing profile for that user. Further, almost every forum has a search feature or function, and the search activity of the user (e.g., search terms or keywords used by the user during the search) can also be used to create user profile. As such, the plug-in module in one embodiment monitors the forum activity of the user and uses that information to create a marketing profile (or user profile) and then deliver ads against that profile for a targeted advertising. By way of example, in one embodiment, the marketing profile (or user profile) can be created by analyzing the posts/messages that the user reads, the posts/messages that the user creates, and/or the profile information the user entered when the user created his/her account on the forum.

By way of example, if someone is viewing a post thread about wheels and he responds to the thread, the press release plug-in module can be used to determine that that particular user may have an interest in wheels, and deliver wheel ads to that user. Alternatively, the press release plug-in module may provide the user activity information to the press

12

release distribution system 400 for such analysis/determination. As such, in the described embodiment, the press release distribution system 400 is integrated into existing forum sites using the press release plug-in modules, rather than sites specifically developed for operating with the press release distribution system. Hence, the press release distribution system 400 draws existing data from forums (i.e., mines already existing data) that are generated by user activities on forums. To get these forum sites to join the network of press release distribution system 400, a revenue sharing may be instituted, in which the press release distribution system 400 delivers ads and shares revenue, as many of these forum sites, despite having great traffic, typically need help to generate revenue from the traffic.

In other embodiments, the forum software may already include a press release interface module for receiving and posting press releases from the press release distribution system 400 and for monitoring user data and forum activity thereof, such that a separate plug-in module is not necessary. Hence, while the press release interface plug-in module is installed separately by the forum site owner, the site owner needs only install the forum software when it already includes the features and functions of the press release interface plug-in module.

The press release distribution system 400 in one embodiment limits the time period during which particular press releases are posted at one or more forums. Further, in one embodiment, the press release distribution system 400 (either alone or together with the forum software and/or the press release interface plug-in module) limits the frequency at which the press releases are displayed for each user. The press release distribution system 400 in one embodiment also tracks the result (i.e., effectiveness) of the press release distribution campaigns.

As shown in FIG. 4, therefore, press releases, news and/or advertisements from/related to the advertisers 403 of particular brand or product can be directed to particular one or more forum sites in accordance with the relationship or relatedness between the press releases, news, advertisements, advertisers, brand, product and the forum sites. By way of example, press releases, advertisement, etc. from aftermarket automotive parts manufacturers will be directed to forum sites of auto enthusiasts and press releases, advertisements, etc. from golf club manufacturers will be directed to golf enthusiast forum sites. Further, in one embodiment, the press releases, advertisements, news, etc. are directed to one or more particular users/members of the forum sites in accordance with the user profiles and/or user activities at the forum site. By way of example, a user actively reading or uploading on threads on multi-function cellular phones will be targeted to be provided with press releases and/or advertisements from cellular phone manufacturers.

FIG. 5 is a conceptual block diagram of the press release distribution system 400 of FIG. 4. As shown in FIG. 5, the press release distribution system includes a press release handler module (or press release handler) 450, a news feed handler module (or news feed handler) 452 and an rss feed handler module (or rss feed handler) 454 for receiving and handling press releases, news feed, and rss feed, respectively. The press release handler module 450, the news feed handler module 452 and the rss feed handler module, either together or separately, may also be referred to as an input handler or input handler module. The term "module" is used throughout this specification to refer to any hardware, software, firmware, application, tool, widget, plug-in, any other

US 9,652,781 B2

13

suitable processing apparatus or method known to those skilled in the art to implement the described functions, or any combinations thereof.

The press release distribution system **400** also includes a distributor/controller module **460** (to be referred to hereinafter as "distributor" or "distributor module") **460**. The distributor module **460** receives the press releases, news feed and rss feed, and provide them to one or more press release poster/monitor modules (to be referred to hereinafter as "press release posters" or "press release poster modules") **470, 472, 474** to be posted at the respective forum sites. In one embodiment, each of the press release poster modules **470, 472** and **474** posts or inserts the press releases as a message on the forum (or forum site). In one embodiment, the press release poster modules **470, 472, 474** are implemented as plug-ins, such as the PR interface plug-ins **414, 424** and **434** of FIG. 4.

In addition to posting the press releases, news feed, and rss feed, the press release poster modules **470, 472, 474** monitor user data and/or forum activities of one or more users at respective forum sites. The press release poster module **470, 472** or **474** may analyze the user data and/or forum activity data. Alternatively or in addition to the analysis of the user data and/or forum activity data in the press release poster modules **470, 472, 474**, in one embodiment, the distributor module **460** analyzes the user data and/or the forum activities. The distributor module **460** may also receive the result of the analysis of one or more of the press release poster modules **470, 472** or **474**, and further analyze such analysis result. Then the distributor module **460** uses the analysis result to target the user/forum site to direct the press releases, news, advertisements, messages and/or non-"press" events. Therefore, in one embodiment, the distributor module **460** analyzes or further analyzes the user/forum activity data, and/or controls providing press releases, news, rss feed, messages, non-"press" events, and/or advertisements to the forum sites and/or the users. The press release poster modules **470, 472** and **474** are not limited to posting press releases and/or monitoring the user data/forum activities, but may be used to post other information such as, for example, advertisements, other news, messages and/or non-"press" events, or any other information suitable for posting on one or more forum sites.

As can be seen in the schematic view of a screen shot of a forum site home page **500** in FIG. **6**, the home page of a forum site typically includes a forum name **504** and one or more banner ads **502, 506**. The home page typically displays one or more posts **510** posted by the members of the forum. Such posts may include threads initiated by a particular posting or postings. The home page **500** also displays a press release **508**, which is displayed with a background color (e.g., red) different from that of the member posts **510**. This way, press releases from the advertisers **403** can be brought to the immediate attention of the forum member. In other embodiments, the press release post (or the alert thereof) **55** may be displayed with other background color, distinguishing font and/or text format (e.g., bold text) as those skilled in the art would appreciate. Such press releases can be viewed and referred to as ad units in the described embodiment, and may be effective advertisements directed at particular forum sites, and/or particular members or users. While the press release **508** is shown as an announcement in FIG. **6**, the press release **508** may be posted or inserted as a message in other embodiments.

FIG. **7** illustrates a flow diagram showing an operation of the press release distribution system in one embodiment in accordance with the present invention. The flow diagram of

14

FIG. **7** will be described in reference to FIGS. **4, 5** and **7**. The press release distribution system **400** first receives a press release or news (**600**). The press release may have originated from one of the advertisers **403** who desires to use the press release as an advertisement to be distributed to the forum sites of interest. By way of example, the advertiser may be a manufacturer of after market auto parts who desires to distribute a press release regarding a scheduled release of a new product to the auto enthusiast fan or forum sites. The press release distribution system **400** may also receive news or RSS feed relevant to one or more of its associated forum sites 1-N (**410, 420, 430**), and distribute the news or other information to the forum sites and/or users/members of the forum sites.

The press release distribution system **400** then distributes the press release or news to the relevant forum sites (**602**). The press release interface plug-in (**412, 422** or **432**) in the forum software (**412, 422** or **432**) of these forum sites posts such press release or news at the forum to be viewed by the members and visitors of the forum site.

The press release plug-in module also monitors user data (e.g., stored in the database **415, 425** or **435**) or the respective forum site (**604**). Such user data is gathered from the users/members by the forum sites at the time of registration or at any other suitable time. The database at the forum site also includes information regarding user activities. By way of example, the database may include such forum activities as reading the posts (or threads thereof) or writing posts onto the forum sites. The press release plug-in also monitors these forum activities of one or more users/members (**605**). The monitored information may be gathered and analyzed by the press release plug-in and/or may be provided to the press release distribution system to be analyzed to generate user profiles (**606**). Based on such user profiles, the press release distribution system can target particular forum sites and/or members thereof to direct the press releases, news and/or advertisements (**608**). Hence, based on the user profiles, particular press releases, advertisements and/or news can be directed (or provided) to the particular forums and/or users (**610**).

While certain exemplary embodiments have been described above in detail and shown in the accompanying drawings, it is to be understood that such embodiments are merely illustrative of and not restrictive of the broad invention. It will thus be recognized that various modifications may be made to the illustrated and other embodiments of the invention described above, without departing from the broad inventive scope thereof. In view of the above it will be understood that the invention is not limited to the particular embodiments or arrangements disclosed, but is rather intended to cover any changes, adaptations or modifications which are within the scope and spirit of the invention.

What is claimed is:

1. A press release distribution system configured to deliver sponsored news content to multiple web sites that each includes one or more pages containing non-sponsored content, the press release distribution system comprising multiple web server computers delivering web pages containing sponsored and non-sponsored news content to clients, the web server computers each configured to:

    monitor user data or user activity at a related one or more of the web sites,

    request sponsored new content from one or more ad servers over a communication network for inclusion on one or more related web sites based on monitored user data or activity;

15

post the sponsored news content among the non-sponsored content at the related one or more of the web sites, wherein the posting comprises displaying the sponsored news content separately from any banner advertisement or static header on the page and embedding the sponsored news content contiguously together with at least some of the non-sponsored content on the page such that the sponsored content scrolls together with the at least some of the non-sponsored content on the page, and the sponsored news content is placed in a fixed position relative to the contiguous non-sponsored news content on the page;

track one or more of impressions, clicks, click-through rate, or user actions with respect to the sponsored news content;

limit a time period during which the sponsored news content is posted at the related one or more of the web sites; and

limit a frequency at which the sponsored news content is displayed;

wherein the sponsored news content posted by the web server is not a banner advertisement or a static header,

wherein at least one feature of the sponsored news content is the same as a corresponding feature of the contiguous non-sponsored news content on the page, and at least one other feature of the sponsored news content differs from or is in addition to the corresponding feature of the non-sponsored news content in order to distinguish the sponsored news content from the contiguous non-sponsored news content.

2. The press release distribution system of claim 1, wherein the sponsored news content comprises a press release.

3. The press release distribution system of claim 1, wherein the non-sponsored content comprises one or more of messages, postings, posts, or threads.

4. The press release distribution system of claim 1, wherein the communications network is the Internet.

5. The press release distribution system of claim 1, wherein the web servers are further configured to monitor user data and user activity at the related one or more of the web sites.

6. The press release distribution system of claim 1, wherein the user activity at the related one or more of the web sites comprises one or more of posts, reads of posts, or searches at the related one or more of the web sites.

7. The press release distribution system of claim 1, wherein the sponsored news content comprises one or more of text, video, or images.

8. A method of electronically delivering advertisements as sponsored news content to a plurality of web sites that each includes non-sponsored content, the method comprising:

electronically monitoring user data or activity on one or more web sites;

electronically requesting sponsored news content by a server computer based on the monitored user data or activity;

electronically distributing the sponsored news content by the server computer to a related one or more of the web sites over the communications networks based on the monitored user data or activity;

electronically embedding the sponsored news content among the non-sponsored content at the related one or more of the web sites;

16

electronically tracking one or more of impressions, clicks, click-through rate, or user actions with respect to the sponsored news content at the related one or more of the web sites; and

electronically delivering a specific sponsored news content to a user based on the monitored user data or user activity;

displaying specific sponsored content among non-sponsored content on a plurality of related web sites;

wherein the sponsored news content is not a banner advertisement or a static header,

wherein when the sponsored news content is displayed, it is displayed separately from any banner advertisement and contiguously together with at least some of the non-sponsored content appearing on the page to scroll together with the at least some of the non-sponsored content such that the sponsored news content is in a fixed position relative to at least some of the contiguously displayed non-sponsored content,

wherein a time period during which the sponsored news content is posted at the related one or more of the web sites is limited,

wherein a frequency at which the sponsored news content is displayed for the user is limited, and

wherein a plurality of features of the sponsored news content are the same as a corresponding plurality of features of the contiguous non-sponsored news content, and at least one feature of the sponsored news content differs from or is in addition to the corresponding feature of the non-sponsored news content in order to distinguish the sponsored news content from the non-sponsored news content.

9. The method of claim 8, wherein the sponsored news content comprises a press release, news, announcement, message, news feed, or non-press event.

10. The method of claim 8, wherein the non-sponsored content comprises one or more of messages, postings, posts, or threads.

11. The method of claim 8, wherein the communications network is the Internet.

12. The method of claim 8, wherein the plurality of web sites comprise forum sites, fan sites, popular sites, enthusiast sites, message forums, user forums, or popular forums.

13. The method of claim 8, further comprising electronically generating user profiles from the monitored user data or user activity at the related one or more of the web sites.

14. The method of claim 8, wherein the user activity at the related one or more of the web sites comprises one or more of posts, reads of posts, or searches at the related one or more of the web sites.

15. The method of claim 8, wherein the sponsored news content comprises one or more of text, video, or images.

16. The method of claim 8, wherein the sponsored news content is displayed with a background color or another distinguishing feature to denote it as being different from the non-sponsored content.

17. The method of claim 8, further comprising electronically posting the sponsored news content among the non-sponsored content at each of multiple related web sites, and electronically monitoring user data or user activity at each of the multiple web sites.

* * * * *

US010147121B2

(12) **United States Patent**
Choi

(10) **Patent No.:** US 10,147,121 B2
(45) **Date of Patent:** *Dec. 4, 2018

(54) **PRESS RELEASE DISTRIBUTION SYSTEM**

(71) Applicant: **NATIVO, INC.**, El Segundo, CA (US)

(72) Inventor: **Justin Choi**, Newport Coast, CA (US)

(73) Assignee: **NATIVO, INC.**, El Segundo, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **15/476,876**

(22) Filed: **Mar. 31, 2017**

(65) **Prior Publication Data**

US 2017/0206563 A1 Jul. 20, 2017

**Related U.S. Application Data**

(63) Continuation of application No. 11/772,014, filed on Jun. 29, 2007, now Pat. No. 9,646,324.

(60) Provisional application No. 60/817,771, filed on Jun. 29, 2006.

(51) **Int. Cl.**
*G06Q 30/00* (2012.01)
*G06Q 30/02* (2012.01)

(52) **U.S. Cl.**
CPC ......... *G06Q 30/0271* (2013.01); *G06Q 30/00* (2013.01); *G06Q 30/0246* (2013.01); *G06Q 30/0255* (2013.01); *G06Q 30/0256* (2013.01); *G06Q 30/0269* (2013.01); *G06Q 30/0277* (2013.01); *G06Q 30/0241* (2013.01); *G06Q 30/0251* (2013.01)

(58) **Field of Classification Search**
CPC ........... G06Q 30/0241; G06Q 30/0251; G06Q 30/0255; G06Q 30/0256; G06Q 30/0269
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 6,571,234 B1 | 5/2003 | Knight et al. |
| 7,801,905 B1 | 9/2010 | Singh et al. |
| 2002/0065802 A1 | 5/2002 | Uchiyama |
| 2003/0028441 A1 | 2/2003 | Barsness et al. |

(Continued)

FOREIGN PATENT DOCUMENTS

WO    WO 2006/017622 A2    2/2006

OTHER PUBLICATIONS

CNN.com homepage, Jan. 1, 2005, Wayback Machine internet archive.

(Continued)

*Primary Examiner* — Meredith A Long
(74) *Attorney, Agent, or Firm* — Lewis Roca Rothgerber Christie LLP

(57) **ABSTRACT**

A press release distribution system provides press release and other news to forum sites as posts. The forum software that runs at forum sites includes press release interface software or is adapted to receive press release interface plug-in modules for interfacing with the press release distribution system. The press release interface software or plug-in module may also monitor and/or analyze user data of forum members and/or forum activities of the users. The monitored user data and forum activities may be provided to the press release distribution system for analysis and generation of user profiles. Using the result of the analysis (e.g., user profiles), the press release distribution system can target particular users or forums to direct the press releases, news, or advertisements for most effective advertising campaign.

**18 Claims, 7 Drawing Sheets**



(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2003/0028451 | A1 | 2/2003 | Ananian |
| 2004/0044571 | A1 | 3/2004 | Bronnimann et al. |
| 2004/0068750 | A1 | 4/2004 | Maa |
| 2004/0186777 | A1 | 9/2004 | Margiloff et al. |
| 2005/0021521 | A1 | 1/2005 | Wycoff |
| 2005/0192948 | A1 | 9/2005 | Miller et al. |
| 2005/0222900 | A1 | 10/2005 | Fuloria et al. |
| 2006/0074751 | A1 | 4/2006 | Kline et al. |
| 2006/0190333 | A1 | 8/2006 | Choi |
| 2007/0043617 | A1 | 2/2007 | Stein et al. |
| 2011/0191309 | A1 | 8/2011 | Anderson et al. |

OTHER PUBLICATIONS

MessageBoardBlaster.com homepage and FAQ, Mar. 1, 2005, Wayback Machine internet archive (6 pages).

International Search Report and Written Opinion for PCT Application No. PCT/US07/15084, dated Feb. 11, 2008, 10 pages.

U.S. Office Action dated Nov. 10, 2009 corresponding to U.S. Appl. No. 11/359,003, 10 pages.

U.S. Office Action dated Jul. 6, 2010 corresponding to U.S. Appl. No. 11/359,003, 14 pages.

U.S. Office Action dated Sep. 15, 2011 corresponding to U.S. Appl. No. 11/359,003, 13 pages.

U.S. Office Action dated Apr. 27, 2012 corresponding to U.S. Appl. No. 11/359,003, 14 pages.

U.S. Office Action dated Sep. 10, 2012 corresponding to U.S. Appl. No. 11/359,003, 3 pages.

U.S. Office Action dated Jul. 10, 2013 corresponding to U.S. Appl. No. 13/871,794, 11 pages.

U.S. Office Action dated Sep. 13, 2013 corresponding to U.S. Appl. No. 13/871,794, 10 pages.

U.S. Office Action dated Jun. 12, 2014, for cross reference U.S. Appl. No. 13/871,794, (18 pages).

U.S. Office Action dated Oct. 14, 2014, for cross reference U.S. Appl. No. 13/871,794, (6 pages).

U.S. Office Action dated Sep. 30, 2014, for cross reference U.S. Appl. No. 11/359,003, (7 pages).

Case: 23-1392    Document: 12    Page: 111    Filed: 03/14/2023



FIG. 1

Case: 23-1392    Document: 12    Page: 112    Filed: 03/14/2023



FIG. 2



FIG. 3

Case: 23-1392     Document: 12     Page: 114     Filed: 03/14/2023



FIG. 4

Case: 23-1392     Document: 12     Page: 115     Filed: 03/14/2023



FIG. 5

PRESS RELEASE DISTRIBUTION SYSTEM

400



FIG. 6

**FIG. 7**



RECEIVE PRESS RELEASE OR NEWS 600

PROVIDE THE PRESS RELEASE OR NEWS TO FORUM SITE 602

MONITOR USER DATA 604

MONITOR FORUM ACTIVITY OF ONE OR MORE USERS 605

ANALYZE THE USER DATA AND FORUM ACTIVITIES 606

USE THE ANALYSIS RESULT TO TARGET THE USER/ FORUM SITE 608

PROVIDE PRESS RELEASES, NEWS, ADS TO THE FORUM SITE/USER 610

US 10,147,121 B2

**1**

## PRESS RELEASE DISTRIBUTION SYSTEM

### CROSS-REFERENCE TO RELATED APPLICATIONS

This application is a continuation of U.S. patent application Ser. No. 11/772,014, filed on Jun. 29, 2007, which claims priority to and the benefit of U.S. Provisional Application No. 60/817,771 filed on Jun. 29, 2006, the entire contents of each of which are incorporated by reference herein.

### FIELD OF THE INVENTION

The present invention relates to online brand marketing and monitoring.

### BACKGROUND

Global computer networks, such as the Internet, are increasingly being used for marketing and advertisements, encroaching into advertising markets traditionally reserved for printed media (e.g., newspapers and magazine) and/or television. Online advertisements often appear on web sites or web pages of the World Wide Web (WWW) in a form of banner ads, or the like. There are also other web sites that are fan sites (or forum sites) utilized for discussing particular interests or hobbies. These fan sites normally consist of message forums and other venues for disseminating information over the global computer networks, are being used to portray certain products or brands in a positive or negative light, and can be important sources of consumer feedback for advertisers, manufacturers and consumers alike.

Since these fan sites tend to have smaller audiences, one should advertise across many of them to reach a sizable market. While this market is highly desirable, the problem is that one needs to work through many different sites to reach the market. Also, since each fan site typically requires a fee for placing an advertisement, it is impractical or impossible to place advertisements on each and every one of them. Therefore, the advertisers, manufacturers or those seeking to reach the market through the fan sites must select the right fan sites on which to place their advertisements. Further, these sites tend to be less professional than typical larger sites (Yahoo, CNN, etc.) that sell ad spaces so it is desirable to have them fit into a set standard for distributing and processing ads.

Due to a generally large number of fan sites available for placing advertisements, it is often very difficult and time consuming to select those relatively few fan sites to run advertisements. For one thing, it is often difficult to identify those fan sites that are frequented by a number of potential customers. Further, it is even more difficult to measure the effectiveness of the advertisements placed on any particular fan site.

Such difficulties in identifying the target fan sites are even more pronounced when the brands being advertised or marketed are for a niche market such as the automotive aftermarket industry, for example. The automotive aftermarket is already fragmented into a number of different market segments such as parts for trucks, sport compact cars, domestic performance cars, luxury SUVs, etc. Therefore, it is not an easy task for an aftermarket manufacturer, which is often a small or medium-sized business with limited resources and marketing budget, to select one or more aftermarket car enthusiast fan sites that will serve as an effective venue for its marketing campaign.

**2**

Further, although these fan sites typically provide an advertising tracking program, they generally only indicate how many people saw the ad and how many people clicked on it without any further information on ad effectiveness. In addition, the fan site operator typically provides advertising tracking information once in a while by sending an e-mail, for example, and the advertiser has no way of validating their data. Therefore, it is very difficult to quantitatively assess which site is truly better than another site.

Further, since each site has its own paperwork and processes for accepting ads and ad money, ranging from very formal to very informal, an advertiser must spend extra time to track which placement invoices should be coming for which sites and for how long.

To further complicate the matter, the existing banner images may not be ideal for all of the sites that the advertisements are to be placed on. In this case, separate ads should be crafted for certain specific sites, which makes tracking even more complicated and the advertiser must keep track of which ads go to which sites. In addition, when the advertiser's products change and/or a new feature is added, the advertiser must re-do all of his advertising banners to reflect the changes and resubmit them to the appropriate sites. This may involve sending e-mails to all of the various site owners.

Other problems associated with online advertisements and marketing that prevent many businesses from effectively utilizing the web for advertising brands or products include: 1) difficulty in monitoring positive and negative comments on user forums, fan sites and/or the like that can make noticeable impacts on sales, as it is difficult and time consuming to monitor the thousands of user forums and other sites on the web; 2) lack of advertisers' knowledge or expertise in gauging the quality of the vendors' sites and limited availability of tools for measuring the performance of the online placements that are purchased, even when advertisers want to diversify their ad spending and advertising on enthusiast web sites; and 3) difficulty in monitoring unauthorized retailers who sell fake products because small or medium-sized businesses generally cannot afford to spend the time to monitor the entire web for unauthorized dealers.

Therefore, it is desirable to provide tools that will facilitate the advertisers, manufacturers or brand managers to locate the most suitable fan sites that are frequented by the target audience, and to monitor the effectiveness of any advertisements that are placed on these fan sites. Further, it is desirable to provide tools that can be used by the advertisers or manufacturers to monitor dissemination of information regarding their brand names or products over the global computer networks.

### SUMMARY OF THE INVENTION

In one exemplary embodiment according to the present invention, a press release distribution system is used to provide press releases, other news, advertisements, messages and/or non-"press" events to the forum sites.

In one exemplary embodiment according to the present invention, the press release distribution system inserts or posts a press release as a message at one or more forum sites.

In one exemplary embodiment according to the present invention, the press release distribution system interfaces with the forum software that runs at each of the forum sites. The forum software may have a built-in software for interfacing with the press release distribution system or may be adapted to receive a press release interface plug-in module for interfacing with the press release distribution system.

US 10,147,121 B2

3

In one exemplary embodiment according to the present invention, the component of the press release distribution system that runs at respective forum sites, e.g., the press release interface plug-in, generates a user profile (e.g., a marketing profile) using user data and/or user activities at the forum such as user reads and uploads.

In an exemplary embodiment according to the present invention, a press release distribution system includes a distributor module adapted to receive a press release, and to distribute the press release to one or more forum sites over a network according to relatedness between the press release and the one or more forum sites; at least one input handler module adapted to receive the press release from one or more advertisers, and to provide the press release to the distributor module; and at least one press release poster module adapted to run at respective said one or more forum sites, to receive the press release over the network, and to post the press release as a message at the respective said one or more forum sites.

In another exemplary embodiment according to the present invention, a method of distributing a press release to one or more forum sites, is provided. The method includes: receiving the press release from one or more advertisers; distributing the press release to the one or more forum sites over a network according to relatedness between the press release and the one or more forum sites; and posting the press release as a message at the one or more forum sites.

In exemplary embodiments of the present invention, a brand management system used to provide marketing and monitoring services for brands or products over the global computer networks, includes a press release distribution system.

In another exemplary embodiment according to the present invention, a brand management system coupled to a plurality of web sites over a communications network, is provided. The brand management system includes: a press release distribution system adapted to receive a press release related to an advertiser and provide the press release to one or more forum sites among the plurality of web sites to post as a message, in accordance with relatedness between the press release and the one or more forum sites; a brand monitoring tool adapted to automatically monitor one or more of the web sites for at least one keyword related to a particular brand or product of the advertiser; and an advertisement directory system comprising a directory of web sites that are likely to provide an effective venue for one or more advertisements for the particular brand or product.

These and other aspects of the invention will be more readily comprehended in view of the discussion herein and accompanying drawings.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a configuration diagram of a brand management system coupled over the global computer networks to advertisers, ad sites, monitored sites, consumers and dealers;

FIG. 2 is a block diagram showing components of the brand management system of FIG. 1;

FIG. 3 is a flow diagram illustrating the process of using the brand management system for ad placement and tracking in an exemplary embodiment of the present invention;

FIG. 4 is a configuration diagram of a press release distribution system coupled over the global computer networks to advertisers and forum sites in an embodiment in accordance with the present invention;

4

FIG. 5 is a conceptualized block diagram of the press release distribution system of FIG. 4 in one embodiment according to the present invention;

FIG. 6 is a schematic view of a screen shot of a forum site home page in an embodiment in accordance with the present invention; and

FIG. 7 is a flow diagram of the operation of the press release distribution system in one embodiment in accordance with the present invention.

DETAILED DESCRIPTION

Exemplary embodiments according to the present invention provide a method and apparatus for facilitating targeted advertising of various different brands and monitoring thereof, over global computer networks, including distribution of press releases. This application contains subject matter related to U.S. patent application Ser. No. 11/359,003 filed Feb. 21, 2006, which claims priority to and the benefit of U.S. Provisional Application No. 60/654,163 filed on Feb. 18, 2005, the entire contents of both of which are incorporated herein by reference.

A brand management system or a brand monitoring and marketing system in exemplary embodiments of the present invention is a web-based application suite that provides businesses with the tools necessary to monitor and market their brands online. The system will provide the businesses with one or more of the tools including, but not limited to, a brand monitoring tool, an ad management tool, and a file management tool. The system can aggregate existing tools and/or provide new tools and services that are not currently available. The brand management system in one embodiment also includes a press release distribution system, and a number of press release interface software or plug-in modules running at forum sites to interface with the press release distribution system. The press release distribution system and the press release interface software may together be also referred to as a press release distribution system.

In an exemplary embodiment according to the present invention, the brand management system includes an ad directory system or an ad directory in a form of a web site to link the brand advertisers or manufacturers to various different web sites that are likely to provide an effective venue for marketing and advertisements for particular market segments. The advertisers or manufacturers can view (which can include logging in) the web page on which the directory of web sites is placed, and select one or more web sites based on their particular needs, in accordance with the information provided in the directory.

The ad directory system can also be used to facilitate distribution of the advertisements, tracking and monitoring of the effectiveness of the advertisements, and transfer of advertisement fees between the advertisers and the web site owners. The brand management system can use a brand monitor including a bot to monitor various different sites (e.g., popular forums, fan sites, etc.) through a keyword search, for example.

The brand management system of the present invention provides one or more of, without being limited to, the following features: 1) identification of the sites that would be suitable or ideal for the brands and/or products of interest, instead of finding one site at a time; 2) quantitative assessment as to which site is truly better than another site; 3) quantitative measurement of ad effectiveness, by such information as how many customers actually purchased products as a result of a particular advertisement on a particular web site; 4) independent confirmation of advertisement tracking

US 10,147,121 B2

5

data provided by the web site operators; 5) ability to create banner and/or other images that are suitable or ideal for all of the sites on which the advertisements are placed, because separate ads may be required for certain specific sites, which makes tracking even more complicated since the advertiser must keep track of which ads go to which sites; and 6) saving the advertisers from having to re-do all of the advertising banners to reflect the changes and resubmit them to the appropriate sites, when the products change or a new feature is added.

As illustrated in FIG. 1, a brand management system 100 is coupled to advertisers 103, and is coupled to monitored sites 110, including ad sites 1 to N 104, 106, 108, over the global computer networks 102. The monitored sites 110 also include popular sites 109 that are not necessarily ad sites. By way of example, the popular sites may include large sites that are monitored but do not have ad sales provided through the brand management system 100. Consumers 112 (or computers thereof) are coupled to the ad sites 1 to N 104, 106, 108. The consumers generally would not directly access the brand management system 100.

The brand management system 100 is used for monitoring and marketing by one or more advertisers, for example, and may also be referred to as a brand monitoring and marketing system herein. The advertisers 103 represent one or more different advertisers, manufacturers, dealers or brand marketers who are using the services provided by the brand management system 100. Similarly, the monitored sites 110 represent one or more sites that are monitored by the brand management system 100 on behalf of the advertisers 103.

As can be seen in FIG. 2, the brand management system 100 includes brand monitoring tools 200, an ad directory system 202, an online payment system 204, and a file manager 210. The ad directory system 202 includes an ad tracker 206, an ad generator 207 and an ad distributor 208. In one embodiment, the brand management system optionally includes a press release distribution system 400. The box 400 representing the press release distribution system 400 is shown in dotted lines because the press release distribution system 400 is optional. In addition, the press release distribution system 400 may be implemented in one or more other modules, such as the ad tracker 206, the ad distributor 208 and/or the file manager 210. Further, some of the components of the press release distribution system 400, such as, for example, press release plug-ins shown in FIG. 4 (or press release posters shown in FIG. 5) may be implemented at the forum sites, separately from the rest of the brand management system 100.

The brand monitoring tools 200 are used for monitoring the user forums, fan sites, etc. to afford advertisers or manufacturers an insight into how their products and/or brands are received or perceived in the market, especially by the relevant online community. The ad directory system 202 is for bringing together sellers and buyers of on-line advertisements, and includes ad tracking, ad generation and ad distributor features as follows. The ad generator 207 can be used by the advertisers or manufacturers to create or to modify online ads (e.g., including banners), while the ad distributor 208 and the ad tracker 206 can be used to distribute ads and to track effectiveness of ads, respectively. Alternatively, the advertisers or manufacturers can submit their own pre-created ads for distribution rather than using the ad generator 207.

By way of example, the ad directory system 202 facilitates the advertisements by the manufacturers/distributors by enabling them to create/submit/modify their own advertisements and placing them on the advertisement directory

6

of the ad directory system 202. The advertisers may also post specific products and quantities/inventories available for sale for each product, such that transactions can be facilitated through the use of the brand management system 100. Hence, the brand management system 100 brings the sellers and purchasers together in an online community setting.

The transactions can be consummated through the use of the online payment system 204. The users of the ad directory system 100 can, in addition to purchasing products from the advertisers/manufacturers/distributors online, bid for products online, such that the ad directory system 202 can be used for advertising, selling, purchasing and/or bidding of various different products having different prices and in different quantities. All these transactions can be monitored using the ad tracker 206 such that the effectiveness of the ads and/or ad campaigns can be measured.

The file manager 210 can be used for online distribution of information related to products or brands (e.g., images, brochures, performance data, etc.) to the dealers and/or the consumers. Any advertising fee transactions between the advertisers and ad site owners can take place using the online payment system 204, for example.

In other embodiments, the ad distributor 208 may also distribute press releases as ad units, and the ad tracker 206 may also track effectiveness of the press releases. In yet other embodiments, the file manager 210 may also be used to distribute the press releases. In still other embodiments, a separate press releases distribution system is used as a part of the brand management system 100 or as a separate system/module to receives press releases and other news, and distribute them to the advertisement sites (e.g., forum sites). One instance of such press release distribution system is illustrated in FIG. 4, and described in reference to FIGS. 4-6 below.

Search engine ranking, linked sites, eBay® postings, and other negative or positive product comments on forums and other web sites can have a dramatic impact on how a brand is perceived. This negative or positive "press" can also directly affect sales. Hence, in an exemplary embodiment, the brand management system 100 performs brand monitoring using the brand monitoring tools 200.

The brand monitoring tools 200 include a bot 201. The brand monitoring tools 200 may also include one or more other tools known to those skilled in the art. During brand monitoring, the bot is used to automatically monitor certain web sites and web postings for specific keywords. These keywords may appear as topics and/or content of discussions in different online forums. They may also appear as products for sale on Internet auction sites. Hence, the bot can be used to monitor/track various different web sites and/or web postings to search for particular keywords, brands, products, advertiser identifications, etc. to monitor how the monitored brands, products, etc. are characterized/perceived by the online community. By way of example, the bot can be targeted to one or more predetermined web sites. The user may also have flexibility to tailor monitoring of various different web sites and postings to fit his needs using the bot. The web sites searched can include one or more of, but are not limited to, eBay® and other auction site postings, Froogle™ posts, Epinions® posts, forum posts, search engines, number of links to the manufacturer's web site, Alexa® ranking, Google® Adwords®, Overture®, Groups, and the like.

EBAY® is a registered trademark of eBay Inc., a Delaware corporation; FROOGLE™ is a trademark of Google Technology Inc., a California corporation; EPINIONS® is a registered trademark of Epinions, Inc., a Delaware corpo-

US 10,147,121 B2

7

ration; ALEXA® is a registered trademark of Alexa Internet Corporation, a California corporation; GOOGLE® and Adwords® are registered trademarks of Google Inc., a Delaware corporation; and OVERTURE® is a registered trademark of Overture Services, Inc. a Delaware corporation.

The advertiser, such as a brand owner and/or a product manufacturer, can select which keywords, trademarks, and phrases are relevant to their businesses. The advertiser can be given links to any posts that contain these keywords. This feature can be used, for example, to give the marketing manager an instant overview of the web activity that their brand is generating. For example, the marketing managers can have, all on one screen, a summary of Internet activities relevant to their brand.

The bot of the brand monitoring tools 200 should be more sophisticated than a normal bot, and should be used for checking Internet activities. In one embodiment, the bot is able to navigate web sites that require users to log in to the web site. In this embodiment, the bot is also able to look for specific data on each web page. Further, the bot is a programmable bot that can be customized for each site being monitored.

In one embodiment, the bot reports indexing failures to indicate changes to the web sites that may cause the bot to fail. "Behaviors" are programmed into the bot as many of these web sites have rules designed to exclude bots from using specific features on their sites. For example, some forums do not allow more than one search every 20 seconds to avoid bots overloading their servers. Those skilled in the art would know how to create/program a bot having one or more of the above features according to exemplary embodiments.

The ad directory system 202, which may also be referred to as an ad directory, of the brand management system 100 provides manufacturers or advertisers with a large directory of web sites related to a particular brand, such as top automotive enthusiast web sites. The manufacturers or advertisers can select web sites that they wish to advertise their brands or products on, using a system similar to an online shopping cart.

By aggregating and organizing these sites, the brand management system will enable advertisers to quickly create and manage ad campaigns across multiple web sites. For web sites selling advertising spaces, the ad directory system 202 will enable them to post their site information, ad programs, audience type, and ad rates. These enthusiast sites will have the option of having their traffic audited for an additional monthly fee. Such auditing process can be automated through an automated digital tracking system (e.g., pixeling), for example. These sites can be specially marked, for example, to indicate that their traffic has been audited.

Advertisers or manufacturers should be able to view these enthusiast sites by site type (e.g., make/model) and easily select multiple ad placements to create an online media buy. Web sites selling their placements through the brand management system 100 should be able to review requested placements and ads submitted by manufacturers. Once an ad placement is accepted by a particular web site, the brand management system 100 will automatically place the ad on that particular web site. The ad distributor 208 manages ad distribution, and the ad tracker 206 manages detailed ad tracking.

The ad tracker 206, which may also be referred to as an ad tracking system, would enable advertisers to easily track a variety of data per ad or per placement. Advertisers would

8

be able to track information including contact form submissions, orders, number of shopping carts started, product pages viewed, and the like.

The ad generator 207, which may also be referred to as an ad generation system or an ad creation system, is a tool that can be used to generate ads that are suitable for all ad sites. The ad generator 207 can also be used to generate two or more ads, each of which is suitable for placement on one or more specific sites. In addition, the ad generator 207 can be used to convert existing ads on printed media to banner or other ads suitable for placement on web pages.

The ad distributor 208, which may also be referred to as an ad distribution system, provides the advertiser with the ability to remove and/or replace ads. Advertisers could also run multiple ads in rotation in one single placement. Optionally, advertisers may have the brand management system automatically disable the less effective one or more ads of a plurality of ads. Advertisers would be able to set which factor they wish to use in evaluating effectiveness including click-thrus, orders, contact form submissions, and/or the like.

In addition to traditional banner placements, the brand management system 100, or the ad distributor 208 thereof, will enable advertisers to distribute online press releases, or choose keyword-related placements tied to text or image ads on the ad sites, which may be enthusiast sites.

An online media buy may include dozens of web sites, so organizing and tracking these payments online will be important for advertisers. The brand management system 100 can process the transactions for the placement fees through its online payment system 204 using a model similar to that of an application service provider (ASP) model. By way of example, monthly fees may be charged by the ad sites through the online payment system 204 for placing advertisements. Advertiser/site feedback may also be incorporated into the brand management system 100. The online payment system 204 can also be used by the advertisers and/or the ad sites to pay for services provided by the brand management system 100.

A model similar to the ASP model can also be used between the advertisers and/or ad sites and the brand management system 100. By way of example, a model similar to the ASP can be used to implement the transactions between the advertisers and/or the ad sites and the brand management system 100. This way, the brand management system 100 can charge a monthly access fee to the advertisers and/or ad sites for buying and selling of ad spaces.

There are at least two fees that are associated with the brand management system of the present invention. A first fee is an access fee to access the system for brand monitoring and to access ad directory. The access fee can be a monthly ASP style fee, and it is conceivable that some customers may only pay this monthly access fee but not buy any ads. The online payment system 204 is used to pay for the placement of the ads. The operator of the brand management system, for example, may keep a percentage of revenue generated through all of the transactions involving purchasing ad spaces and placing ads.

According to FIG. 3, the advertiser or manufacturer first accesses the ad directory system (300). The ad directory system contains information on available ad sites corresponding to the products or brands of interest. The advertiser or manufacturer selects ad sites based on the site type (e.g., catering to the specific industry) and/or the like (302).

The advertiser or manufacturer may already have available ads, or they may wish to modify existing ads and/or create new ads using the tools available in the brand man-

US 10,147,121 B2

9

agement system, such as the ad generator **207** (**304**). After selection of the ad sites and the creation/submission of the ads, a payment is arranged (**305**), for example, through the online payment system **204**. Then, the ads are distributed to the selected ad sites (**306**). The effectiveness of the ads can be tracked (**308**) using the ad tracker **206**, for example. The ad campaign can then be adjusted (**310**) using factors such as effectiveness of the various different ad sites.

Further, advertisers or manufactures can gain detailed tracking information by using the brand management system **100**. By way of example, a total summary for the campaign may show total clicks, total impressions, click-through rates (CTR) and total user actions, all of which can be tracked, such that ads can be tied to some user activity such as a dealer search, product page view, contact form submission, or an online order. This way, one or more user activities associated with the advertisements can be tracked/monitored.

In addition, manufacturers or advertisers can distribute ads evenly or remove ineffective ads after so many days or after so many impressions. Further, the advertisers or manufactures can remove or edit existing ads or generate new ads. This way, advertisers or manufactures can quickly change ads on multiple sites, run multiple ads in one placement, run different ads based on time of day, and/or remove ineffective ads without having to resubmit the ads manually to multiple site owners.

Currently, product images, documents, and data are typically distributed by burning the data onto CD-ROMs as their dealers request them. By moving this functionality online, the manufacturer will gain several benefits including, but not limited to, reduced labor costs associated with distributing materials to dealers and media and reduced CD media and postage costs.

The file manager **210** is a part of a suite of tools (i.e., the brand management system **100**) that address the common needs of advertisers or manufacturers, such as the automotive aftermarket industry.

The file manager **210** should enable advertisers or manufacturers to do one or more of, but not limited to, the following: 1) upload various documents and images; 2) upload large images and automatically have "thumbnail" previews created; 3) organize documents and images into categories and/or subcategories; 4) establish access rights depending on user type; 5) track downloads by user and by file; and 6) provide news/updates to dealers.

Further, the file manager **210** should enable manufacturers' dealers to do one or more of, but not limited to, the following: 1) view thumbnails of images (created automatically by the system); 2) search for files by a keyword; 3) browse files by category/subcategory; 4) select multiple files or download entire categories of files; and 5) quickly see new files uploaded since the last login.

While the present application has been described mainly in reference to the automotive aftermarket, the directory system in exemplary embodiments of the present invention can be applied to any suitable market with strong enthusiast following online. The sites and market segments having such strong enthusiast following online, may include wedding sites, golf, professional wrestling, and the like.

As discussed above, in embodiments in accordance with the present invention, the following strategy is used, for example, for brand monitoring, marketing and management: 1) A large number of small automotive forums (publishers) are aggregated into one automotive network; 2) The clients are enabled to easily create online ad campaigns by selecting various publishers; 3) The advertisers are enabled to upload,

10

distribute, and track ad banners across these publishers; 4) The brand monitoring and marketing system will automatically monitor posts on these sites to see if anything negative or positive is said about the advertiser; and 5) Other online services will be provided to advertisers through the brand monitoring and marketing system (e.g., e-commerce, etc.).

In another embodiment in accordance with the present invention, a press release distribution system is used to inject or post press releases into the forum. The press releases can include text, video, graphics, images, multimedia, programming, and/or any other suitable information as those skilled in the art would appreciate. Here, each of the press releases may be viewed or referred to as an ad unit that can be embedded into the forums.

As shown in FIG. **4**, a press release (PR) distribution system **400** in an embodiment in accordance with the present invention, is coupled to advertisers **403** and forum sites **1** to N (**410**, **420**, **430**), wherein N is an integer greater than or equal to 3. In the described embodiment, there is no limit to the number of forum sites that the press release distribution system **400** is coupled with. The press release distribution system **400** receives press releases, news feed and/or Really Simple Syndication (RSS) feed over a network **402**, which may be a global computer network or the Internet, or any other suitable network known to those skilled in the art. The press release distribution system **400** may be a part of a brand management system **100**, or may be a standard alone system. Such stand alone press release distribution system may be coupled or not coupled with the brand management system **100**. One embodiment of the press release system **400** may be referred to as POSTRELEASE™, which is a trademark of CIE Studios, LLC, Long Beach, Calif.

In the example depicted in FIG. **4**, the press release distribution system **400** receives press releases from the advertisers **403**. In other embodiments, the press release distribution system **400** may receive the press releases in any other suitable manner over the network **402** or otherwise. Further, the news and RSS feeds may be provided using any suitable method over the network **402** or otherwise, as those skilled in the art would appreciate. Any advertisements including text and/or graphics can also be distributed and posted directly into forums using the press release distribution system **400**, of course. The press releases are posted on (or inserted into) the forum (or forum site) as a message or an announcement. The "message" may also be referred to as a "post" throughout this specification. Further, the "message" is not limited to text, but may also include one or more of images, video, web site code, Flash, or any other suitable information or data.

As can be seen in FIG. **4**, one or more users **440** (i.e., computers or other network devices thereof) are also coupled to the forum sites 1-N (**410**, **420**, **430**) via the network **402**. The users **440** are consumers who may be members or users of the forum sites 1-N. The press releases posted on the forum sites 1-N will be read by the users **440** of the corresponding forum sites. The users **440** upload posts at the forum sites, and also read the posts of interest from the forum sites. These user activities can be used or analyzed to generate personal/marketing profiles for the users. While only one box **440** is used to designate the users in FIG. **4**, the users of course can be located at multiple different locations (e.g., across the globe).

The press release distribution system **400** may be included in the brand management system **100** of FIGS. **1** and **2**, for example, or implemented as a system separate from the brand management system **100** on the same or different server from that of the brand management system **100**. In

11

other embodiments, the features and functions of the press release distribution system **400** are implemented in other modules of the brand management system **100**, such as the ad tracker **206**, the ad distributor **208** and/or the file manager **210**.

The forum site **1** (**410**) runs forum software **412**; the forum site **2** (**420**) runs forum software **422**; and the forum site N (**430**) runs forum software **432**. The forum software **412**, **422** and **432** respectively have installed therein, respective press release (PR) plug-ins (or plug-in modules) **414**, **424** and **434**. The press release plug-ins may also be referred to as press release interface plug-ins herein. The forum software may be VBulletin or any other forum software available to those skilled in the art. Those skilled in the art would appreciate that the plug-in modules are designed and developed to work with one or more desired forum software. The press release plug-in module receives the press releases and/or other news from the press release distribution system **400**, and posts the received press releases and/or other news on the corresponding forum site. Alternatively, the press release distribution system **400** and the press release plug-ins may together also be referred to as a press release distribution system.

Each of the forum sites **1** to N (**410**, **420**, **430**) also includes a respective one of databases **415**, **425** and **435**. The database includes user data, e.g., name, birth date/age, gender, occupation, address, e-mail address, phone number, and/or any other personal data required (or optionally requested) by the forum site for registration as a member. The database also includes the forum postings, traffic and forum activities, and may also include history and/or archive of the forum postings, traffic and forum activities. The forum activities may include the activities of the users/members while logged onto the forum site, such as the posts downloaded/read and posts written/uploaded by the users.

In one embodiment, the press release plug-in module is used to monitor the posts, user information, user behavior, and/or other forum activity at the corresponding forum site. By way of example, most forum sites require that the users be registered as members in order to post on forums, while some non-registered users can still view the site and posts thereon. Also, most forums are broken down by topic areas. Further, the registration process on many forums including nearly all automotive forums require age information and optional location, occupation, and other personal data. The press release plug-in in one embodiment uses such personal data and by tracking the content of each message the user posts and reads, to develop a marketing profile for that user. Further, almost every forum has a search feature or function, and the search activity of the user (e.g., search terms or keywords used by the user during the search) can also be used to create user profile. As such, the plug-in module in one embodiment monitors the forum activity of the user and uses that information to create a marketing profile (or user profile) and then deliver ads against that profile for a targeted advertising. By way of example, in one embodiment, the marketing profile (or user profile) can be created by analyzing the posts/messages that the user reads, the posts/messages that the user creates, and/or the profile information the user entered when the user created his/her account on the forum.

By way of example, if someone is viewing a post thread about wheels and he responds to the thread, the press release plug-in module can be used to determine that that particular user may have an interest in wheels, and deliver wheel ads to that user. Alternatively, the press release plug-in module may provide the user activity information to the press

12

release distribution system **400** for such analysis/determination. As such, in the described embodiment, the press release distribution system **400** is integrated into existing forum sites using the press release plug-in modules, rather than sites specifically developed for operating with the press release distribution system. Hence, the press release distribution system **400** draws existing data from forums (i.e., mines already existing data) that are generated by user activities on forums. To get these forum sites to join the network of press release distribution system **400**, a revenue sharing may be instituted, in which the press release distribution system **400** delivers ads and shares revenue, as many of these forum sites, despite having great traffic, typically need help to generate revenue from the traffic.

In other embodiments, the forum software may already include a press release interface module for receiving and posting press releases from the press release distribution system **400** and for monitoring user data and forum activity thereof, such that a separate plug-in module is not necessary. Hence, while the press release interface plug-in module is installed separately by the forum site owner, the site owner needs only install the forum software when it already includes the features and functions of the press release interface plug-in module.

The press release distribution system **400** in one embodiment limits the time period during which particular press releases are posted at one or more forums. Further, in one embodiment, the press release distribution system **400** (either alone or together with the forum software and/or the press release interface plug-in module) limits the frequency at which the press releases are displayed for each user. The press release distribution system **400** in one embodiment also tracks the result (i.e., effectiveness) of the press release distribution campaigns.

As shown in FIG. **4**, therefore, press releases, news and/or advertisements from/related to the advertisers **403** of particular brand or product can be directed to particular one or more forum sites in accordance with the relationship or relatedness between the press releases, news, advertisements, advertisers, brand, product and the forum sites. By way of example, press releases, advertisement, etc. from aftermarket automotive parts manufacturers will be directed to forum sites of auto enthusiasts and press releases, advertisements, etc. from golf club manufacturers will be directed to golf enthusiast forum sites. Further, in one embodiment, the press releases, advertisements, news, etc. are directed to one or more particular users/members of the forum sites in accordance with the user profiles and/or user activities at the forum site. By way of example, a user actively reading or uploading on threads on multi-function cellular phones will be targeted to be provided with press releases and/or advertisements from cellular phone manufacturers.

FIG. **5** is a conceptual block diagram of the press release distribution system **400** of FIG. **4**. As shown in FIG. **5**, the press release distribution system includes a press release handler module (or press release handler) **450**, a news feed handler module (or news feed handler) **452** and an rss feed handler module (or rss feed handler) **454** for receiving and handling press releases, news feed, and rss feed, respectively. The press release handler module **450**, the news feed handler module **452** and the rss feed handler module, either together or separately, may also be referred to as an input handler or input handler module. The term "module" is used throughout this specification to refer to any hardware, software, firmware, application, tool, widget, plug-in, any other

US 10,147,121 B2

13

suitable processing apparatus or method known to those skilled in the art to implement the described functions, or any combinations thereof.

The press release distribution system **400** also includes a distributor/controller module **460** (to be referred to hereinafter as "distributor" or "distributor module") **460**. The distributor module **460** receives the press releases, news feed and rss feed, and provide them to one or more press release poster/monitor modules (to be referred to hereinafter as "press release posters" or "press release poster modules") **470, 472, 474** to be posted at the respective forum sites. In one embodiment, each of the press release poster modules **470, 472** and **474** posts or inserts the press releases as a message on the forum (or forum site). In one embodiment, the press release poster modules **470, 472, 474** are implemented as plug-ins, such as the PR interface plug-ins **414, 424** and **434** of FIG. **4**.

In addition to posting the press releases, news feed, and rss feed, the press release poster modules **470, 472, 474** monitor user data and/or forum activities of one or more users at respective forum sites. The press release poster module **470, 472** or **474** may analyze the user data and/or forum activity data. Alternatively or in addition to the analysis of the user data and/or forum activity data in the press release poster modules **470, 472, 474**, in one embodiment, the distributor module **460** analyzes the user data and/or the forum activities. The distributor module **460** may also receive the result of the analysis of one or more of the press release poster modules **470, 472** or **474**, and further analyze such analysis result. Then the distributor module **460** uses the analysis result to target the user/forum site to direct the press releases, news, advertisements, messages and/or non-"press" events. Therefore, in one embodiment, the distributor module **460** analyzes or further analyzes the user/forum activity data, and/or controls providing press releases, news, rss feed, messages, non-"press" events, and/or advertisements to the forum sites and/or the users. The press release poster modules **470, 472** and **474** are not limited to posting press releases and/or monitoring the user data/forum activities, but may be used to post other information such as, for example, advertisements, other news, messages and/or non-"press" events, or any other information suitable for posting on one or more forum sites.

As can be seen in the schematic view of a screen shot of a forum site home page **500** in FIG. **6**, the home page of a forum site typically includes a forum name **504** and one or more banner ads **502, 506**. The home page typically displays one or more posts **510** posted by the members of the forum. Such posts may include threads initiated by a particular posting or postings. The home page **500** also displays a press release **508**, which is displayed with a background color (e.g., red) different from that of the member posts **510**. This way, press releases from the advertisers **403** can be brought to the immediate attention of the forum member. In other embodiments, the press release post (or the alert thereof) may be displayed with other background color, distinguishing font and/or text format (e.g., bold text) as those skilled in the art would appreciate. Such press releases can be viewed and referred to as ad units in the described embodiment, and may be effective advertisements directed at particular forum sites, and/or particular members or users. While the press release **508** is shown as an announcement in FIG. **6**, the press release **508** may be posted or inserted as a message in other embodiments.

FIG. **7** illustrates a flow diagram showing an operation of the press release distribution system in one embodiment in accordance with the present invention. The flow diagram of

14

FIG. **7** will be described in reference to FIGS. **4, 5** and **7**. The press release distribution system **400** first receives a press release or news (**600**). The press release may have originated from one of the advertisers **403** who desires to use the press release as an advertisement to be distributed to the forum sites of interest. By way of example, the advertiser may be a manufacturer of after market auto parts who desires to distribute a press release regarding a scheduled release of a new product to the auto enthusiast fan or forum sites. The press release distribution system **400** may also receive news or RSS feed relevant to one or more of its associated forum sites 1-N (**410, 420, 430**), and distribute the news or other information to the forum sites and/or users/members of the forum sites.

The press release distribution system **400** then distributes the press release or news to the relevant forum sites (**602**). The press release interface plug-in (**414, 424** or **434**) in the forum software (**412, 422** or **432**) of these forum sites posts such press release or news at the forum to be viewed by the members and visitors of the forum site.

The press release plug-in module also monitors user data (e.g., stored in the database **415, 425** or **435**) or the respective forum site (**604**). Such user data is gathered from the users/members by the forum sites at the time of registration or at any other suitable time. The database at the forum site also includes information regarding user activities. By way of example, the database may include such forum activities as reading the posts (or threads thereof) or writing posts onto the forum sites. The press release plug-in also monitors these forum activities of one or more users/members (**605**). The monitored information may be gathered and analyzed by the press release plug-in and/or may be provided to the press release distribution system to be analyzed to generate user profiles (**606**). Based on such user profiles, the press release distribution system can target particular forum sites and/or members thereof to direct the press releases, news and/or advertisements (**608**). Hence, based on the user profiles, particular press releases, advertisements and/or news can be directed (or provided) to the particular forums and/or users (**610**).

While certain exemplary embodiments have been described above in detail and shown in the accompanying drawings, it is to be understood that such embodiments are merely illustrative of and not restrictive of the broad invention. It will thus be recognized that various modifications may be made to the illustrated and other embodiments of the invention described above, without departing from the broad inventive scope thereof. In view of the above it will be understood that the invention is not limited to the particular embodiments or arrangements disclosed, but is rather intended to cover any changes, adaptations or modifications which are within the scope and spirit of the invention.

What is claimed is:

1. A method of displaying sponsored posts among a plurality of non-sponsored posts on one or more web pages, the method comprising:

electronically receiving one or more sponsored posts over a communications network, wherein the sponsored post is directed to a particular user or user type;

electronically displaying the sponsored post among the non-sponsored posts on the web page;

electronically tracking user data or activity with respect to the sponsored post, the data or activity comprising one or more of impressions, clicks, click-through rate, or user actions;

wherein the sponsored post is not a banner advertisement or a static header,

US 10,147,121 B2

15

wherein when the sponsored post is displayed, it is displayed separately from any banner advertisement and contiguously together with at least some of the non-sponsored posts appearing on the web page to scroll together with the at least some of the non-sponsored post such that the sponsored post is in a fixed position relative to at least some of the contiguously displayed non-sponsored posts,

wherein the sponsored post includes at least one of video or image content;

wherein a time period during which the sponsored post is posted is limited,

wherein a frequency at which the sponsored post is displayed for the user or user type is limited, and

wherein a plurality of features of the sponsored post are the same as a corresponding plurality of features of the contiguous non-sponsored posts, and at least one feature of the sponsored post differs from or is in addition to the corresponding feature of the non-sponsored posts in order to distinguish the sponsored posts from the non-sponsored posts.

2. The method of claim 1, wherein the sponsored post comprises a press release, news, announcement, message, advertisement, or non-press event.

3. The method of claim 1, wherein the non-sponsored post comprises one or more of messages.

4. The method of claim 1, wherein the communications network is the Internet.

5. The method of claim 1, wherein each of the one or more web pages comprise one or more of forum sites, news sites, fan sites, popular sites, enthusiast sites, message forums, user forums, online communities, or popular forums.

6. The method of claim 1, further comprising electronically generating user profiles from the electronically tracked user data or user activity at one or more of each of the web pages.

7. The method of claim 1, wherein the user activity at one or more of the web pages on which the sponsored posts are placed comprises one or more reads of the sponsored posts or searches at the web pages.

8. The method of claim 1, wherein the sponsored post is displayed with a background color or another distinguishing feature to denote it as being different from the non-sponsored posts.

9. The method of claim 1, further comprising electronically posting the sponsored posts among the non-sponsored posts at each of multiple web pages, and electronically monitoring user data or user activity at each of the multiple web pages.

10. A system configured to distribute advertisements as sponsored posts for display among non-sponsored posts, the distribution system comprising:

one or more servers configured to:

distribute sponsored posts on behalf of one or more advertisers over a communications network to one or more web pages over the communications network;

16

display the sponsored posts among the non-sponsored posts on the web page;

monitor user data or user activity directed to the sponsored posts; and

utilize a particular one of the monitored user data or user activity to deliver a specific advertisement in a form of the sponsored post to a particular user or user type, and to track one or more of impressions, clicks, click-through rate, or user actions with respect to the sponsored post,

wherein the sponsored post includes image or video content, and

wherein the sponsored post is not a banner advertisement or a static header,

the one or more servers further configured to display the sponsored post separately from any banner advertisement or static header on the page, embed the sponsored post contiguously together with at least some of the non-sponsored posts on the page, enable the sponsored post to scroll together with the at least some of the non-sponsored posts on the page, and place the sponsored post in a fixed position relative to the contiguous non-sponsored posts on the page,

wherein a plurality of features of the sponsored posts are the same as a corresponding plurality of features of the contiguous non-sponsored posts, and at least one feature of the sponsored post differs from or is in addition to the corresponding feature of the non-sponsored posts in order to distinguish the sponsored posts from the non-sponsored posts.

11. The system of claim 10, wherein the sponsored post comprises a press release, news, announcement, message, news feed, advertisement, or non-"press" event.

12. The system of claim 10, wherein the non-sponsored post comprises one or more of messages.

13. The system of claim 10, wherein the communications network is the Internet.

14. The system of claim 10, wherein each of the one or more web pages comprise forum sites, fan sites, popular sites, enthusiast sites, online communities, message forums, user forums, or popular forums.

15. The system of claim 10, wherein the distribution system is further configured to generate user profiles from the monitored user data or user activity at one or more of the web pages on which the sponsored posts are placed.

16. The system of claim 10, wherein the user activity at one or more of the web pages comprises one or more of non-sponsored posts, reads of sponsored posts, or searches at one or more of the web pages on which the sponsored posts are placed.

17. The system of claim 10, wherein the sponsored post further comprises text.

18. The system of claim 10, wherein the sponsored post is displayed with a background color or another distinguishing feature to denote it as being different from the non-sponsored posts.

* * * * *

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS</u>

**Case Number:** <u>23-1392</u>

**Short Case Caption:** <u>Integrated Advertising Labs, LLC v. Revcontent, LLC</u>

> **Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

☑ the filing has been prepared using a proportionally-spaced typeface and includes <u>7,991</u> words.

☐ the filing has been prepared using a monospaced typeface and includes _____ lines of text.

☐ the filing contains _____ pages / _____ words / _____ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. _____).

Date: <u>03/14/2023</u>          Signature: <u>/s/ Justin B. Kimble</u>

                                          Name: <u>Justin B. Kimble</u>